## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS



|  |  |
|---|---|
| AMERICAN EXPRESS FINANCIAL ADVISORS, INC., | ) |
|  | ) |
|  | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) **Civil Action No.** |
| v. | ) |
|  | ) |
| NEIL H. GENDREAU, | ) |
|  | ) **04-40221** |
| Defendant. | ) |
|  | ) |

FILED
IN CLERKS OFFICE

2004 OCT 27  P 3: 02

U.S. DISTRICT COURT
DISTRICT OF MASS

RECEIPT #
AMOUNT $
SUMMONS ISSUED
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK
DATE

### COMPLAINT

Plaintiff American Express Financial Advisors, Inc. ("AEFA" or "American Express"), for its Complaint against Defendant Neil H. Gendreau ("Gendreau"), complains and alleges as follows:

### JURISDICTION AND VENUE

1.      This Court has personal jurisdiction over Defendant Gendreau in that Gendreau resides in Boylston, Massachusetts, and does business in Shrewsbury, Massachusetts, and the surrounding area. Venue also is proper in this Court because of Gendreau's residence and business activities in and around this District.

2.      This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332, by reason of the diversity of citizenship of the parties and that, without the granting of injunctive relief, AEFA will suffer irreparable harm and damages in an amount in excess of $75,000, exclusive of interest and costs. Plaintiff AEFA is a Delaware corporation with its principal place of business in Minneapolis, Minnesota. This Court further has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1338 and 15 U.S.C. § 1121 because portions of this action arise under the Trademark Act of 1946 as amended, 15 U.S.C. § 1051, *et seq.* (also referred to herein as the "Lanham Act").

## PARTIES

3.     Plaintiff AEFA provides a variety of financial services to persons and entities nationwide (AEFA formerly was named IDS Financial Services Inc.). AEFA is a subsidiary of American Express Financial Corporation, a Delaware corporation with its principal place of business in Minneapolis, Minnesota.

4.     Defendant Gendreau began his relationship with AEFA on or about January 5, 1994, and became an affiliated financial advisor on January 4, 1995. Gendreau worked out of AEFA's Shrewsbury office.

## FACTUAL ALLEGATIONS

### Gendreau's Affiliation with AEFA

5.     Before joining AEFA, Gendreau had no experience working in the financial services industry and had just graduated from college.

6.     Upon Gendreau's appointment as an advisor with AEFA, on or about January 5, 1994, and as a condition of his employment, training and relationship with AEFA, Gendreau signed the Personal Financial Planner's Agreements that controlled the terms of his relationship with AEFA.

7.     In reliance on Gendreau's initial promises, AEFA trained him at significant expense. When Gendreau joined AEFA, he was enrolled in AEFA's comprehensive training program, which included a two week session at the American Express training facility at Chaska, Minnesota. Thereafter, Gendreau also was assigned to work under the supervision of an experienced AEFA Personal Financial Advisor. This training enabled Gendreau to become an AEFA financial advisor.

8.     For approximately his first year with AEFA, after completing the training provided and receiving the appropriate licensing with AEFA's assistance, Gendreau was an AEFA employee, receiving a salary and expense allowance to support him while he learned the business and built a client

2

base to work with for AEFA. After his first year, Gendreau became an independent contractor affiliated with AEFA.

9.     On or about December 15, 1999, Gendreau transformed his affiliation with AEFA from that of independent contractor to a franchisee when he executed the American Express Financial Advisors Inc. Independent Advisor Business Franchise Agreement ("Gendreau Franchise Agreement"). Under the terms of the Franchise Agreement, a copy of which is attached as Exhibit A, Gendreau was entitled to establish and operate an Independent Financial Advisor Business for AEFA. The Franchise Agreement contained a three-(3) year term, subject to automatic renewal upon the satisfaction of certain designated conditions.

10.     The Gendreau Franchise Agreement also required Gendreau, upon termination of his affiliation with AEFA, to return confidential and proprietary business records, including the records of the clients he served on behalf of AEFA, and to refrain, for a one-year period after his termination, from soliciting and diverting investment and insurance business of AEFA clients with whom he had worked or learned of while associated with AEFA.

11.     The Gendreau Franchise Agreement contained an Addendum 3-R (Rollout) Restrictive Covenant Addendum ("Gendreau Addendum 3-R"), which Gendreau also executed on December 15, 1999. According to the Gendreau Addendum 3-R, AEFA specifically agreed to forbear from the enforcement of certain of its designated rights under the Franchise Agreement if Gendreau satisfied certain conditions at the termination of his affiliation.

12.     The Franchise Agreement and Addendum 3-R, described below, executed by Gendreau are designed to protect AEFA's reasonable expectations in the continued confidentiality of their client information, client goodwill, and client relationships, all of which AEFA entrusted to Gendreau. The contracts also protect AEFA's clients from violations of their privacy and misuse of their confidential

financial information by former representatives. The contracts clearly set forth the expectations and conditions that must be followed upon the termination of affiliation with AEFA.

13.    After Gendreau became an AEFA financial advisor, AEFA assisted him in developing and expanding his practice by providing him with AEFA client accounts, client referrals and reassignments of AEFA client accounts.

14.    AEFA also made available to Gendreau ongoing training and education, at AEFA's expense, in investment planning methods and procedures and new and more sophisticated investment techniques.

