**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| AMERICAN EXPRESS FINANCIAL ADVISORS, INC., <br><br> Plaintiff, <br><br> v. <br><br> NEIL H. GENDREAU, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No.

**04-40221**

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

Defendant Neil Gendreau ("Gendreau") claims he terminated his affiliation with American Express Financial Advisors, Inc. ("AEFA") on October 8, 2004. However, he did not bother to tell AEFA. Instead, he merely registered to do business with, and started doing business for, his new employer, NFP Securities, Inc.

AEFA did not learn of Gendreau's termination until almost a week later. When AEFA's local Field Vice President, Jack Henehan ("Henehan"), learned of Gendreau's career change, he contacted Gendreau and requested that he return all AEFA's property, including client files and other proprietary and confidential information, Gendreau refused. Indeed, on October 20, 2004, Gendreau told Henehan that he would not return any information, despite his contractual obligations to do so, until a court told him to do so, and to date has kept his word and AEFA's confidential client information. Henehan Decl., ¶ 23.

Gendreau's affiliation with AEFA was controlled by the American Express Financial Advisors Inc. Independent Advisor Business Franchise Agreement (the Gendreau "Franchise Agreement"), which clearly identified Gendreau's obligations upon his termination of that affiliation. Accordingly,

AEFA now requests this Court grant its motion and compel Gendreau to return that information that he has improperly retained and cease using AEFA's telephone numbers and other markings. AEFA further requests an injunction preventing Gendreau from improperly soliciting AEFA's clients in violation of his contractual obligation. By issuing the requested relief, the Court will preserve the *status quo* pending a hearing and decision before the National Association of Securities Dealers, Inc.[1]

## BACKGROUND

### Defendants' Affiliation with AEFA

From March of 2000, until he delivered notice of his resignation to AEFA on October 18, 2004, Gendreau was a franchisee of AEFA, working as financial advisors for AEFA in Shrewsbury, Massachusetts. Declaration of Jack Henehan ("Henehan Decl."), ¶¶ 6, 9. Prior to becoming a franchisee, Gendreau first had been an AEFA employee, and then an independent contractor, since

---

[1] Because the parties in this matter are members of, or affiliated with, the National Association of Securities Dealers ("NASD"), this motion is the one and only time this Court should have contact with this matter. Through this motion, AEFA seeks to preserve the status quo until this dispute is heard by an arbitration panel of the NASD. If, and only if, this Court enters injunctive relief, the NASD rules mandate that, no later than 15 days after an injunction is issued, an expedited hearing will be held by the assembled panel. Should the Court deny injunctive relief, however, the matter will proceed through the NASD's non-expedited arbitration process. Accordingly, in compliance with the NASD rules, AEFA is filing a claim for arbitration with the NASD. The NASD will have ongoing jurisdiction over this dispute because both Defendants were registered brokers and had executed NASD Form U-4 which provides for arbitration of disputes. Under the NASD's Code of Arbitration Procedure, and specifically Rule 10201, all disputes between NASD member firms, such as AEFA, and associated persons of NASD member firms, such as Gendreau, must be submitted for mandatory arbitration before the NASD. However, the NASD's procedures specifically require a party seeking a temporary injunction relief to do so *first* from a Court, so that the *status quo* will be maintained while expedited proceedings are sought before the NASD. *See* NASD Code of Arbitration Procedure, Rule 10335, Exhibit A to the Affidavit of Alex Hahn ("Hahn Aff."). This rule recognizes the fact that injunctive relief before a Court is usually considered and ruled on within a matter of days or hours, whereas similar proceedings before the NASD, even on an expedited basis, may take much longer. Once the Court issues temporary injunctive relief, the NASD rules specifically require that a hearing for continuing injunctive relief must be commenced by the NASD within *fifteen days* of the date of any order granting a temporary injunctive order. Rule 10335(b)(1).

January 1994. *Id.*, ¶ 4. During this time, AEFA had trained and supported Gendreau, who had no experience as a financial advisor prior to joining AEFA. *Id.*, ¶¶ 4, 5, 8.

Throughout his affiliation, AEFA assisted Gendreau in developing and expanding the base of AEFA clients with whom he worked. *Id.*, ¶¶ 11 - 19. AEFA allowed Gendreau to use its trade name and logo, provided him with AEFA client accounts, client referrals, and reassignments of client accounts. *Id.*, ¶¶ 8 & 11. Further, at AEFA's expense, Gendreau received ongoing training and education in investment planning methods and procedures and new and more sophisticated investment techniques. *Id.* Gendreau also received sales, research, and promotional support through AEFA's network of financial professionals. *Id.*, ¶ 12.

