UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AMERICAN EXPRESS FINANCIAL ADVISORS, INC., <br><br> Plaintiff, <br><br> v. <br><br> NEIL H. GENDREAU, <br><br> Defendants. | Civil Action No. <br><br> DECLARATION OF JOHN A. HENEHAN <br><br> 04-40221 |

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT.

1.  I am a Field Vice President for American Express Financial Advisors, Inc. ("AEFA" or "American Express") and have been employed by or affiliated with AEFA for over 16 years. I submit this declaration in support of AEFA's request for injunctive relief against Neil Gendreau.

2.  I am over 21 years of age. Except to the extent indicated, I make this affidavit on personal knowledge.

3.  Plaintiff AEFA provides a variety of financial services to persons and entities nationwide (AEFA formerly was named IDS Financial Services Inc.). AEFA is a subsidiary of American Express Financial Corporation.

4.  According to AEFA's financial advisor records, Defendant Neil Gendreau became sponsored by AEFA on January 5, 1994, and subsequently was appointed an advisor for AEFA on January 4, 1995. Before joining AEFA, Mr. Gendreau had no experience working in the financial services industry, but rather had recently graduated from college.

5. As with most new financial advisors, AEFA provided Mr. Gendreau with extensive training. AEFA trained Mr. Gendreau, at significant expense, by enrolling him in AEFA's comprehensive training program, which included a two-week session at its training facility at Chaska, Minnesota. Thereafter, Mr. Gendreau was assigned to work under the supervision of an experienced American Express Personal Financial Advisor. This training enabled Mr. Gendreau to become an AEFA financial advisor. During his initial training Mr. Gendreau was a contractual employee of AEFA and, after the completion of that training, Mr. Gendreau became an independent contractor with AEFA.

6. According to AEFA's financial advisor records, on December 15, 1999, Mr. Gendreau executed the American Express Financial Advisors Inc. Independent Advisor Business Franchise Agreement ("Gendreau Franchise Agreement"). The Gendreau Franchise Agreement provided that, upon AEFA implementation of its new franchise program, Mr. Gendreau would transform his affiliation with AEFA from that of independent contractor to a franchisee. A copy of Mr. Gendreau's American Express Financial Advisors Inc. Independent Advisor Business Franchise Agreement is attached as Exhibit A. Under the terms of the Franchise Agreement, Mr. Gendreau was entitled to establish and operate an Independent Financial Advisor Business for AEFA. The Franchise Agreement contained a three (3) year term, subject to automatic renewal upon the satisfaction of certain designated conditions.

7. The Gendreau Franchise Agreement further contained an Addendum 3-R (Rollout) Restrictive Covenant Addendum ("Gendreau Addendum 3-R"), which Mr. Gendreau also executed on December 15, 1999, a copy of which is attached as Exhibit B. According to Gendeau Addendum 3-R, AEFA specifically agreed, upon Mr. Gendreau's termination, to forbear from the enforcement of certain of its designated rights under the Franchise Agreement if Mr. Gendreau satisfied certain conditions.

8. Throughout his affiliation, AEFA assisted Mr. Gendreau in developing and expanding his practice by providing him with AEFA client accounts, client referrals and reassignments of AEFA client

2

accounts. AEFA also made available to Mr. Gendreau ongoing training and education, at AEFA's expense, in investment planning methods and procedures and new and more sophisticated investment techniques. Moreover, throughout his affiliation with AEFA, Mr. Gendreau has had numerous telephone and computer contacts with the American Express Corporate Office located in Minneapolis, Minnesota.

9. On March 22, 2000, AEFA implemented its franchise program and Mr. Gendreau became a franchisee. He remained a franchisee until he terminated his affiliation in October 2004.

Mr. Gendreau worked as a franchisee of AEFA in its Shrewsbury, Massachusetts office. For a period of time, Mr. Gendreau shared that office with another AEFA franchiser, Cheryl Crouse. They were the only registered financial advisors in the Shrewsbury office.

11. AEFA authorized Mr. Gendreau, as a franchiser, to use the AEFA and American Express trade names, marks, and logos. In the financial services field, name recognition and identification with a strong, stable and well-known company have great importance and value.

12. AEFA provided Mr. Gendreau with sales, research, and promotional support through AEFA's network of financial professionals. By virtue of his affiliation with AEFA, Mr. Gendreau also gained access to AEFA's confidential books and records, including the identity, addresses, and account information of numerous AEFA clients whose accounts he was assigned.

13. Through his affiliation with AEFA as financial advisors, Mr. Gendreau worked one-on-one with AEFA clients and was encouraged by AEFA, as part of AEFA's long-term strategy, to build valuable and lasting financial planning relationships with AEFA clients. AEFA trains its financial advisors to build valuable and lasting financial planning relationships with its clients and to document important information about each client, including their special needs and preferences and the important contact persons. These relationships benefit both AEFA and its financial advisors.

14. AEFA places a high value on the client relationships and goodwill with which its financial advisors are entrusted. Mr. Gendreau had long-term relationships with numerous AEFA clients for whom he was the primary point of contact. Mr. Gendreau spent many years servicing these clients, getting to know them, and handling their various issues. Mr. Gendreau was, in fact, the very face of AEFA since AEFA does no direct marketing to its clients. Mr. Gendreau's disregard for the non-competition agreement they each signed with AEFA places AEFA at a serious disadvantage in continuing to service the clients previously entrusted to them.