15.    AEFA also authorized Gendreau to use the AEFA and American Express trade names, marks, and logos. In the financial services field, name recognition and identification with a strong, stable and well-known company have great importance and value.

16.    AEFA provided Gendreau with sales, research, and promotional support through American Express' network of financial professionals.

17.    By virtue of his affiliation with AEFA, Gendreau also gained access to AEFA's confidential books and records, including the identity, addresses, and account information of numerous AEFA clients whose accounts he was assigned.

18.    Through his affiliation with AEFA as a financial advisor, Gendreau worked one-on-one with clients and was encouraged by AEFA, as part of its long-term strategy, to build valuable and lasting financial planning relationships with those clients.

### Gendreau's Contractual Relations with AEFA

19.    Due to the benefit of the relationships, backing, and training provided by AEFA, and the critical nature of the information provided, AEFA requires each financial advisor execute contracts designed to protect that information.

4

20.     AEFA explicitly sets forth the protections of its Confidential Information in Section 10 of

the Franchise Agreement, stating:

> 10.     <u>CONFIDENTIAL INFORMATION.</u>  Independent Advisor has had and/or
> may have access to AEFA trade secrets and confidential information that
> Independent Advisor agrees has great value to AEFA.  Independent Advisor
> agrees that because of such access, Independent Advisor is in a position of trust
> and confidence with respect to this information.  To protect client confidentiality,
> AEFA goodwill, trade secrets, and other proprietary and confidential business
> information, Independent Advisor agrees to not, during the term of this
> Agreement or thereafter, except as permitted under Section 14 regarding transfers
> of the Independent Financial Advisor Business, communicate, divulge, or use for
> himself or herself except pursuant to the System, or for the benefit of any other
> person, partnership, association, or corporation any confidential information, or
> trade secrets, including, without limitation, Client names, addresses and data and
> know-how concerning the methods of operation of the System and the business
> franchised under which may be communicated to Independent Advisor or of
> which Independent Advisor may be apprised by virtue of Independent Advisor's
> operation under the terms of this Agreement.  Independent Advisor also shall not
> reveal any information about potential clients to whom a presentation has been
> made by any Independent Advisor who might reasonably be expected to do
> business with AEFA.  Independent Advisor agrees to divulge such confidential
> information only to such of his or her employees as must have access to it in order
> to operate the Independent Financial Advisor Business.  Except as otherwise
> permitted in Section 19, Independent Advisor agrees that, without limitation,
> Client names, addresses, data and other personal and financial information
> recorded in Client records are confidential.  Confidential information includes
> compilations and lists of such Client information even if of otherwise public
> information if such compilations or lists were the result of substantial effort, time
> and/or money expended pursuant to the System.  Independent Advisor further
> agrees to use this confidential information only in furtherance of this Agreement
> or in accordance with the Manuals and for no other purpose.  Confidential
> information does not include information which is generally known outside of
> AEFA other than as a result of a disclosure by Independent Advisor, Independent
> Advisor's agents or representatives, or any other person or entity in breach of any
> contractual, legal or fiduciary obligation of confidentiality to AEFA or to any
> other person or entity with respect to such information.

21.     AEFA also enters into post-affiliation restrictive covenants, as set forth in Section 19,

with its financial advisors:

> 19.     <u>COVENANTS.</u>  . . . .
>
> •     Independent Advisor specifically acknowledges that, pursuant to this
> Agreement, Independent Advisor will receive additional substantive rights as a

franchisee of AEFA. Independent Advisor also recognizes he or she will receive valuable and confidential information, including, without limitation, information regarding the operational, sales, promotional, and marketing methods and techniques of AEFA and the System. In recognition of and in consideration for these and other benefits, to protect the confidentiality of AEFA's Client information and to protect AEFA's goodwill, Independent Advisor covenants that (a) during the term of this Agreement and (b) for one year after the expiration or termination of this Agreement in the geographic area within which Independent Advisor operates or operated, Independent Advisor agrees to not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person or entity:

a.          (1)    Encourage, assist, participate, induce, or attempt to induce any Client or prospective business or client to terminate an agreement with AEFA, AEFA's affiliates, Issuers, or any financial advisor business under the System;

(2)    Encourage, assist, participate, induce, or attempt to induce any Client or prospective business or client to terminate, surrender, redeem, or cancel any action related to Products & Services acquired or ordered from or through AEFA, AEFA's affiliates, Issuers, or any financial advisor business under the System, except as provided in the Manuals or with AEFA's written approval and consent;

(3)    Solicit any Clients that Independent Advisor contacted, serviced or learned about while operating under this Agreement to open an account other than an AEFA account or to sell any investment, financial or insurance products or services other than through AEFA with AEFA's written approval and consent; or

(4)    Open an account for, or provide or offer to provide any investment, financial, or insurance products or services to any Clients that Independent Advisor contacted, serviced or learned about while operating under this Agreement;

b.          (1)    Employ, or retain as an independent contractor, any person who is at that time employed by AEFA or associated with AEFA as an independent contractor or agent or by any other Independent Advisor of AEFA, or otherwise directly or indirectly induce such person to leave his or her employment, association or independent contractor relationship with AEFA; or

(2)    Disparage AEFA, its affiliates, employees, advisors, and Products and Services.

For purposes of this Section, an "**Issuer**" is a company or entity that issues Products & Services distributed or offered by AEFA, AEFA's affiliates, or AEFA as the agent of another company.