Due to his affiliation, AEFA granted Gendreau access to its confidential books and records, and provided Gendreau the identity, addresses, and account information of hundreds of AEFA clients whose accounts he was assigned. *Id.*, ¶¶ 16 & 18. As part of its long-term strategy, AEFA encouraged Gendreau to build valuable and lasting financial planning relationships with its clients. *Id.*, ¶¶ 13.

Through his affiliation with AEFA, Gendreau became a successful financial advisors. At the time he terminated his affiliations, Gendreau had 180 client group accounts, containing approximately $20.4 million in assets, and in 2004 had earned in excess of $163,000. *Id.*, ¶ 19.

### Defendants' Franchise Agreement with AEFA

Gendreau's relationship with AEFA was governed by the Gendreau Franchise Agreement.[2] Included in the Franchise Agreements were certain required actions to be taken by Gendreau upon his termination. Of immediate importance for this matter is the requirement that Gendreau, "to satisfy regulatory requirements, . . . ***immediately deliver to AEFA the originals of all Client records,***

---

[2]   A copy of the entire Franchise Agreement is attached as Ex. A to the Henehan Decl.

including records containing Clients lists and/or other information and transactions belonging to AEFA . . . " Henehan Decl., Ex. A, ¶ 18 (emphasis added). Moreover, Gendreau must ***return all confidential and proprietary business records***, including the original records of the AEFA clients to whom they provided services, within five (5) business days of termination. *Id.*, Ex. B (¶ 3) (emphasis added). Beyond the return of client information, Gendreau also was required to: (1) cease operating as an AEFA franchise; (2) cease using confidential information; (3) cease using AEFA's proprietary marks; (4) cease using AEFA's telephone numbers; (5) immediately return all AEFA manuals, records, and other confidential information; and (6) discontinue using AEFA's computer software. Henehan Decl., Ex. A (¶ 18).

Further, for a one-year period, Gendreau must refrain from soliciting or redirecting the business of the clients with whom they had worked, or of whom they had learned, while associated with AEFA. Henehan Decl., Ex. A (¶¶ 10, 18-19). Specifically, Section 19 of the Franchise Agreement contains a nonsolicitation clause, which provides, in part:

> COVENANTS. . . . .
>
> • Independent Advisor specifically acknowledges that, pursuant to this Agreement, Independent Advisor will receive additional substantive rights as a franchisee of AEFA. Independent Advisor also recognizes he or she will receive valuable and confidential information, including, without limitation, information regarding the operational, sales, promotional, and marketing methods and techniques of AEFA and the System. In recognition of and in consideration for these and other benefits, to protect the confidentiality of AEFA's Client information and to protect AEFA's goodwill, Independent Advisor covenants that (a) during the term of this Agreement and (b) for one year after the expiration or termination of this Agreement in the geographic area within which Independent Advisor operates or operated, Independent Advisor agrees to not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person or entity:
>
>     a.   (1)   Encourage, assist, participate, induce, or attempt to induce any Client or prospective business or client to terminate an agreement with AEFA, AEFA's affiliates, Issuers, or any financial advisor business under the System;

(2) Encourage, assist, participate, induce, or attempt to induce any Client or prospective business or client to terminate, surrender, redeem, or cancel any action related to Products & Services acquired or ordered from or through AEFA, AEFA's affiliates, Issuers, or any financial advisor business under the System, except as provided in the Manuals or with AEFA's written approval and consent;

(3) Solicit any Clients that Independent Advisor contacted, serviced or learned about while operating under this Agreement to open an account other than an AEFA account or to sell any investment, financial or insurance products or services other than through AEFA with AEFA's written approval and consent; . . . .

### Addendum 3-R to the Franchise Agreement

Because Gendreau was an advisor at the time AEFA implemented its franchise program in 2000, he was eligible for Addendum 3-R to the Franchise Agreement. Under the express terms of Addendum 3-R, which Gendreau executed, AEFA agrees to forbear from the enforcement of certain of its designated rights under the Franchise Agreement, including the prohibition against soliciting and diverting AEFA clients for one year post-termination, if Gendreau satisfies certain explicit conditions. A copy of Gendreau's Addendum 3-R is attached as Ex. B to the Henehan Decl.