15. AEFA treats information regarding its clients and services, including but not limited to client names, addresses, and data, including suitability information, investments and investment history, financial plans, and financial goal information, prospective client names, addresses, and data, and know-how concerning the methods of operation of the System and the business franchised client lists and other financial information as confidential and trade secret. AEFA derives economic value from this information, as it is not being generally known to other persons or entities in the financial services industry, and takes steps to protect the information from being disclosed. Specifically, AEFA requires that all its franchisers protect its confidential information and trade secrets by password protecting access to the franchiser's computer, maintaining security measures to control access to the franchiser's office, and prohibiting the general distribution of the information.

16. As a result of Mr. Gendreau's affiliation with AEFA, AEFA made certain confidential client and company information available to him to use in connection with his responsibilities as AEFA financial advisor.

17. The nature of the confidential AEFA client information available to Mr. Gendreau to use in connection with his responsibilities as AEFA financial advisor included, but was not limited to, the following: client personal information, dates of birth, financial information, social security numbers,

children, assets, liabilities, employment, and employment benefits. Not only is this information confidential pursuant to AEFA policy, but it is confidential pursuant to government regulations as well.

18.    The nature of AEFA's confidential and proprietary company information available to Mr. Gendreau to use in connection with his responsibilities as AEFA financial advisors include the following: AEFA client lists, client contact information, client account numbers, yearly and quarterly client statements reflecting the value and activity of accounts, and client meeting notes and correspondence confirming those meetings. This type of information is proprietary in part because it is developed at a cost to AEFA, and is the type of information that if it were readily available to competitors it would place AEFA in a competitive disadvantage.

19.    As a result of the foregoing, and as a result of Mr. Gendreau's efforts, for which AEFA paid him, Mr. Gendreau became a successful financial advisor. According to AEFA's business records, as of October 2004, Mr. Gendreau had account responsibility for approximately one hundred and eighty (180) AEFA client groups, representing approximately $20.4 million in assets invested through AEFA. AEFA's records further established that through October 12, 2004, Mr. Gendreau generated gross commissions, bonuses, and other compensation of more than $163,000.

20.    On or about October 15th, 2004, I learned that Mr. Gendreau had resigned from AEFA when AEFA Field Risk Mitigation Director, Erika D'Atri, asked if I knew that Mr. Gendreau had resigned. Up to that day, I had not received any notice from Mr. Gendreau, and had not been informed in any way by Mr. Gendreau, of his decision to terminate his affiliation with AEFA.

21.    Upon learning of Mr. Gendreau's termination, I immediately called his office. He did not answer, so I left a message on his answering machine. I then call back to his office and spoke to Cheryl Crouse who confirmed that indeed, Neil had terminated his affiliation with AEFA and that she was moving her office out of the space she shared with him.

spoke to Cheryl Crouse who confirmed that indeed, Neil had terminated his affiliation with AEFA and that she was moving her office out of the space she shared with him.

22. Mr. Gendreau failed to inform me in writing, or otherwise, of his termination of affiliate with AEFA. I understand that on October 18, 2004, Mr. Gendreau sent by facsimile, to AEFA's office in Minneapolis, a copy of an email termination notice that he previously had sent to the fusion financial group on October 8, 2004, and that he had signed and backdated his signature on that facsimile. A copy of that facsimile is attached as Exhibit C.

23. On October 20, 2004, I met with Mr. Gendreau at his office. I discussed this decision with him and told him that, in accordance with AEFA's practices and his Franchise Agreement, he would need to take certain steps to terminate the affiliation and that he would need to return certain documents and information to AEFA. Mr. Gendreau indicated he would not return any information to me and did in fact refused to return any information, including specifically any client files, and said that the only way he would give back the information would be if a court ordered him to do so. At that time, Mr. Gendreau also refused to allow me to retrieve any of AEFA's other confidential information or manuals in his possession. I also was unable to review his computer to ensure that all of AEFA's software had been removed. In addition, the AEFA signage outside Mr. Gendreau's office remained in place and had not been removed. Finally, Mr. Gendreau was continuing to use the AEFA telephone and facsimile numbers, but he had changed the message on his answering machine to indicate that the caller had reached the "fusion financial group."24. Through internal investigations that have occurred since Mr. Gendreau's affiliation was terminated, AEFA has learned that he:

    (a)    continued to access the AEFA computer system after October 8, 2004;

    (b)    continues to use AEFA's signs;

(c) continues to use AEFA's Confidential Information, confidential methods, procedures, and techniques;

(d) continues using the telephone number and facsimile number used in the Independent Financial Advisor Business while affiliated with AEFA; and

(e) has not provided proof that he erased, destroyed, or otherwise removed AEFA's computer software from his computer.

25. In addition, Mr. Gendreau has, and continues to, refuse to return any client records. AEFA's own investigation has revealed that Mr. Gendreau has, and continues to, contact and solicit AEFA's clients for the purpose of soliciting AEFA clients to terminate their accounts with AEFA and continue working with him at his new company. By retaining the client records, Mr. Gendreau can more easily meet with, and convince, clients to leave AEFA and follow him. These actions put AEFA at a significant disadvantage in retaining the clients' business.

26. Mr. Gendreau's contacting and soliciting of clients is directly in violation of his Franchise Agreement and is damaging to AEFA's relationship with its clients. Mr. Gendreau has not complied with any request that I have made and has not complied with the requirements contained in his Franchise Agreement, or the Addendum 3-R, as I understand those requirements.

27. It is my understanding that the NASD website states that Mr. Gendreau became an affiliated member of NFP Securities on October 8, 2004.

_____
John A. Henehan