●      Independent Advisor understands and acknowledges that if Independent Advisor terminates this Agreement, AEFA shall have the right to continue to actively offer all Products and Services to Clients the Independent Advisor serviced at AEFA.

●      Upon expiration of this Agreement, Independent Advisor may have a right to revenue based on past Products & Services that have been purchased by Clients through the Independent Financial Advisor Business, as provided for in the Manuals, or with AEFA's approval and consent.

●      Independent Advisor understands and acknowledges that AEFA shall have the right, in its sole discretion, to reduce the scope or restrictiveness of any covenant set forth above, or any portion thereof, without Independent Advisor's consent, effective immediately upon receipt by Independent Advisor of written notice thereof; and Independent Advisor agrees that it shall comply forthwith with any covenant as so modified, which shall be fully enforceable notwithstanding the provides of Section 24 hereof. Independent Advisor agrees and understands that AEFA's exercise of such discretion, as to the Independent Advisor who is the subject of this Agreement, or of any other Independent Advisor, shall not constitute a waiver of any of AEFA's right to enforce this or any other agreements.

●      Independent Advisor expressly agrees that the existence of any claims it may have against AEFA, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by AEFA of the covenants of this Section 19.

. . .

●      Nothing in this Agreement will prevent Independent Advisor from engaging in a competitive business consistent with the covenants in this Section 19, including serving as a financial advisor or consultant affiliated with another firm, after this Agreement expires or is terminated. Nothing in this Agreement will prohibit Independent Advisor from soliciting and servicing any Clients that Independent Advisor contacted, serviced or learned about while operating under and agreement with AEFA more than one year after this Agreement terminates or expires, provided that Independent Advisor makes no use directly or indirectly of any confidential or trade secret information, including but not limited to client files and lists obtained from AEFA.

●      Upon Independent Advisor's request, AEFA may in its complete discretion release Independent Advisor from any provisions in this Section 19, in whole or in part, for example to exclude specified family members from the

provisions in this Section 19.  Such requests by Independent Advisor must be in writing and any release to Independent Advisor must be in writing and signed by an officer of AEFA.  Any such release shall not act as a waiver of any of AEFA's rights under this Agreement as such rights apply to any other Independent Advisor.

• AEFA agrees that clients who Independent Advisor purchased a direct or indirect interest in or obtained outside of the AEFA System and transferred to AEFA are not subject to Section 19 (a)(1), (2), (3) and (4).

22.    In Section 18, the Franchise Agreement also sets certain obligations upon the financial advisors, including:

18.    <u>OBLIGATIONS UPON TERMINATION OR EXPIRATION</u>

Upon termination or expiration of this Agreement, all rights granted hereunder to Independent Advisor shall forthwith terminate although Independent Advisor's duties under this Agreement shall continue as specified in this Section 18, and:

• Independent Advisor agrees to *immediate cease to operate the Independent Financial Advisor Business*, and Independent Advisor agrees to not thereafter, direct or indirectly, represent to the public or hold himself or herself out as a present or former franchisee of AEFA.

• Independent Advisor agrees to *immediately and permanently cease to use*, in any manner whatsoever, any *confidential methods, procedures, and techniques* associated with the System; the Proprietary Marks; and the distinctive forms, slogans, signs, symbols, and devices associated with the System.  In particular, Independent Advisor agrees to cease to use, without limitation, *all signs, advertising materials, displays, stationery, forms, products, and any other articles which display the Proprietary Marks*.

• Independent Advisor agrees to *immediately cease using any telephone number* used by Independent Advisor in the Independent Financial Advisor Business.  AEFA agrees to immediately cease using the telephone number unless the telephone number is for an Area Office or other AEFA-leased space.  At AEFA's expense, AEFA reserves the right to add a forwarding message to any such telephone number, indicating the telephone number for AEFA and for the departing Independent Advisor.

• Independent Advisor agrees, in the event it continues to operate or subsequently begins to operate any other business, *not to use any reproduction, counterfeit, copy, or colorable imitation of the Proprietary Marks*, either in connection with such other business or the promotion thereof, which, in AEFA's sole discretion, is likely to cause confusion, mistake, or deception, or which, in

AEFA's sole discretion, is likely to dilute AEFA's rights in and to the Proprietary Marks. . . .

- Independent Advisor agrees to ***immediately deliver*** to AEFA the Manuals and all other original records, including most recent financial plans and recommendations, computer databases and files, correspondence, and instructions containing confidential information relating to the System (and any copies thereof, including electronic or computer generated copies, even if such copies were made in violation of this Agreement), all of which are acknowledged to be the property of AEFA. ***To satisfy regulatory requirements, Independent Advisor agrees to immediately deliver to AEFA the originals of all Client records, including records containing Client lists and/or information and transactions belonging to AEFA***, unless Independent Advisor transfers the Independent Financial Advisor Business as provided in Section 14.

- Independent Advisor agrees to immediately (i) discontinue use of any computer software developed for the System or AEFA, (ii) deliver to AEFA all such computer software in Independent Advisor's possession or control and any copies made of such computer software, (iii) erase or destroy any of such computer software contained in the computers or data storage devices under the control of Independent Advisor, and (iv) remove such computer software from any other computer programs or software in Independent Advisor's possession or control that incorporates or used such computer software in whole or in part.

- Independent Advisor agrees to comply with the covenants contained in Section 19 of this Agreement.