Among the explicit conditions that Gendreau had to satisfy was the requirement that he must have been affiliated with AEFA for at least six consecutive years, not been subject to discipline as a result of a violation of the Companies' Compliance Rules, have provided two-weeks' written notice of termination, and have otherwise complied with the termination obligations specified in the Franchise Agreement. Henehan Decl., Ex. B (¶ C).

While his tenure with AEFA allowed him to satisfy the first obligation, Gendreau failed to comply with the other obligations. Specifically, he (1) failed to provide a two-week notice; (2) continued to use AEFA's confidential information, confidential methods, procedures, and techniques; (3) continued to use the telephone number and facsimile number used while affiliated with AEFA; and (4) engaged in pre-termination solicitation of AEFA's customers. Henehan Decl., ¶¶ 21, 24.

Accordingly, Gendreau failed to qualify for the forbearance provisions of Addendum 3-R and remains subject to the post-affiliation limitations contained in Section 19 of his Franchise Agreement.

### **Gendreau's Improper Conduct**

On or about October 15th, 2004, AEFA Field Vice President John Henehan ("Henehan") learned that Gendreau was claiming to have resigned his affiliation with AEFA the previous week. Henehan Decl., ¶ 20. During a conversation with AEFA's Field Risk Mitigation Director, Erika D'Atri, Henehan was told that Gendreau claimed to have left AEFA. *Id.* However, neither Henehan or AEFA's Group Vice President, Patrick O'Connell, had received any notice from Gendreau, either in writing or orally. *Id.* Upon learning of Gendreau's supposed termination, Henehan contacted his office, but was unable to reach Gendrau personally. *Id.*, ¶ 21. When Henehan spoke with the financial advisor who shared Gendreau's office, Cheryl Crouse, she confirmed that Gendreau had terminated his affiliation with AEFA. *Id.*

On October 20, 2004, Henehan finally met with Gendreau in Gendreau's office. To that date, Henehan still had not received a written copy of Gendreau's resignation, but understood a copy had been delivered to AEFA's home office in Minneapolis. *Id.*, ¶ 22, Ex. C. At their meeting, Henehan informed Gendreau that he was required to comply with the terms of the Gendreau Franchise Agreement, including the return of AEFA's proprietary documents and client files, and to turn off the telephone number Gendreau had been using. *Id.*, ¶ 23. Gendreau told Henehan that he would not return any information without a court order to do so. *Id.* Gendreau further refused to allow Henehan to retrieve any of AEFA's client information and files, confidential information, and manuals in his possession, or to review his computer to ensure that all of AEFA's software had been removed. *Id.* In addition, the AEFA signage outside Gendreau's office remained in place and had not been removed. Finally, Gendreau refused to cease using the AEFA telephone and facsimile numbers, but instead

changed the message on his answering machine to indicate that the caller had reached the "fusion financial group." *Id.*

Before providing notice of his intent to terminate his affiliation with AEFA, Gendreau had been in communication with certain of AEFA's clients, soliciting them to leave AEFA. Henehan Decl., ¶ 25. Gendreau has continued this activities through the present day, continuing to call upon clients and scheduling meetings with them. *Id.* Gendreau's actions violation both the Gendreau Franchise Agreement and the Addendum 3-R and the Franchise Agreement. *Id.*, ¶ 26.

In addition to soliciting AEFA clients, Gendreau misappropriated AEFA's confidential information and trade secrets. Due to his affiliation with AEFA, Gendreau was in possession of AEFA's client records and files containing confidential information and trade secrets. Henehan Decl., at ¶¶ 16, 17. Upon the termination of his affiliation with AEFA, Gendreau was obligated to immediately return all client records and files. *Id.*, Ex. A (¶ 18). However, as of Friday, October 22, 2004, Gendreau had failed to return *any* client files or other client information, despite repeated requests. Henehan Decl., ¶¶ 23-25. Gendreau has informed AEFA that he is not returning any client files and will not allow an AEFA representative to pick them up without a Court Order. *Id.*, ¶ 23. Gendreau certainly knows that his failure to return these materials improves his ability to solicit and divert AEFA clients and places AEFA at a significant disadvantage in attempting to maintain its relationship with its clients. *Id.*, ¶ 25. Moreover, not only is this client information confidential pursuant to AEFA policy, it is confidential pursuant to government regulations as well. *Id.*, ¶ 17. Finally, Gendreau also has failed to prove that he erased, destroyed, or otherwise removed AEFA's computer software from his computer. Henehan Decl., ¶ 24.