(Emphasis Added)

23.     The Franchise Agreement contains a Minnesota choice of law provision in Section 26.

24.     Finally, Gendreau agreed in Section 19 of the Franchise Agreement, that AEFA would be entitled to injunctive relief for any violation of the Franchise Agreement:

- Independent Advisor agrees that to the fullest extent permitted by applicable law, AEFA will be entitled to injunctive relief from a court or NASD arbitration should Independent Advisor violate any of the covenants in this Section 19 and in Section 10 and 18 (the "Sections") of this Agreement. Independent Advisor recognizes that AEFA's remedies solely at law will be inadequate, that AEFA will be irreparably harmed by violations of the provisions in the Sections, and thus that AEFA will be entitled to injunctive relief to prevent future violations of the provision sin the Sections until a full and final resolution of any dispute may be had on the merits. If Independent Advisor has signed Addendum No. 3 but fails to comply with it, AEFA shall be entitled to immediate injunctive relief to enforce at AEFA's option, the covenants in Section 19, including 19(a)(1), (2), (3), and (4) and/or of Addendum 3. AEFA has the right to

seek such injunctive relief in a court of competent jurisdiction, which relief shall extend until, and if, a decision on the merits of the same issue is rendered by an NASD arbitration panel. Such election by AEFA to see judicial relief shall not waive any rights AEFA may have to arbitrate disputes arising under this Agreement, including rights to obtain damages from Independent Advisor in arbitration for violations of this Agreement.

25.     Addendum 3-R provides that financial advisors can qualify to be released from certain of

the post-termination covenants (relating to soliciting and servicing clients) contained in the Franchise

Agreement upon the satisfaction of certain requirements set forth in Section C of Addendum 3-R:

C.     <u>Terms of Forbearance Agreement</u>. As a mitigation of this irreparable harm, AEFA agrees to forbear from enforcement of its rights against Advisor under the Restrictive Covenant if Advisor timely and fully complies with the following conditions:

1.     <u>Two Weeks' Notice</u>. Advisor must provide AEFA with at least two-weeks' written notice of the termination of the Franchise Agreement ("Termination Notice"), with a copy to be delivered personally to the Advisor's Group Vice President ("GVP") designate, or if no designate is timely provided, to the Advisor's immediate AEFA leader, and, in either event, a copy, by facsimile or overnight mail, to AEFA Corporate Office, Licensing Unit.

2.     As of the date of the Termination Notice, the Advisor must:

(a)     <u>Length of Service</u>. Have served at least six consecutive years as an advisor for AEFA.

(b)     <u>Compliance Obligations</u>. Not be subject to discipline as a result of a violation of the Compliance Rules as defined in Section 3 of the Franchise Agreement ("Compliance Rules"). This discipline may include, but not be limited to, suspension, strict supervision, involuntary termination or otherwise "permitted to resign".

3.     <u>Return of Complete Files and Proprietary Materials</u>. Within five (5) business days after the date of the Termination Notice (including the date of such Notice), Advisor must return all original client files and AEFA proprietary materials, as defined in the Franchise Agreement, to the Advisor's GVP designate or, if no designation is provided by AEFA within five (5) business days, to the Advisor's immediate AEFA leader.

To the extent consistent with privacy laws and policies, in order to allow Advisor to service portable products and to fulfill compliance duties, Advisor may retain copies of consolidated statements, financial plans, tax returns, advisor notes,

insurance policies, AEFA or AEFA approved product applications and trust or other legal documents for the clients Advisor serviced at AEFA, but may not retain copies of any AEFA/American Express Company proprietary materials, or AEFA/American Express Company trademarked, or copyrighted materials, software or property, as defined in the Franchise Agreement.

4.     Franchise Agreement Compliance.  On and before the effective date of termination of the Franchise Agreement between AEFA and Advisor, Advisor shall comply fully with Section 18 (Obligations upon Termination or Expiration) of the Franchise Agreement.

26.     While not imposing undue hardships on Gendreau, the covenants summarized above protect AEFA's legitimate interests in their proprietary marks and information.  These covenants also preserve AEFA's interests in their long-term relationships with clients and client goodwill by protecting AEFA from the deflection of clients by former agents by means of the opportunities which AEFA gave them while allowing their former agents the opportunity to compete upon satisfying certain minimal obligations.  AEFA pays their agents to work hard for the AEFA clients assigned to them and to develop good relationships with those clients.  The agents thus embody AEFA's client goodwill and would have an unfair competitive advantage if permitted to use that goodwill against AEFA.

27.     The covenants in the Franchise Agreement also protect AEFA's clients' privacy, which AEFA has promised to preserve.  The covenants provide AEFA with the means of ensuring that agents preserve the confidentiality of AEFA client information.

### Gendreau's Violation of His
### Franchise Agreement and Acts of Unfair Competition

28.     As a result of the foregoing, and as a result of Gendreau's efforts for which AEFA paid him, Gendreau became a successful financial advisor and had become one of AEFA's "Platinum" team advisors, a title reserved for only the very elite of AEFA's financial advisors.

29.     As of October 8, 2004, Gendreau had account responsibility for approximately one hundred and eighty (180) American Express client groups, representing approximately $20.4 million dollars of assets invested through AEFA. To date in 2004, Gendreau had earned excess of $160,000.