Gendreau is bound by the post-termination provisions of his Franchise Agreement, including the one-year prohibition against soliciting or redirecting the investment and insurance business of the

AEFA clients with whom he had worked while affiliated with AEFA, but has failed to honor those obligations. AEFA therefore requests that this Court issue a preliminary injunctive order restoring the *status quo* and stopping Gendreau's ongoing breaches and violations, pending the NASD hearing and decision on AEFA's request for immediate injunctive relief.

## ARGUMENT

### Preliminary Injunction Standard

A party seeking a preliminary injunction must establish that (1) it is substantially likely to succeed on the merits of its claim, (2) absent the injunction there is a significant risk of irreparable harm, (3) the balance of the hardships weighs in its favor, and (4) the injunction will not harm the public interest. *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 33 (1st Cir. 1998).[3] "Likelihood of success in the main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inv. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996). The greater the likelihood of success on the merits, the less risk of irreparable harm to the plaintiff must be shown. *Id.* at 19.

### Choice of Law

A federal court sitting in a diversity action must apply the choice of law rules of the forum

---

[3] In the Franchise Agreement, Gendreau expressly agreed that American Express is entitled to an injunction from the Court to keep him from violating his obligations. Henehan Decl., Ex. A (¶ 19) and Addendum 3-R at ¶ I (providing for a 45-day injunction). Even if portions of this dispute may be eligible for NASD arbitration (if, for example, Defendants remain subject to NASD jurisdiction), the Court has jurisdiction to grant preliminary injunctive relief pending that possible arbitration. *See Wells v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 919 F. Supp. 1047, 1050 (E.D. Ky. 1994) (observing that preliminary injunction hearings may go forward in Court even though dispute is subject to arbitration) and cases cited therein; *see also* NASD Code of Arbitration Procedure § 10335 (expressly authorizing parties subject to NASD arbitration to seek interim injunctive relief from courts pending determination of final relief from NASD arbitrators) (attached as Exs. A & B to the Hahn Aff.); *Am. Express Fin. Advisors Inc. v. Makarewicz*, 122 F.3d 936, 940 (11th Cir. 1997) (holding that America Express' right to an injunction is reserved for the courts); *Koob v. IDS Fin. Servs. Inc.*, 629 N.Y.S. 2d 426, 431 (N.Y. App. Div. 1995) (holding that American Express' contracts "removes the matter [of interim injunctive relief] from the authority of the arbitrator" and reserves it for the courts). A copy of the Statement of Claim filed with the NASD is attached to the Hahn Aff. as Ex. C.

8

state. *Engine Specialties, Inc. v. Bombardier, Ltd.*, 605 F.2d 1, 19 (1st Cir. 1979); *Alves v. Siegel's Broadway Auto Parts, Inc.*, 710 F. Supp. 864, 865 (D. Mass. 1989) (citing *Klaxon v. Stentor Elec.*, 313 U.S. 487, 496 (1941)). The Franchise Agreement provides that it is to be "interpreted and construed exclusively under the laws of the State of Minnesota." Henehan Decl., Ex. A (¶ 26). Massachusetts courts uphold contractual "choice of law provisions so long as there is no serious conflict with the public policy of Massachusetts and the designated state has some substantial relation to the contract." *Comdisco Disaster Recovery Servs., Inc.*, 789 F. Supp. 48, 52 (D. Mass. 1992) (citing *Morris v. Watsco, Inc.*, 433 N.E.2d 886, 888 (Mass. 1982) and *Steranko v. Inforex, Inc.*, 362 N.E.2d 222, 228 (Mass. App. 1977)).

In this case, both prongs of the test are met. First, application of Minnesota law would not be contrary to a fundamental policy of Massachusetts. Minnesota, like Massachusetts, enforces restrictive covenants, such as the one at issue, that are reasonably necessary to protect a legitimate business interest, are reasonable in scope and duration and are not injurious to the public. *Compare Walker Employment Serv. v. Parkhurst*, 219 N.W.2d 437, 441 (Minn. 1974); *Bennett v. Storz Broad. Co.*, 134 N.W.2d 892, 899-900 (Minn. 1965) (Minnesota courts will uphold a covenant not to compete if it is "for a just and honest purpose, for the legitimate interest of the party in whose favor it is imposed, reasonable as between parties, and not injurious to the public") *with Novelty Bias Binding Co. v. Shevrin*, 175 N.E.2d 374, 376 (Mass. 1961) (In Massachusetts, a restrictive covenant is enforceable if it is "necessary for the protection of the employer, is reasonably limited in time and space, and is consonant with the public interest."); *New England Canteen Serv., Inc. v. Ashley*, 363 N.E.2d 526, 674 (Mass. 1977) (trade secrets, confidential data and goodwill are all legitimate business interests of the employer that it may seek to protect by restrictive covenant).