30.     Gendreau worked with fellow AEFA financial advisor, Cheryl Crouse ("Crouse"), in AEFA's Shrewsbury office, where they were the only two financial advisors.

31.     In his position as a financial advisor with AEFA, Gendreau had access to hundreds of AEFA's client files. These files are AEFA's property and contain AEFA's confidential information. These files also contain confidential client information which AEFA clients have entrusted to AEFA and which AEFA promised to protect and which AEFA has statutory obligations to protect. While Gendreau was entitled to use these client records to perform his duties as an AEFA, financial advisor, he had no authorization or right to retain such records or copies of such records for personal use and was specifically required by his Franchise Agreements to return such records and copies thereof to AEFA upon terminating his affiliation with AEFA.

32.     On October 8, 2004, Gendreau became registered with another broker-dealer, NFP Securities, Inc. ("NFP"), but did not immediately terminate his affiliate with AEFA. Gendreau did not provide AEFA with notice of his intent to terminate his affiliation with AEFA until October 18, 2004.

33.     NFP is a direct competitor of AEFA in the provision of financial services.

34.     Upon information and belief, as part of his scheme to divert AEFA clients and their investments from AEFA, Gendreau wrongfully and without authorization has retained and refuses to return any of the files and records of AEFA's clients, including copies of various confidential lists of the AEFA clients assigned to them. These lists include client names, addresses, telephone numbers, and all investments currently in each client's account.

35.    When Gendreau kept the AEFA client records, he knew that AEFA would be at a significant disadvantage in its ability to continue servicing the affected clients and that his actions would sabotage AEFA's relationships with those clients.

36.    Gendreau retained these confidential and proprietary AEFA documents to be in a better position to solicit these AEFA's clients' business after he left, in violation of his contractual duties.

37.    Representatives of AEFA sought to obtain the records and files of their clients from Gendreau. Most recently, on October 20, 2004, a representative of AEFA contacted both Gendreau who refused to return any files, stating it would take "court order" to make him return the files and documents.

38.    To date, Gendreau has retained and misappropriated confidential AEFA client records and information, and other of AEFA's confidential and proprietary information, in direct contradiction of his obligation to return such information upon the termination of his affiliation with AEFA. Gendreau's retention of AEFA client records and information directly violates AEFA's client privacy policies.

39.    To date, Gendreau continues to use the same telephone and facsimile numbers that he used while associated with AEFA, and has not changed the telephone number, or disconnected it, as required by his contracts with AEFA. This number is listed in telephone directories under AEFA's name, and persons calling this number expecting to reach AEFA will instead reach Gendreau.

40.    To date, Gendreau continues to use AEFA's signs in affiliation with his business and has not removed the signs as required by his contract.

41.    Upon information and belief, Gendreau has converted and attempted to convert many AEFA client accounts, has misappropriated many client files and records, and has or intends to damage

13

many relationships between AEFA and its clients. There remain, however, many client relationships they have not yet destroyed and millions of dollars of client assets they have not yet diverted.

42.    These actions by Gendreau against AEFA violate the contracts that Gendreau entered into with AEFA. These actions also constitute violations of the Lanham Act, breaches of the fiduciary duty owed to AEFA, misappropriation of AEFA's confidential and trade secret information, and other tortious conduct against AEFA.

## COUNT I
## BREACH OF CONTRACT

43.    AEFA repeats and realleges Paragraphs 1 through 42 of this Complaint as if fully set forth herein.

44.    Gendreau has violated and threatens to violate the provisions of Section 18 of his Franchise Agreement by:

(a)    Continuing to use AEFA's Confidential Information, confidential methods, procedures, and techniques;

(b)    Using the telephone number and facsimile number used in the Independent Financial Advisor Business while affiliated with AEFA; and

(c)    Retaining and refusing to return all client records.

45.    Gendreau further has violated and threatens to violate Section 19 of his Franchise Agreement by soliciting or assisting others in soliciting AEFA clients to his new company.

46.    As a direct and proximate result of Gendreau's breach and threatened breach of the Gendreau Franchise Agreement, AEFA has suffered damages in excess of $75,000 and will continue to suffer said injury, loss, harm or damage, unless and until Gendreau is restrained from his unlawful conduct.

47.    As a direct and proximate result of Gendreau's breach of the Gendreau Franchise Agreement, AEFA has suffered additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation.

## COUNT II
## MISAPPROPRIATION OF CONFIDENTIAL INFORMATION –

48.    AEFA repeats and realleges Paragraphs 1 through 42 of this Complaint as if fully set forth herein.

49.    AEFA has protectable confidential information in its client names, addresses, and data, including suitability information, investments and investment history, financial plans, and financial goal information, prospective client names, addresses, and data, and know-how concerning the methods of operation, client lists and other financial information.

50.    AEFA derives economic value from this confidential information, due to it not being generally known to other persons who could obtain economic value from its disclosure or use.

51.    AEFA has made reasonable efforts under the circumstances to maintain the secrecy and confidentiality of its confidential information.

52.    Gendreau has misappropriated AEFA's confidential information and, on information and belief, is using this information to compete with AEFA and to injure AEFA's relationships with its clients.

53.    Gendreau has misappropriated AEFA's client files through this refusal to return those file and, through such actions, is injuring and attempting to injury AEFA's relationships with its clients.

54.    AEFA has been injured and is continuing to be injured by Gendreau's misappropriation of its confidential information and retention of its client files.