As to the second prong, Minnesota has a substantial relationship to the parties and the relationship between them. AEFA has its principal place of business in Minneapolis, Minnesota. Throughout his affiliation with AEFA, Gendreau received training and support from the AEFA Corporate Office Minnesota, including intensive two-week training sessions in Minnesota. Henehan Decl., ¶ 5. Gendreau also had numerous telephone and computer contacts with the Corporate Office in Minnesota. *Id.*, ¶ 8. These facts establish a reasonable basis for the choice of Minnesota law. *See, e.g., Vesprinir v. Shaw Indus., Inc.*, 221 F. Supp. 2d 44, 61 (D. Mass. 2002) (honoring Georgia choice of law provision where one of the parties had its principal place of business in Georgia, the agreement was signed by the parties in Georgia and Georgia bore a reasonable relationship to the contractual transaction between the parties). Accordingly, this Court should honor the parties' choice of Minnesota law.

## I.     AEFA Has a Strong Likelihood of Success

### A.     The Franchise Agreement is an Enforceable Contract

A covenant not to compete is enforceable under Minnesota law if consideration was given for the covenant and if the restriction is reasonable to protect a legitimate business interest. *Webb Publ'g Co. v. Fosshage*, 426 N.W.2d 445, 449-450 (Minn. Ct. App. 1988); *Overholt Crop Ins. Serv. Co. v. Bredeson*, 437 N.W.2d 698, 703-04 (Minn. Ct. App. 1989). In this case, Gendreau executed his Franchise Agreement, containing the restrictive covenants, on December 15, 1999, and that Franchise Agreement became effective on March 22, 2000, in conjunction with AEFA's implementation of its franchise program. Henehan Decl., ¶¶ 6 & 9. (These covenants replaced effectively identical covenants in Gendreau's prior independent contractor agreements signed when first joining AEFA). Minnesota law provides that entering into a restrictive covenant at the commencement of, and as a condition of, a relationship provides adequate consideration. *Overholt*, 437 N.W.2d at 702; *see also*

*Blackwell v. E.M. Helides, Jr., Inc.*, 331 N.E.2d 54, 56 (Mass. 1975) (restrictive covenant enforceable where it was condition of employment and agreement was executed in advance of employment).

Under Minnesota law, AEFA has a legitimate interest in protecting itself against "the deflection of trade or customers by the employee by means of the opportunity which the employment has given him." *Bennett*, 134 N.W.2d at 898; *Overholt*, 437 N.W.2d at 703; *Webb Publishing*, 426 N.W.2d at 450. Indeed, a Massachusetts court has found that AEFA "has a legitimate interest in protecting the client goodwill it creates for its financial advisors." *Am. Express Financial Advisors, Inc. v. Walker*, No. CIV.A. 98-01673, 1998 WL 754620, at *6 (Mass. Super. Oct. 28, 1998) (attached as Ex. D to Hahn Aff.). The court noted:

> [T]o a client, the financial advisor may have become the embodiment of American Express since all that American Express had to offer appeared to emanate from the financial advisor. Indeed, American Express expressly encouraged its planners to develop this type of close one-to-one relationship with its clients, because it recognized that loyalty to an institution is more likely when there is loyalty to a person affiliated with that institution. Because its goodwill is inextricably interwoven with that of its financial advisors, American Express may fear that its goodwill will travel with their financial advisors when they leave American Express.

*Id.* In that case, the Court held that it is reasonable for AEFA to attempt to protect its goodwill and its confidential information through a restrictive covenant, and granted AEFA a preliminary injunction. *Id.* at *8.[4]

Secondly, the restrictions are narrowly tailored to provide AEFA a reasonable period of time,

---

[4] The court enforced the full term of the nonsolicitation provision (one year), but only enforced the noncompete for four months. *Walker*, 1998 WL 754620, at *8. (The court also noted that its holding diverted from several other courts which have upheld the one year noncompete provision. *Id.* at *9.) While the contract at issue in *Walker* was an independent contractor agreement, the predecessor to the Franchise Agreement at issue in this matter, the purpose of the two agreements are identical. Moreover, AEFA is not seeking a ruling from this Court on whether a permanent injunction is needed, but rather requests only that the Court maintain the *status quo* until the NASD can rule on the merits, in accordance with the NASD Rules.