## COUNT III
## VIOLATION OF § 43(a) OF THE LANHAM ACT

55.    AEFA repeats and realleges Paragraphs 1 through 42 of this Complaint as if fully set forth herein.

56.    Section 43(a) of the Lanham Act creates civil liability for:

> Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which
>
> (a) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (b) in commercial advertising or promotion, misrepresented the nature . . . of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

57.    AEFA has commercially valuable, recognizable and registered names and marks.

58.    By retaining telephone numbers associated by the investing public with AEFA, and thereby misrepresenting the nature of his relationship with AEFA, Gendreau has made and continues to make misrepresentations and false representations and descriptions of fact regarding his obligations to AEFA.

59.    The public is likely to be confused and mislead by Gendreau's misleading and false statements.

60.    Section 43(a) has been violated by the Gendreau's false, implied representations regarding AEFA.

70.    Gendreau's false and misleading representations were made willfully and intentionally.

71.    Gendreau's false and misleading representations cause injury to AEFA, and his activities have an effect on interstate commerce.

16

## COUNT IV
## BREACH OF FIDUCIARY DUTY

72.    AEFA repeats and realleges Paragraphs 1 through 42 of this Complaint as if fully set forth herein.

73.    As an AEFA financial advisor who was allowed access to AEFA's confidential information, Gendreau owed and owes AEFA certain fiduciary duties.

74.    Among these fiduciary duties are the duty to preserve AEFA's confidential information, the duty not to destroy this information, and the duty not to use this confidential information in ways adverse to AEFA's interests.

75.    Gendreau breached these duties while affiliated with AEFA by, among other things, soliciting, diverting, and attempting to divert AEFA clients he was working with, on behalf of AEFA, for his own benefit; converting AEFA's confidential information and trade secrets for his personal use; and by using AEFA's confidential information against AEFA's best interests.

76.    AEFA has been injured and is continuing to be injured by Gendreau's breaches.

## COUNT V
## CONVERSION OF CLIENT FILES

77.    AEFA repeats and realleges Paragraphs 1 through 42 of this Complaint as if fully set forth herein.

78.    Gendreau has wrongfully and without authorization retained possession, custody, or control over certain AEFA client records and files.

79.    AEFA is the rightful owner of such AEFA client records and files.

80.    AEFA's right to possession of its property is immediate, absolute, and unconditional.

81.    AEFA has been injured and is continuing to be injured by Gendreau's misappropriation.

## COUNT VI
## UNFAIR COMPETITION

82.    AEFA repeats and realleges Paragraphs 1 through 42 of this Complaint as if fully set forth herein.

83.    Gendreau's actions constitute unfair competition.

84.    As a result of Gendreau's unlawful actions, AEFA has been injured and will continue to be injured unless and until Gendreau is restrained from his unlawful conduct.

## COUNT VII
## INJUNCTIVE RELIEF

85.    AEFA repeats and realleges the allegations of paragraphs 1 through 42 of this Complaint as if fully set forth herein.

86.    Under the terms of the Gendreau Franchise Agreement, Gendreau was obligated to, among other things:

(a)    Cease representing himself and holding himself out as a franchisee of AEFA;

(b)    Cease using AEFA's Confidential Information, confidential methods, procedures, and techniques;

(c)    Cease using the telephone number and facsimile number used in the Independent Financial Advisor Business while affiliated with AEFA;

(d)    Return all client records; and

(e)    Not solicit or assist others in soliciting AEFA's clients to his new venture for a period of one year following the termination of their affiliation with AEFA.

87.    When he terminated his affiliation with AEFA, Gendreau was reminded, by letter, of his obligations under the Franchise Agreement.

88.    Despite his execution of the AEFA Franchise Agreement and knowledge of his obligations thereunder, Gendreau has engaged in breaches of his Franchise Agreement to further his own interests in direct competition with AEFA.

89.    In light of his ongoing actions and demonstrated unwillingness to comply with the reasonable requests of AEFA, and his ongoing retention of confidential client information, it is highly likely that Gendreau has solicited numerous clients both prior to and subsequent to his departure and is in the process of inducing these customers to discontinue doing business with AEFA.

90.    If Gendreau is permitted to continue to keep AEFA client information, solicit clients, and retain other AEFA property while continuing to advertise that he is affiliated with AEFA, such conduct will cause irreparable harm.

91.    AEFA is entitled to preliminary and permanent injunctive relief ordering Gendreau to discontinue his current actions, return AEFA's property and client files, cease advertising himself as affiliated with AEFA, and cease solicitation of AEFA customers.

**WHEREFORE**, AEFA respectfully requests that the Court grant the following relief:

A.    Direct Gendreau to:

(i)    Cease representing himself and holding himself out, as a franchisee of AEFA;

(ii)    Cease using AEFA's Confidential Information, confidential methods, procedures, and techniques; and

(iii)    Disconnect all telephone numbers used while affiliated with AEFA, including facsimile numbers.

B.    Direct Gendreau to immediately return all originals and copies of AEFA documents, including all AEFA client records, financial plans, financial inventories and AEFA computer software, in Defendants' possession or control.