11

one year, to protect its confidential information and trade secrets and to protect against the deflection of its goodwill with its clients by reestablishing those relationships.[5] Minnesota expressly permits the use of restrictive covenants to protect confidential information, *Cherne Indus. v. Grounds & Assocs.*, 278 N.W.2d 81, 92 (Minn. 1979), and the substitution of customer restrictions for geographic restrictions. *Overholt*, 437 N.W.2d at 703; *IDS Life Ins. Co. v. SunAm., Inc.*, 958 F. Supp. 1258, 1273 (N.D. Ill. 1997) (applying Minnesota law and finding covenant containing customer restriction enforceable); *see also Higdon Food Serv., Inc. v. Walker*, 641 S.W.2d at 751-52 (finding covenant containing customer restriction enforceable). The restrictive covenants clearly are enforceable and, as show below, there is strong evidence regarding Defendants' breach.

B. The Evidence Demonstrates Gendreau's Breach

Since terminating his affiliation with AEFA, Gendreau has steadfastly refused to comply with any of the provisions of his Franchise Agreement. Henehan Decl., ¶¶ 22-24. Specifically, Gendreau wrongfully retained confidential client information and documents containing trade secrets, including all client files. *Id.* Despite repeated requests, Gendreau has refused to return *any* client files or other client information, *id.*, ¶ 23., in direct violation of the Franchise Agreement. *Id.*, Ex. A (¶ 18). Gendreau has informed AEFA that he is not returning any client files and will not allow an AEFA representative to pick them up. *Id.*, ¶ 23. In fact, Gendreau stated that only way AEFA could receive any of the information is with a Court's Order. *Id.* Beyond retaining client and confidential information, Gendreau continues to retain his old AEFA telephone and facsimile numbers. *Id.*, ¶ 24..

---

[5] Courts in both Minnesota and Massachusetts have consistently affirmed covenants not to compete for terms of one or two years. *See, e.g., Walker Employment Serv., Inc. v. Parkhurst*, 219 N.W.2d 437, 442 (Minn. 1974) (one-year); *Webb Publ'g*, 426 N.W.2d at 450 (18 months); *Alside, Inc. v. Larson*, 220 N.W.2d 274, 280 (Minn. 1974) (two years); *Oxford Global Resources, Inc. v. Guerriero*, 2003 WL 23112398, at *9 (D. Mass. Dec. 30, 2003) (one year); *All Stainless, Inc. v. Colby*, 308 N.E.2d 481 (Mass. 1974) (two years).

Gendreau's failure to return these materials improves his ability to solicit and divert AEFA's clients and places AEFA at a significant disadvantage in attempting to maintain its relationship with its clients. Henehan Decl., ¶ 25. Moreover, not only is this client information confidential pursuant to AEFA policy, it is confidential pursuant to state and federal regulations as well. *Id.*, ¶ 17.

In this case, AEFA seeks protection of its confidential client information, goodwill and business relationships, and the retention of its clients.[6] Over the course of his ten years with AEFA, Gendreau has had access to, and regularly used, confidential client information concerning AEFA's business. Gendreau also was responsible for developing and cultivating goodwill on behalf of AEFA. Henehan Decl., ¶¶ 13-14. He became the very face of the AEFA business. *Id.*; *see also Walker*, 1998 WL 754620, at *6. Gendreau used the AEFA name, information systems, data, resources, and training, to become the skilled financial advisor necessary to service an client base of approximately 180 AEFA clients account groups, and to control over $20.4 million dollars in client assets. Henehan Decl., ¶ 19. Now, Gendreau seeks to keep all client information and compete with AEFA by soliciting its clients with confidential information that he obtained while working for AEFA. These actions are in direct violation of the terms of Gendreau's Franchise Agreement.

Because of the strong evidence against Gendreau demonstrating the breach of his agreements, AEFA's legitimate protectable interests, and the reasonableness of the covenants not to compete, AEFA has a strong likelihood of success on the merits.

---

[6] AEFA is not requesting that the Court prevent its clients from voluntarily leaving AEFA, or that DeGon and Bruce be prevented from servicing those clients who have already left AEFA as those issues will be addressed by the NASD arbitration. Rather, AEFA merely seeks the prevention of ongoing breaches and other actions inconsistent with DeGon's and Bruce's obligations under their respective Franchise Agreements.