C.    Enjoin Gendreau, his agents, servants, employees, officers, attorneys, successors, and assigns, and all persons, firms, and corporations acting in connection or participation with them or on their behalf, from:

(i)    For a period of one year, directly or indirectly, soliciting any further business from any AEFA client whom Gendreau served or whose name became known to Gendreau while Gendreau represented AEFA;

(ii)    Revealing or disclosing in any manner information contained in the records or files of AEFA, including the names, addresses, or any financial information of any AEFA client whom Gendreau served or whose name became known to Gendreau while he represented AEFA;

(iii)    Encouraging or inducing any AEFA client whom Gendreau served or whose names became known to Gendreau while he represented AEFA, who has not already transferred their accounts from AEFA to terminate any agreement or relationship with AEFA or to withdraw any investment or account currently with AEFA for one year.

F.    Direct Gendreau to provide AEFA with an accounting of all fees and commissions received by Gendreau, directly or indirectly, after his resignation from AEFA, from any AEFA client whom either Gendreau served or whose name became known to him while he represented AEFA;

G.    Direct Gendreau to segregate all receipts from, and to maintain separate accounts for all services performed for and products sold to, any person who is or was an AEFA client whom either Gendreau served or whose name became known to Gendreau while he represented AEFA;

20

H.  Grant AEFA compensatory damages in excess of seventy-five thousand dollars ($75,000.00).

I.  Award punitive damages as the Court deems appropriate;

J.  Award of attorneys' fees and costs; and

K.  Grant such other relief as the Court deems appropriate.

Respectfully submitted,
AMERICAN EXPRESS FINANCIAL
ADVISORS, INC.

By its attorneys,

Anthony A. Scibelli (BBO #556507)
C. Alex Hahn (BBO #634133)
Scibelli and Whiteley, LLP
Old City Hall
45 School Street, 3rd Floor
Boston, MA 02108
(617) 227-5725

-and-

Edward B. Magarian (MN No. 49219)
Todd W. Schnell (MN No. 252256)
DORSEY & WHITNEY, LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402
(612) 340-2600

DATED:  October 27 , 2004

JS-44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

*American Express Financial Advisors, Inc.*

**DEFENDANTS**

*Neil H. Gendreau.*

FILED

**(b)** County of Residence of First Listed Plaintiff **Hennepin, MN**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed _____ (IN U.S. PLAINTIFF CASES ONLY)
NOTE.   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

2004 OCT 27  P 3: 02

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

*C. Alex Hahn, Esq.*
*Anthony A. Scibelli, Esq.*
*Scibelli and Whiteley, LLP*
*Old City Hall, 45 School Street, 3rd Floor*
*Boston, MA 02108          (617)227-5725*

Attorneys (If Known)

# 04-40221

DISTRICT OF MASS



## II. BASIS OF JURISDICTION   (Place an-X- in One Box Only)

_ 1   U.S. Government Plaintiff

_ 3   Federal Question
(U.S. Government Not a Party)

_ 2   U.S. Government Defendant

X 4   Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an aX "in One Box for Plaintiff
(For Diversity Cases Only)                      and One Box for Defendant)

|  | DEF |  | DEF |
|---|---|---|---|
| Citizen of This State _ 1 | X1 | Incorporated or Principal Place _ 4 of Business In This State | _ 4 |
| Citizen of Another State _ 2 | _ 2 | Incorporated *and* Principal Place X 5 of Business In Another State | _ 5 |
| Citizen or Subject of a _ 3 Foreign Country | _ 3 | Foreign Nation _ 6 | _ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALT | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| _ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | _ 610 Agriculture | _ 422 Appeal 28 USC 158 | _ 400 State Reap portionment |
| _ 120 Marine n | _ 310 Airplane | _ 362 Personal Injury — | _ 620 Other Food & Drug | _ 423 Withdrawal 28 USC | _ 410 Antitrust |
| _ 130 Miller Act | _ 315 Airplane Product | Med. Malpractice | _ 625 Drug Related Seizure of | 157 | _ 430 Banks and Banking |
| _ 140 Negotiable Instrument | Liability | _ 365 Personal Injury — | Property 21 USC | | _ 450 Commerce/ICC Rates/etc. |
| _ 150 Recovery of Overpayment | _ 320 Assault, Libel & | Product Liability | _ 630 Liquor Laws n | | _ 460 Deportation |
| & Enforcement of Judgment | Slander | _ 368 Asbestos Personal | _ 640 R.R. & Truck n | **PROPERTY RIGHTS** | _ 470 Racketeer Influenced and |
| _ 151 Medicare Act | _ 330 Federal Employers' | Injury Product Liability | _ 650 Airline Regs. | _ 820 Copyrights | Corrupt Organizations |
| _ 152 Recovery of Defaulted | Liability | | _ 660 Occupational Safety /Health | _ 830 Patent | _ 810 Selective Service |
| Student Loans (Excl. Veterans) C | _ 340 Marine | **PERSONAL PROPERTY** | n    _ 690 Other | _ 840 Trademark | _ 850 Securities/Commodities/ |
| _ 153 Recovery of Overpayment | | _ 370 Other Fraud Liability | | | Exchange |
| of Veteran's Benefits | _ 345 Marine Product | _ 371 Truth in Lending n | | | _ 875 Customer Challenge 12 USC |
| _ 160 Stockholders' S suits | Liability | _ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | 3410 |
| X190 Other Contract | _ 350 M otor V chicle | Property Damage | _ 710 Fair Labor Standards Act | _ 861 HIA(1395ff) | _ 891 Agricultural Acts |
| 1 95 Contract Product Liability | _ 355 M otor V chicle | _ 385 Property Damage | _ 720 Labor/Mgmt. Relations | _ 862 Black Lung (923) | _ 892 Economic Stabilization Act |
| | Product Liability | Product Liability | _ 730 LaborM gmt .Reporting & | _ 863 DIW C/DIW W (405 (g)) | _ 893 Environ mental Matters |
| | _ 360 Other Personal Injury | | Disclosure Act | _ 864 SSID Title XVI | _ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER** | _ 740 Railway Labor Act | _ 865 RSI(405(g)) | _ 895 Freedom of Information Act |
| _ 210 Land Condemnation | _ 441 Voting | _ 510 Motions to Vacate | _ 790 Other Labor Litigation | | _ 900 Appeal of Fee under Equal |
| _ 220 Foreclosure | _ 442 Employment | Sentence Habeas Corpus: | _ 791 Empl. Ret. Inc. Security | **FEDERAL TAX SUITS** | access to Justice |
| _ 230 Rent Lease & Ejectment | _ 443 Housing/ | _ 530 General | Act | _ 870 Taxes (U.S. Plaintiff or | _ 950 Constitutionality o f State |
| _ 240 Torts to Land | Accommodations n | _ 535 Death Penalty | | Defendant n) | Statutes |
| _ 245 Tort Product Liability | _ 444 Welfare | _ 540 Mandamus & Other n | | _ 871 IRS —Third P arty 26 | _ 890 Other Statutory Actions |
| _ 290 All Other Real Property | _ 440 Other Civil Rights | _ 550 Civil Rights | | USC 7609 | |
| | | _ 555 Prison Condition | | | |