### C. Violation of the Lanham Act

Gendreau's violation of 15 U.S.C. § 1125(a)[7] (unfair competition) also creates the likelihood of consumer confusion, generally the key element of a claim for federal unfair competition. *See, e.g., Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 492-93 (1st Cir. 1981). The First Circuit has an eight-point test for causing confusion under the Lanham Act: (1) the similarity of the marks; (2) the similarity of the goods, (3) the relationship between the parties' channel of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendants' intent in adopting the mark; and (8) the strength of the mark. *See e.g., Volkswagenwerk AG v. Wheeler*, 814 F.2d 812, 817 (1st Cir. 1987).

The general requirement underlying a showing of the likelihood of confusion is that the public believes that the mark's owner sponsored or otherwise approved the use of the trademark. Here, it is very likely that the public will believe that Gendreau continues to be affiliated with AEFA. Despite the specific contractual requirement that he disconnect his telephone numbers upon termination, Gendreau has kept the same number so that anyone looking up AEFA in the telephone book finds Gendreau's telephone number and, while intending to call AEFA, now reaches Gendreau's new venture. Likewise, Gendreau occupies the same office which is associated with AEFA signs, which he has not removed. *See, e.g., Hair Assoc., Inc. v. Nat'l Hair Replacement Servs., Inc.*, 987 F. Supp. 569, 590 (W.D. Mich. 1997) ("Where former franchisees or licensees continue to use marks or confusingly

---

[7] Section 1125(a) provides, in pertinent part: "Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or devise, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-- (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damages by such act."

14

similar marks after the licenses is terminated, consumer confusion is inevitable;" "[T]he problem is further accentuated by the fact that defendants also remained in the same location where they had been as a franchise"). Because of the likelihood of confusion, AEFA has a strong likelihood of success on its Lanham Act claim.

### II. Preliminary Injunctive Relief Will Prevent The Irreparable Harm To AEFA For Which No Adequate Legal Remedy Exists

Unless this Court grants the requested injunctive relief, AEFA will suffer irreparable injury through the loss of confidential client information and Gendreau's continued use of AEFA's confidential information and telephone numbers. Gendreau wrongfully retained confidential client information and documents, including documents containing confidential information and trade secrets, any all client files. Henehan Decl., ¶ 24. Despite repeated requests, Gendreau has refused to return *any* client files or other client information, *id.*, ¶ 23., in direct violation of the Franchise Agreement. *Id.*, Ex. A (¶ 18). If this Court does not grant preliminary injunctive relief, AEFA will continue to suffer irreparable harm from the loss of this confidential information. *See, e.g., Creative Communication Consultants v. Gaylord*, 403 N.W.2d 654, 657 (Minn. Ct. App. 1987) (irreparable harm properly found based on disclosure of confidential information).

AEFA also will suffer irreparable harm in the loss of client goodwill generated by Gendreau through AEFA's support and dedication to the professional training, growth, and development of its financial advisors. It is well-established that irreparable harm can arise out of the breach of a non-compete clause. *See, e.g., Cherne*, 278 N.W.2d at 92; *see also Euctectic Welding Alloys Corp. v. West*, 160 N.W.2d 566, 569 n.4. (Minn. 1968) ("an inherent threat of irreparable injury may be inferred from the breach of an otherwise valid and enforceable restrictive covenant [not to compete or not to disclose trade secrets], sufficient to invoke at least temporary equitable relief."). Injuries such as

these are difficult to identify and measure, as are the money damages resulting from the loss of clients. *Walker*, 1998 WL 754620, at *10 (holding that American Express had met its burden of establishing irreparable harm); *Medtronic, Inc. v. Gibbons*, 527 F. Supp. 1085, 1094 (D. Minn. 1981). Under Minnesota law, the threat of irreparable harm is inferred from a breach of a valid restrictive covenant. *Gibbons*, 527 F. Supp. at 1091-1092.