## V. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

Transferred from                                      Appeal to
another district                                      District
Judge from

X 1   Original
Proceeding

1 -- 2   Removed from
State Court

-- 3   Remanded from
Appellate Court

-- 4   Reinstated or
Reopened

-- 5   (specify)

-- 6   Multidistrict
Litigation

-- 7   Magistrate
Judgment

## VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

*Jurisdiction is pursuant to 28 U.S.C. § 1332. This is an action for breach of contract, misappropriation of confidential information, and violations of 15 U.S.C. § 1125(a)*

## VII. REQUESTS IN COMPLAINT

_ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $ Excess of $75,000.00    CHECK YES only if demanded in complaint:
JURY DEMAND:    _ Yes   _X No

## VIII. RELATED CASE(S)   (See instructions):
IF ANY

JUDGE_____

DOCKET NUMBER_____

10/27/04
Date

SIGNATURE OF ATTORNEY OF RECORD

Receipt # _____ Amoun _____    Applying IFP _____    Judge _____    Mag.Judge _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY)

*American Express Financial Advisors, Inc. v. Neil H. Gendreau*

2. CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUITCODE LISTED ON THE CIVIL COVER SHEET.   (SEE LOCAL RULE 40.1(A)(1)).

|   |      |   |
|---|------|---|
| _ | I.   | 160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT. |
| _ | II.  | 195, 368, 400, 440, 441-444, 540, 550, 555,625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950. |
| X | III. | 110,120,130,140,151,190,210,230,240,245,290,310, 315, 320, 330, 340, 345, 350, 355, 360, 362,365, 370, 371, 380,385,450,891. |
| _ | IV.  | 220, 422, 423, 430, 460, 510, 530, 610, 620,630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900. |
| _ | V.   | 150, 152, 153. |

*Also complete A3 120 or AO 121 for patent, trademark or copyright cases

3. TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1 (G)). IF MORE THAN ONE PRIOR RELATED CASE HAS BEEN FILED IN THIS DISTRICT PLEASE INDICATE THE TITLE AND NUMBER OF THE FIRST FILED CASE IN THIS COURT.

4. HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS COURT?

YES        (NO)

5. DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE PUBLIC INTEREST?   (SEE 28 USC §2403)

YES        (NO)

IF SO, IS THE U.S.A. ORAN OFFICER, AGENT OR EMPLOYEE OF THE U.S. APARTY?

YES        NO

6. IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE 28 USC §2284?

YES        (NO)

7. DO ALL OF THE PARTIES IN THIS ACTION, EXCLUDING GOVERNMENTAL AGENCIES OF THE UNITED STATES AND THE COMMONWEALTH OF MASSACHUSETTS ("GOVERNMENTAL AGENCIES"), RESIDING IN MASSACHUSETTS RESIDE IN THE SAME DIVISION? - (SEE LOCAL RULE 40.1 (D)).

YES        (NO)

A. IF YES, IN WHICH DIVISION DO ALL OF THE NON-GOVERNMENTAL PARTIES RESIDE?

EASTERN DIVISION        CENTRAL DIVISION        WESTERN DIVISION

B. IF NO, IN WHICH DIVISION DO THE MAJORITY OF THE PLAINTIFFS OR THE ONLY PARTIES, EXCLUDING GOVERNMENTAL AGENCIES, RESIDING M MASSACHUSETTS RESIDE?

EASTERN DIVISION        (CENTRAL DIVISION)        WESTERN DIVISION

(PLEASE TYPE OR PRINT) ATTORNEY'S NAME    *Anthony A. Scibelli and C. Alex Hahn*

ADDRESS   *Old City Hall, 45 School Street, 3rd Floor, Boston, MA 02108*

TELEPHONE NO.    *617-227-5725*

(Cover sheet local.wpd -11/27/00)