If Gendreau is allowed to ignore his contractual obligations, the value of the business he captures from AEFA clients, who have come to rely on him for advice and service, and the accompanying loss of goodwill and business relationships, will be difficult to ascertain. Gendreau had long-term relationships with numerous AEFA clients for whom he was the primary point of contact. *See* Henehan Decl., ¶ 14. Gendreau spent many years servicing these clients, getting to know them and their various issues. *Id.* He was, in fact, the very face of AEFA since AEFA does no direct marketing to its clients. *Id.* Gendreau's disregard for the non-solicitation agreement he signed with AEFA places AEFA at a serious disadvantage in continuing to service the clients previously entrusted to them. *Id.*

It is impossible to determine at this time the number of AEFA clients who will be "pirated away" by Gendreau because of the breach of his Franchise Agreements, nor is it possible to determine with any degree of certainty the commissions each of these clients will generate not only this year, but 5, 10, or 20 years into the future. Gendreau's breach of his post-termination covenants involves financial loss and other irreparable injuries to AEFA that are incapable of measurement.[8]

---

[8] Injunctive relief is also necessary to protect the ability of the AEFA system of offices and affiliates to discourage other affiliates from violating their Franchise Agreements. In *Merrill Lynch v. Patinkin*, No. 91 C 2324, 1991 WL 83163, *5 (N.D. Ill. May 9, 1991) (attached as Ex. E to the Hahn Aff.), for example, the court specifically considered this risk in granting Merrill Lynch injunctive relief, stating: "The court believes that the denial of the extension of the TRO under the circumstances presented in this case would leave Merrill Lynch vulnerable to the same conduct from other

### III. The Threatened Injury to AEFA Outweighs the Threatened Injury to Gendreau

The balance of the harms weighs in favor of granting injunctive relief. As already noted, without injunctive relief, AEFA will suffer the loss of goodwill and business relationships, and the confidentiality of client information. Numerous AEFA clients will be solicited to terminate their relationships with AEFA. Other AEFA franchisees will be encouraged to engage in similar conduct.

The requested injunction will not subject Gendreau to obligations other than those that he expressly agreed to undertake. Gendreau will be free to compete – anywhere they want – in the field in which AEFA trained them, so long as he is not using AEFA's confidential business and client information. *See Prudential Ins. Co. of Am. v. Tracia*, No. 20024369C, 2002 WL 31862713, at *2 (Mass. Super. Ct. Nov. 12, 2002) (holding that the balance of harms weighed in favor of plaintiff where defendant was not precluded from gainful employment at another company, even one of plaintiff's competitors) (attached as Ex. F to Hahn Aff.).

Further, Gendreau is not entitled to retain any clients information as he is not longer affiliated with AEFA. Under AEFA's Franchise Agreements and privacy policy, as well as applicable state and federal laws, once Gendreau ceased to be an affiliated individual with AEFA, he was no longer entitled to retain any client information and must return that information.

Finally, Gendreau will not be required to wait for a protracted period of time for a result on the merits of this dispute. Upon the entry of injunctive relief, the NASD will commence a hearing, within fifteen days, regarding any ongoing injunctive relief. *See* NASD Code of Arbitration Procedure, Rule 10335 (b)(1); *Tracia*, 2002 WL 31862713, at *2 (noting that defendant was entitled to a prompt hearing before the NASD).

---

employees. Hence, the potential harm plaintiff faces, on several levels, is enormous." *Id.* Without injunctive relief, AEFA will be exposed to the identical harm.

17

The granting of injunctive relief will not cause undue hardship on Gendreau. In contrast, without it, AEFA will suffer the loss of goodwill, business relationships, the confidentiality of client information, and numerous AEFA clients will be solicited to terminate their relationships with AEFA. As such, the balance of harms favors granting injunctive relief.

### IV.    The Public Interest Favors Entry Of The Injunction

Granting the requested injunctive relief, under these circumstances, does no disservice to the public interest. AEFA's clients will be "protected by the status quo" and will not be unfairly or unknowingly diverted from their relationship with AEFA. Accordingly, the balance of factors weighs in favor of granting injunctive relief.

### CONCLUSION

For the foregoing reasons, AEFA respectfully requests that this Court grant its request for an immediate injunction to prevent Gendreau from improperly retaining confidential client information that he is not entitled to possess, and prevent Gendreau from stealing AEFA's clients, destroying AEFA's goodwill, and misappropriating AEFA's confidential information.

Respectfully submitted,
AMERICAN EXPRESS FINANCIAL
ADVISORS, INC.

By its attorneys,

_____
Anthony A. Scibelli (BBO #556507)
C. Alex Hahn (BBO #634133)
Scibelli and Whiteley, LLP
Old City Hall
45 School Street, 3rd Floor
Boston, MA 02108
(617) 227-5725

-and-

                                        Edward B. Magarian (MN No. 49219)
                                        Todd W. Schnell (MN No. 252256)
                                        DORSEY & WHITNEY, LLP
                                        50 South Sixth Street, Suite 1500
                                        Minneapolis, Minnesota 55402
                                        (612) 340-2600

DATED: October 27, 2004