

Westlaw.

1998 WL 754620
9 Mass.L.Rptr. 242
(Cite as: 1998 WL 754620 (Mass.Super.))

**C**

Superior Court of Massachusetts.

AMERICAN EXPRESS FINANCIAL ADVISORS
INC., Plaintiff,
v.
Joeann M. WALKER, Steven T. Healey, Individually
and d/b/a WALKER AND HEALEY
FINANCIAL SERVICES, and Michael J. Riccio,
Defendants.

No. CIV.A. 98-01673.

Oct. 28, 1998.

*FINDINGS OF FACT AND CONCLUSIONS OF
LAW ON PLAINTIFF'S MOTION FOR A
PRELIMINARY
INJUNCTION*

Ralph D. Gants Justice of the Superior Court

*1 The plaintiff, American Express Financial
Advisors Inc. ("American Express"), has moved for a
preliminary injunction to enforce a restrictive
covenant barring its former independent contractors,
the defendants Joeann Walker, Steven Healey, and
Michael Riccio, from, among other restrictions,
accepting any business for a period of one year from
the clients they had when they were affiliated with
American Express. This Court, after the initial
hearing on September 14, 1998, granted a limited
Temporary Restraining Order barring the plaintiffs
from soliciting business from their former American
Express clients pending this decision. For the reasons
stated below, American Express's motion for a
preliminary injunction is ALLOWED in part and
DENIED in part, and the Temporary Restraining
Order is hereby DISSOLVED in favor of the instant
Order.

*FINDINGS OF FACT*

"By definition, a preliminary injunction must be
granted or denied after an abbreviated presentation of
the facts and the law." *Packaging Industr. Group,
Inc.* v. *Cheney,* 380 Mass. 609, 616, 405 N.E.2d 106
(1980). The preliminary findings of fact below are
based on the verified complaint and the many
affidavits and attached exhibits furnished by the

parties.

American Express, formerly known as IDS Financial
Services Inc. ("IDS"), is a broker-dealer providing a
variety of financial services to persons and entities
throughout the nation. When a potential client comes
to American Express in search of financial planning
services, it will direct that person to a Personal
Financial Advisor, who will assess that person's
current financial situation and future needs,
recommend a personal financial plan, and assist in
implementing that plan by investing in approved
American Express investments, insurance policies,
and annuities. The Personal Financial Advisor is an
employee of American Express until the completion
of an initial training period and then becomes an
independent contractor of American Express,
authorized to use American Express's trade name and
paid on commission based on the volume of clients'
investments in American Express investment
vehicles.

The three defendants each were Personal Financial
Advisors with American Express until they resigned
in the summer of 1998. Walker and Healey resigned
on or about July 2, 1998, went into business together
as Walker and Healey Financial Services, and
became representatives of another broker-dealer--
Commonwealth Equity Services. Riccio resigned
roughly one month later--on or about August 11,
1998--and also became a representative of
Commonwealth Equity Services.

All of them had been Personal Financial Advisors
affiliated with American Express for no less than
three years and had joined when American Express
was using the IDS name; [FN1] Walker became an
Advisor on or about August 19, 1992, Healey on or
about November 15, 1989, and Riccio on or about
June 7, 1995. All had college degrees and outside
work experience, but none had any significant
background or training in financial services or
planning.

> FN1. All of the agreements signed by the
> defendants early in their affiliation with
> American Express were with IDS; the name
> change to American Express came later. For
> the sake of simplicity, I will refer to the
> plaintiff as American Express even when

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1998 WL 754620
9 Mass.L.Rptr. 242
(Cite as: 1998 WL 754620 (Mass.Super.))

Page 2

discussing events that occurred when it was known as IDS.

*2 The three defendants, as a condition of participating in American Express's training program, each executed identical Planner Candidate Disclosures. In these Disclosures, the defendants indicated their understanding that, if American Express were to appoint them as financial planners (which American Express did not thereby promise to do), they "will sign Personal Financial Planner Agreements with IDS, which include non-competition clauses, in which, among other things, I promise that if my association with IDS ends, I will not solicit or sell insurance and/or securities products to IDS clients for one year after I leave IDS."

Each defendant successfully completed the training program and was appointed an IDS financial planner pursuant to a Personal Financial Planner's Agreement ("Planner's Agreement"). The defendants' execution of this Agreement, like the Planner Candidate Disclosure, was a required condition of their affiliation with American Express; it was not subject to negotiation or revision. In short, the defendants effectively were given the choice of signing these Agreements as is or looking elsewhere for work.

Under the Planner's Agreement, the defendants were employees of American Express only during their training period, which lasted roughly one year. When their training period ended, they were affiliated with American Express only as independent contractors, not as employees. [FN2] As independent contractors, under the Planner's Agreement, "You decide whom to choose as business prospects and when and where to conduct your working activities." Yet, each financial planner had to agree to certain ethical conditions in their dealings with clients and prospective clients, including promising to "explain the terms of Products or Services fully; make no untrue statements; and state all relevant facts."

> FN2. A defendant's status as an independent contractor rather than an employee, in some contexts, may have consequence in deciding whether to enforce a restrictive covenant, but it does not have consequence in this decision.

Under the portion of the Agreement entitled, "Restrictions on Your Activities," the defendants

were prohibited from engaging in certain activities for a period of one year after the termination of the Agreement and other activities were forever barred. For *one year* after the Agreement ended, the Agreement provided:

[Y]ou agree that you will not, in the territory where you sought applications for Products or Services under this or any other agreement with IDS or an Affiliate, directly or indirectly offer for sale, sell or seek an application for any Product or Service issued or provided by any company to or from a Client you contacted, dealt with or learned about while you represented IDS or an Affiliate or Issuer or because of that representation. (Section IV(1)(g)); and

[Y]ou agree not to use any [information regarding the identity of Clients and potential Clients] in connection with any business in competition with IDS or an Affiliate or Issuer. (Section IV(1)(f)). [FN3]

> FN3. A "Client" under the Agreement was defined as "a person or entity who (1) purchases or holds a Product or Service acquired from or through IDS or an Affiliate or one of their Planners with the consent of IDS or the Affiliate; or (2) authorized IDS, an Affiliate or one of their Planners to make personal financial planning presentations to it or its employees or members; or (3) is a member of a Client's household." (Section I(1)(p)).

The Agreement *forever* prohibited the defendants, without the written consent of IDS, from:

.--using "any information you acquired while this Agreement was in force in a manner adverse to the interests of IDS, an Affiliate, or an Issuer" (Section IV(1)(a));

*3 .--encouraging or inducing anyone "to terminate an agreement with IDS, an Affiliate or Issuer without IDS' consent" (Section IV(1)(a)(1));

.--encouraging or inducing "any Client to stop carrying out any action related to a Product or Service it acquired from or through IDS" (Section IV(1)(a)(2));

.--encouraging or inducing "any Client to sell, surrender or redeem any Product or Service distributed or offered by IDS or an Affiliate" (Section IV(1)(a)(4));

.--revealing "the names and addresses of IDS Clients or any other information about them, including financial information" (Section IV(1)(e));

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1998 WL 754620
9 Mass.L.Rptr. 242
(Cite as: 1998 WL 754620 (Mass.Super.))

and
.--doing "anything to damage the goodwill of IDS, an Affiliate or Issuer." (Section V(5)).

The Agreement further provided that it was a Minnesota contract, governed by Minnesota law. All disputes regarding the Agreement are to be submitted for arbitration, but the Agreement specifically preserves American Express's right to seek an injunction from a court while the arbitration is pending.

The defendants gave no advance notice to American Express of their intentions to terminate the Planner's Agreement, in violation of that Agreement which obliged them to give American Express fifteen days written notice of their resignation. On or about their last day affiliated with American Express, they sent their respective clients nearly identical letters informing the clients that they had decided to accept a position with Commonwealth Equity Services, Inc., effective that same day, and that they were excited about this new opportunity "to offer clients a large variety of quality financial services and products." The letter thanked the clients for the confidence they had placed in them. It continued:

American Express Financial Advisors will in the immediate future assign your business to another of its financial advisors if you desire to continue to keep your business with the company. Obviously, I would welcome the opportunity to serve your future financial advisory and investment needs. Because of certain non-compete restrictions, however, I am unable for now to solicit your business in competition with American Express Financial Advisors. Nonetheless, who you choose to do business with, including me, is your decision not mine or theirs.

The letter gave the defendant's new work address and telephone number. In capital letters, the letter declared below the signature:

THIS LETTER IS NOT INTENDED TO BE AND SHOULD NOT BE CONSTRUED TO BE A SOLICITATION OF YOUR FUTURE BUSINESS.

Apart from the solicitation implicit in this letter, American Express has been unable to present persuasive evidence that the defendants have initiated contact with their American Express clients or otherwise solicited their business. It is undisputed that a number of these clients have transferred their American Express accounts, worth millions of dollars, to Commonwealth Equity Services in order

to continue to receive financial planning from the defendants. Yet, American Express has presented no evidence to contradict the substantial evidence presented by the defendants that these clients have transferred their investment monies on their own initiative based, to varying degrees, on their satisfaction with the financial advice and attention they had received from the defendants and their dissatisfaction with the financial advice and inattention they believed they were receiving from their successors at American Express. [FN4]

FN4. The only evidence of client "tampering" that American Express has mustered is that many of defendant Riccio's former clients at American Express have submitted form letters to American Express asking that their accounts be reassigned to John Gunning, an American Express financial advisor who was in Riccio's training class. From these letters and Riccio's telephone calls to American Express on behalf of these former clients, it is plain that Riccio is communicating with these former clients and advising them regarding the reassignment. Yet, it does not appear that Riccio is seeking to solicit these clients to leave American Express and join him. Indeed, he simply appears to be helping them find an American Express financial advisor who will provide them with better advice and service. While American Express complains about this conduct, it has pointed to no provision of the Planner's Agreement that it violates. No similar allegation has been made regarding the defendants Walker and Healey.

## CONCLUSIONS OF LAW

*4 In determining whether to grant a preliminary injunction, this Court must perform the three-part balancing test articulated in *Packaging Industr. Group, Inc.* v. *Cheney,* 380 Mass. at 616-617, 405 N.E.2d 106. First, the court must evaluate the moving party's claim of injury and its likelihood of success on the merits. *Id.* at 617, 405 N.E.2d 106. Second, it must determine whether failing to issue a preliminary injunction would subject the moving party to irreparable injury--losses that cannot be repaired or adequately compensated upon final judgment. *Id.* at 617 n. 11, 405 N.E.2d 106. Third, "[i]f the judge is convinced that failure to issue the injunction would

1998 WL 754620
9 Mass.L.Rptr. 242
(Cite as: 1998 WL 754620 (Mass.Super.))

subject the moving party to a substantial risk of irreparable harm, the judge must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party." *Id.* at 617, 405 N.E.2d 106. In balancing these factors, "[w]hat matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the party's chance of success on the merits. Only where the balance between these risks cuts in favor of the moving party may a preliminary injunction properly issue." *Id.* "In an appropriate case, the risk of harm to the public interest also may be considered." *GTE Products Corp. v. Stewart,* 414 Mass. 721, 723, 610 N.E.2d 892 (1993) quoting *Brookline v. Goldstein,* 388 Mass. 443, 447, 447 N.E.2d 641 (1983).

## I. *The Enforceability of the Restrictive Covenants in the Planner's Agreement*

Under the Planner's Agreement, Minnesota's substantive law must govern this decision. [FN5] Since Minnesota courts generally look upon covenants not to compete with "disfavor," *Overholt Crop Ins. Serv. Co., Inc. v. Bredeson,* 437 N.W.2d 698, 703 (Minn.Ct.App.1989), I must first examine whether it is likely that American Express will be able to prevail on the merits and enforce such a provision.

> FN5. The parties all agree that there are no substantive differences between Minnesota and Massachusetts law with respect to non-compete and confidentiality covenants. Therefore, decisions from both jurisdictions are cited in this decision.

"Under Minnesota law, a restrictive covenant is unenforceable if the restraint is not necessary for the protection of the business or goodwill of the employer, or if the restraint imposed upon the employee is broader than necessary to protect the employer's legitimate business interest." *Medtronic, Inc. v. Gibbons,* 527 F.Supp. 1085, 1094 (D.Minn.1981), *aff'd,* 684 F.2d 565 (8th Cir.1982). See also *Kallok v. Medtronic, Inc.,* 573 N.W.2d 356, 361 (Minn.1998); *Walker Employment Serv. v. Parkhurst,* 300 Minn. 264, 219 N.W.2d 437, 441 (Minn.1974); *Bennett* v. *Storz Broadcasting Co.,* 270 Minn. 525, 134 N.W.2d 892, 899 (Minn.1965). Minnesota courts will uphold a covenant not to compete if it is "for a just and honest purpose, for the

legitimate interest of the party in whose favor it is imposed, reasonable as between parties, and not injurious to the public." [FN6] *Walker Employment Serv. v. Parkhurst,* 219 N.W.2d at 441 quoting *Bennett v. Storz Broadcasting Co., supra.*

> FN6. Factors that Massachusetts courts consider to determine whether a covenant is sufficiently reasonable to enforce include the legitimate business interests of the employer, the duration and geographic scope of the restriction, and the impact of enforcement on the public. See *Woolley's Laundry v. Silva,* 304 Mass. 383, 387, 23 N.E.2d 899 (1939); *All Stainless, Inc. v. Colby,* 364 Mass. 773, 778, 308 N.E.2d 481 (1974). See also Restatement (Second) of Contracts, § 188(1) (1979) ("A promise to refrain from competition ... is unreasonably in restraint of trade if (a) the restraint is greater than is needed to protect the promisee's legitimate interest, or (b) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public.")

*5 American Express argues that its restrictive covenant is limited in time to one year and in scope to clients of the departing financial advisor, and is reasonably designed to protect American Express's legitimate interest in keeping its clients, protecting confidential information regarding the names and addresses of clients and prospective clients, and preserving its goodwill. The defendants argue that the Planner's Agreement they signed which contained the non-compete provisions was given to them when they first began their employment with American Express without adequate explanation or advice, and with no opportunity to negotiate or otherwise revise its terms. They insist that, as an adhesion contract, it should not be enforced. Moreover, they contend that the goodwill built with their clients was earned from their work, not the institutional support provided by American Express, and therefore properly belongs to them. They note that the non-compete provisions injure those former clients who have come to rely upon them for financial advice and now are barred for one year from seeking that advice. While they contend that all the restrictive covenants in the Planner's Agreement are overbroad and unenforceable, they direct their aim primarily at the provisions that bar them from doing business with any of their former clients for one year.

The Planner's Agreement is certainly an adhesion contract. The defendants had no opportunity to negotiate its terms; they could sign it and accept the terms set forth by American Express as is, or look elsewhere for work. Yet, the fact that it was an adhesion contract does not mean that it is unenforceable *per se;* it simply means that this Court must scrutinize the Agreement more closely to determine whether it is unconscionable, offends public policy, or is unfair under the circumstances. *Chase Commercial Corp. v. Owen,* 32 Mass.App.Ct. 248, 253, 588 N.E.2d 705 (1992); see also Restatement (Second) of Contracts § 211 (1979); *Kroeger v. Stop & Shop Cos.,* 13 Mass.App.Ct. 310, 318-319, 432 N.E.2d 566 (1982).

In evaluating the enforceability of a covenant not to compete, I must weigh the various interests at stake. See *Kallok v. Medtronic, Inc.,* 573 N.W.2d at 361; *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. de Liniere,* 572 F.Supp. 246, 249 (N.D.Ga.1983); *Minet Ins. Brokers, Inc. v. Rooney,* Civil No. 97- 0675-C at 4 (Suffolk Super. Ct. Feb. 14, 1997) (J. Hinkle). American Express's primary justification for barring its former financial advisors for one year from all dealings with their American Express clients is that such a blanket prohibition is necessary to protect its goodwill. Goodwill encompasses a variety of intangible business attributes that tends to enable a business to retain its customers. *McFarland v. Schneider,* Civil No. 96-7097 at 108 (Middlesex Super. Ct. Feb. 17, 1998) (J. McHugh). See also *Slate Co. v. Bikash,* 343 Mass. 172, 175-176, 177 N.E.2d 780 (1961). Stripped to its core, when American Express states that it wishes to preserve its goodwill, it means that it wants to prevent its clients (and their investments) from leaving American Express with their financial advisors and transferring their investments with them. To examine whether this interest is legitimate under the circumstances found here, I must first examine what American Express does for its clients, what share of that is performed by its financial advisors, and how its advisors interact with American Express. See generally *McFarland v. Schneider, supra* at 109-112.

*6 When American Express offers financial planning services to its clients, it really is offering three kinds of benefits. First, it offers a range of investment and insurance products that are available only through its financial advisors. Second, it offers investment information and analysis that is generally gathered and conducted by its "back-room" employees and furnished to the financial advisors who have direct

contact with its clients. Third, it offers the financial planning and investment advice of its financial advisors, supported by the training and supervision provided to them by American Express. As a result, there is a "symbiotic relationship" between American Express and its financial advisors. See *Medtronic, Inc. v. Gibbons,* 527 F.Supp. at 1091. Financial advisors will look good to their clients only if the clients' portfolios prosper, and those portfolios will not prosper unless the information and analysis furnished to the financial advisors by American Express is sound and the investment vehicles offered by American Express perform as promised. Similarly, American Express, no matter how effective its "back room" operations are and how much its investment vehicles out-perform the market, will not have loyal clients unless those clients are satisfied with the advice, attention and "bedside manner" of their financial advisor.

When financial advisors leave American Express, they carry with them only the third type of benefit; they leave behind the informational and analytical support they had previously obtained from American Express's "back room" operations and the investment products that American Express had to offer. Indeed, even this third type of benefit may not be the same, because the advisors have also lost the continuing training and supervisory support that American Express may have furnished. Yet, to a client, the financial advisor may have become the embodiment of American Express since all that American Express had to offer appeared to emanate from the financial advisor. Indeed, American Express expressly encouraged its planners to develop this type of close one-to-one relationship with its clients, because it recognized that loyalty to an institution is more likely when there is loyalty to a person affiliated with that institution. Because its goodwill is inextricably interwoven with that of its financial advisors, American Express properly may fear that its goodwill will travel with their financial advisors when they leave American Express. Therefore, it has a legitimate business interest in protecting the client goodwill it creates for its financial advisors. See *Medtronic, Inc. v. Gibbons, supra* at 1091; *Walker Employment Serv., Inc. v. Parkhurst, supra* at 440; *McFarland v. Schneider, supra* at 109-110.

Yet, more than American Express's legitimate interests are at stake when it imposes a restrictive covenant that bars its financial advisors from doing business with its clients for one year: by restricting whom its former financial advisors may deal with for one year, it is also restricting whom its current clients

1998 WL 754620
9 Mass.L.Rptr. 242
(Cite as: 1998 WL 754620 (Mass.Super.))

may deal with for one year. In short, this covenant bars American Express's clients from transferring its funds into the care of the defendants even when its clients may decide, intelligently and rationally, that this is what they want to do with the money they devoted a lifetime to earning. Indeed, although American Express declares that it does not want its restrictive covenant enforced to this degree, the Planner's Agreement by its terms would bar a defendant's mother, if she had become her child's client at American Express, from transferring her funds to her child's new broker-dealer.

*7 This restriction on the ability of its clients to obtain advice from the advisor of their choice would be more palatable if American Express had informed its clients, when they signed on with American Express, that they would not be able to remain with their financial advisor if the advisor were to leave American Express. Yet, it is plain that American Express did not provide clients with this warning, or give them any information from which they could have inferred this consequence. Here, through affidavits and letters, some of the defendants' former clients have attested, quite passionately, to their desire to remain the clients of the defendants and to their outrage at the possibility that American Express, through an agreement of which they had no knowledge, may prevent them from receiving the investment advice and support they want and need.

In considering the competing interests of American Express and their clients, I note that, as a broker-dealer, American Express has a fiduciary duty to protect the interests of its clients, and its financial advisors share a similar fiduciary duty. See _Berenson v. Nirenstein,_ 326 Mass. 285, 288-289, 93 N.E.2d 610 (1950) (fiduciary obligation of brokers to their clients "rests upon fundamental principles of business morality and honor which are of the highest public interest, and which it is the bounden duty of courts to preserve unimpaired"); _Merrill Lynch, Pierce, Fenner & Smith, Inc. v. de Liniere,_ 572 F.Supp. at 249 ("fiduciary duties of a broker are recognized in law because of the important role of the broker in protecting the financial welfare of his clients"). See also Client Relations Guide, 1998 Edition for American Express Financial Advisors and Managers at 7 ("At American Express Financial Advisors (AEFA) all of our activities and decisions are guided by the American Express Corporate Values: Placing the interest of the Clients first...." ) The Planner's Agreement in part reflected this obligation when it required the defendants, in dealing with clients, to "explain the terms of Products or Services fully;

make no untrue statements; and state all relevant facts." Yet, neither American Express nor its financial advisors informed their clients, as the advisors were consciously cultivating a one-on-one relationship with them, that the relationship with the advisor must take a one year sabbatical if the advisor were to leave American Express. One can understand why American Express did not want to notify its clients of this information, but it must understand that there are consequences to its silence on this issue. [FN7]

> FN7. This Court expressly does not decide whether the failure to disclose this information to clients constituted a breach of American Express's or the defendants' fiduciary duty to their clients.

Moreover, in balancing these competing interests, I recognize that the relationship between a financial advisor and an individual client is not the same as between a salesperson and a client, or even between a financial advisor and a pension fund or other such institution. Compare _Merrill Lynch, Pierce, Fenner & Smith, Inc. v. de Liniere,_ 572 F.Supp. at 249 ("[a] stock broker stands in a different relationship to his customers from that of other kinds of salesmen") with _Medtronic, Inc. v. Gibbons,_ 527 F.Supp. at 1091 (pacemaker sales representative) and _McFarland v. Schneider, supra_ at 115-116 (portfolio manager for institutional investors). The job of a financial advisor, as described by American Express in its Verified Complaint, is to work with clients on a "one-to-one basis to help them identify their most important financial goals and establish and implement their financial plans...." In performing this job, a financial advisor learns from clients what they own, what matters to them in life (at least financially), what they are prepared to risk, and what they hope to accomplish with their money. Once a plan is established that accords with the client's means, needs, and desires, the client essentially entrusts all or a part of his life's savings to the financial advisor for the advisor to invest. While the relationship may not be as intimate as that of a doctor and patient or attorney and client and, unlike those professions, is not specifically protected from non-compete agreements in this Commonwealth by statute or Supreme Judicial Court rule, it is plainly a valuable and important personal and financial relationship whose significance, in the context of a particular case, the common law should not categorically ignore. See _Prudential Servs., Inc. v. Plunkett,_ 8

1998 WL 754620
9 Mass.L.Rptr. 242
(Cite as: 1998 WL 754620 (Mass.Super.))

Page 7

F.Supp.2d 514, 520 (E.D.Va.1998) (because relationship between financial advisor and client is, like a doctor-patient or lawyer-client relationship, dependent on personal trust, client should be free to choose own advisor). Compare G.L. c. 112, § § 12X, 74D (1983) (prohibiting non-compete restrictions on the right of doctors and nurses to practice); S.J.C. Rule 3:07, RPC 5.6 (prohibiting non- compete restrictions on the right of lawyers to practice).

*8 Having considered the legitimate interests of American Express in addition to the interests of its clients and the general public, I find that it is reasonable for American Express to attempt to protect its goodwill and its confidential information regarding the identities of present and prospective clients through some form of restrictive covenant. Some period of time of noncompetition is needed to permit American Express to replace the departing financial advisor with another advisor, to permit that person to establish a relationship of trust and confidence with clients, and to allow American Express to demonstrate to its clients that the goodwill generated by the departing financial advisor was attributable more to American Express than to the particular skills of that individual. That period of time, however, should not be so great as to unfairly restrict American Express's clients from investing their life's savings with the departing financial advisor's new broker-dealer, if they are convinced after a decent interval that this is what they want to do. I conclude that the one year prohibition in the Planner's Agreement is an unreasonably long time to interfere with American Express clients' legitimate interests in investing their money with whom they want. On balance, I find that a four month prohibition is the longest period of time reasonable for a blanket prohibition against a financial advisor doing business with a former client when that client had not been previously advised of the existence of such a prohibition. Four months is long enough for American Express to assign a replacement financial advisor and permit that advisor to demonstrate to her new clients her competence and concern, but not so long (in most economic circumstances) that it will unduly damage the client to sit tight with American Express and be denied the planning and investment advice of his former financial advisor. [FN8]

FN8. I note that a four month prohibition is consistent with the amount of time American Express deems sufficient for a successor financial advisor to establish herself to a client as a worthy replacement to the departed advisor. In a sample form letter routinely sent to clients upon the termination of a financial planning relationship, American Express estimates that a new advisor-client relationship can be satisfactorily established within a few months:

We realize that this change may be an inconvenience and we want to assure you that we will strive to make the transition a smooth one. For most clients, this process is completed within 30 days. A few months after your transition to a new advisor, we will follow up to ensure that your expectations have been met.

While a one year blanket prohibition of all business dealings between a financial advisor and her client is unreasonably long, a one year prohibition of solicitation is not unreasonably long. Although American Express's legitimate interest in preserving its goodwill may need somewhat to give way to protect its clients' ability to invest with whom they want, this does not mean that its former financial advisors should be entitled to entice its clients away by soliciting their business. If a client, after four months have passed, decides on his own initiative that he wants to leave American Express and become a client of his former financial advisor now affiliated with a different broker-dealer, he should be allowed to do so, but it is reasonable for American Express contractually to oblige its financial advisors to wait at least one year after their termination before they are allowed to solicit that client's business.

I have considered whether it would make more sense to enforce only the longer, one year bar on solicitation and not the shorter, four month blanket bar on all business dealings with American Express clients--in other words, to let clients follow the defendants if they wish but prohibit the defendants from encouraging them. I decide against such a resolution for two reasons. First, as stated earlier, since the financial advisor has the direct relationship with the client and thereby personifies to the client all the benefits that American Express can provide to the client, barring the financial advisor only from solicitation would give inadequate protection to the goodwill fairly created by American Express. Clients naturally may tend to follow the person they know and have come to trust. Second, while it may not be difficult to identify aggressive solicitation, it is quite difficult to identify and sanction more subtle forms of it. Indeed, in this case, the farewell letter of the

1998 WL 754620
9 Mass.L.Rptr. 242
(Cite as: 1998 WL 754620 (Mass.Super.))

Page 8

defendants to their American Express clients, although it declared in capital letters that it was not intended to be and should not be construed to be a solicitation of the clients' business, certainly would be understood as inviting clients to take the initiative to transfer their investments in order to continue to be advised by them. The letter said that the defendant could not solicit their business but would welcome the opportunity to continue to serve their financial advisory and investment needs. It then observed that the choice of financial advisors was the client's decision, and later gave the defendant's new address and telephone number. If solicitation were all that was prohibited, financial advisors could too easily seek to circumvent the restrictions by dropping hints more subtle than these. [FN9]

> FN9. While even subtle hints could be eliminated by barring financial advisors from giving any notice to clients of their departure from American Express and prohibiting all contact with them following their departure, it would be fundamentally unfair to clients to require their financial advisor to disappear from their lives without notice. In short, the law should not bar all communication with clients regarding their financial advisors' resignation from American Express but, if such communications are allowed, there is likely to be some degree of solicitation implicit in the communication, no matter how veiled. A four month period in which the financial advisor is barred from accepting the former client's business at least means that, if a client chooses to stay with the financial advisor, he will do so only after four months have passed from the communication informing him of his advisor's departure from American Express. By then, not only will American Express have had the opportunity to establish a relationship between the client and a new financial advisor but any subtle solicitation done at the time of departure will be four months old and likely forgotten. I note that any form letters sent by financial advisors to their clients must comply with NASD rules, one of which requires approval prior to distribution by a registered principal of the member.

*9 Some of the restrictions in the Planner's

Agreement that are to endure forever do not survive scrutiny regarding their reasonableness and may not be enforced, at least as drafted. Even under the Agreement, the defendants are entitled to provide financial planning services to their former American Express clients after more than a year has passed since their termination from American Express. It is unreasonable and unfair, given the fiduciary obligations that they will then owe to their clients, to restrict the advice they may give regarding their clients' continued investment in American Express products. It may be in their client's best interests to advise them to disinvest in an American Express investment vehicle or to withdraw from an American Express life insurance plan. They should not be barred by their prior contractual commitments with American Express from serving their new clients, even if that advice may be adverse to the interests of American Express. Consequently, I find that the following prohibitions in the Planner's Agreements are unreasonable and unenforceable to the extent they limit the ability of the defendants from providing the best possible financial advice to persons who have become or lawfully will become their clients:

.--using "any information you acquired while this Agreement was in force in a manner adverse to the interests of IDS, an Affiliate, or an Issuer" (Section IV(1)(a));

.--encouraging or inducing anyone "to terminate an agreement with IDS, an Affiliate or Issuer without IDS' consent" (Section IV(1)(a)(1));

.--encouraging or inducing "any Client to stop carrying out any action related to a Product or Service it acquired from or through IDS" (Section IV(1)(a)(2)); and

.--encouraging or inducing "any Client to sell, surrender or redeem any Product or Service distributed or offered by IDS or an Affiliate" (Section IV(1)(a)(4)).

I recognize that, in finding unenforceable the Planner's Agreement's one year blanket prohibition on doing business with clients and its permanent restrictions beyond one year regarding the advice financial advisors may provide to their own clients, I am differing from certain other courts that have upheld the Planner's Agreement against similar challenges. See, e.g., *American Express Financial Advisors v. Theis*, Civil No. C8-95-2811 (Minn.Dist.Ct. Nov. 29, 1995); *IDS Financial Corp. v. Dube*, Civil No. 92- 0530 (Mass.Super.Ct. May 22, 1992); *New Boston Select Group, Inc. v. Ristaino*, Civil No. 96-1238 (Mass.Super.Ct. March 7, 1996); *American Express Financial Advisors v. Fury*, Civil No. C8-95-1032 (N.D.Iowa Nov. 22, 1995). I note,

1998 WL 754620
9 Mass.L.Rptr. 242
(Cite as: 1998 WL 754620 (Mass.Super.))

however, that some of these courts only issued an order prohibiting future solicitation, and did not bar for one year all financial dealings by financial advisors with their former clients. See *American Express Financial Advisors v. Theis, supra; American Express Financial Advisors v. Fury, supra; New Boston Select Group, Inc. v. Ristaino, supra.* In those cases where the one year blanket prohibition was enforced, few of these courts addressed head-on the impact such an order would have on those American Express clients who wanted to transfer their accounts to the departing financial advisor. See *IDS Financial Corp. v. Dube, supra* (no discussion of impact on clients); *IDS Financial Servs. Inc. v. Musumeci,* Civil No. 9402566 (D.N.J. July 12, 1994) (noting only that customers may seek advice from other financial planners); *American Express Financial Advisors v. Hughes,* Civil No. CV 98-2273- TUC-WDB (D. Ariz. June 10, 1998) (no discussion of impact on clients); *American Express Financial Advisors v. Knox,* Civil No. 98-0615-BH-C (S.D.Ala. July 23, 1998) (noting absence of testimony that clients would suffer any economic loss). When this consideration was carefully examined in similar contexts, it was deemed important enough to cause the court to deny injunctive relief to enforce the covenants not to compete. See *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. de Liniere,* 572 F.Supp. at 249; *Minet Ins. Brokers, Inc. v. Rooney, supra* at 4.

## II. *The Appropriateness of a Preliminary Injunction*

*10 The above findings regarding the likelihood that American Express will be able ultimately to enforce the restrictive covenants in the Planner's Agreement affect, but do not necessarily determine, my decision as to whether a preliminary injunction should issue. As stated above, I must also examine whether American Express would suffer irreparable injury if I fail to issue a preliminary injunction and then balance this risk against the risk that the defendants would suffer irreparable injury from such an injunction. See *infra* at 6-7.

The defendants contend that, even if a breach of the restrictive covenant were shown, no injunction is warranted because no irreparable harm can be shown. Under Minnesota law, however, the threat of irreparable harm can be inferred from a breach of a valid restrictive covenant. *Medtronic, Inc. v. Gibbons,* 527 F.Supp. at 1091-1092 and cases cited. Even if irreparable harm were not inferred as a matter of law, there is sufficient evidence to support

American Express's contention of irreparable injury. The loss of goodwill, by its nature, is difficult to identify and measure, as are the money damages resulting from the loss of clients. *Id.* at 1091-1092. I find that American Express has met its burden of establishing irreparable harm if an injunction is not issued.

I also find that the issuance of a preliminary injunction barring the defendants from doing any business with former clients for four months and from soliciting clients for one year would do irreparable injury to the defendants, since their American Express clients are the defendants' natural client base.  [FN10] See *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. de Liniere,* 572 F.Supp. at 249 (injunction would leave broker "with no client base in a business that thrives on commissions from regular clients"). The irreparable injury would be far greater if the injunction forced the defendants to relinquish existing clients who had followed them from American Express. Those clients who transferred their funds from American Express already have had to pay substantial surrender charges as a result of this transfer, and would likely pay additional surrender charges if they now transferred their assets from Commonwealth. They would be unlikely to risk even greater surrender charges by returning to the defendants and Commonwealth after the time has elapsed. Moreover, it would be an even greater hardship on the clients to oblige them to transfer these funds back to American Express, whom they do not want to handle their investments, and incur additional surrender charges from Commonwealth in doing so.

> FN10. The four month bar would have a negligible impact on Walker and Healey, since it would expire within days of the issuance of any injunction. It would have a greater impact on Riccio, who left American Express after the other two defendants.

Balancing these competing risks of irreparable injury, this Court shall enforce through a preliminary injunction the four month blanket prohibition on dealing with former clients and the one year ban on solicitation, but it shall not order the defendants to transfer the accounts of those American Express clients who have already joined the defendants prior to this Order. Ordering the defendants to relinquish these accounts and transfer them back to American Express may help to put American Express back to

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1998 WL 754620
9 Mass.L.Rptr. 242
(Cite as: 1998 WL 754620 (Mass.Super.))

where it was before the defendants' violation of the blanket prohibition of the Planner's Agreements, but it would impose undue hardship on the defendants and unfair hardship on their former American Express clients. Consequently, the preliminary injunction shall apply only to the acceptance and solicitation of new business by the defendants, not to the maintenance of current client accounts. This Court also shall enforce through a preliminary injunction for a period of one year the prohibition on the use of confidential information, which the defendants do not contend would pose a hardship for them or their clients. [FN11]

> FN11. The Planner's Agreement prohibits the defendants from ever using confidential information "in a manner adverse to" American Express, but it limits to one year the prohibition on using any confidential client information with any business in competition with American Express. American Express here seeks only a one year injunction on the use of confidential information.

### ORDER

*11 This Court hereby preliminarily enjoins the defendants, Joeann M. Walker and Steven T. Healey, individually and doing business as Walker and Healey Financial Services, as follows:

1. With respect to any persons or entities whom Walker or Healey served while representing American Express and for whom neither is the financial advisor or registered representative as a representative of any broker-dealer other than American Express ("Non-Clients"), Walker and Healey are preliminarily enjoined:
a. until November 2, 1998, from directly or indirectly offering for sale, selling, or seeking an application for any Products (defined as certificates, stock, other securities or investments, lending products, life insurance and annuity policies and contracts, and other insurance products) or Services (defined as financial planning, advisory, securities brokerage, tax, or other financial services);
b. until July 2, 1999, from soliciting [FN12] any Non-Clients (a) to do financial services business with, or to become clients of, them or any broker-dealer with which they are associated, or (b) to cease business, in whole or in part, with or through

American Express.

> FN12. As used in this Order, soliciting means taking any action, directly or indirectly, to attract, including without limitation requesting, encouraging, inducing and/or persuading. Except as provided in 1(a) and 3(a), the defendants are not prohibited from accepting business from American Express clients who independently seek their services in the absence of any direct or indirect soliciting activity on any defendant's part.

2. Until July 2, 1999, from using any confidential information belonging to American Express in connection with any business in competition with American Express.

This Court hereby preliminarily enjoins the defendant Michael J. Riccio as follows:

3. With respect to any persons or entities whom Riccio served while representing American Express and for whom he is not the financial advisor or registered representative as a representative of any broker-dealer other than American Express ("Non-Clients"), Riccio is preliminarily enjoined:
a. until December 11, 1998, from directly or indirectly offering for sale, selling, or seeking an application for any Products (defined as certificates, stock, other securities or investments, lending products, life insurance and annuity policies and contracts, and other insurance products) or Services (defined as financial planning, advisory, securities brokerage, tax, or other financial services);
b. until August 11, 1999, from soliciting any Non-Clients (a) to do financial services business with, or to become clients of, him or any broker-dealer with which he is associated, or (b) to cease business, in whole or in part, with or through American Express.

4. Until August 11, 1999, from using any confidential information belonging to American Express in connection with any business in competition with American Express.

This Court hereby preliminarily enjoins all defendants as follows:

5. Walker and Healey, until July 2, 1999, and Riccio,

1998 WL 754620
9 Mass.L.Rptr. 242
(Cite as: 1998 WL 754620 (Mass.Super.))

Page 11

until August 11, 1999, are directed (a) to maintain a log of the name, date, and mode (*e.g.*, telephone, mail, etc.) of the initial inquiry to any defendant of every Non- Client who inquires about financial products and/or services, except if the Non-Client is the spouse, parent, or child of any of the defendants, and (b) to segregate and maintain separate accounts and records of all services and products sold or provided after July 2, 1998 (for Walker and Healey) and after August 11, 1998 (for Riccio) to any persons or entities whom they served while representing American Express.

**\*12** 6. Defendants shall, within ten days of this Order, return to counsel for American Express any and all materials, including client lists and records, in their possession, custody, or control that belong to American Express, except materials concerning the accounts of their current clients.

Nothing in this Order shall affect the defendants' business and financial dealings with their spouse, children, and parents.

1998 WL 754620, 9 Mass.L.Rptr. 242, 1998 WL 754620 (Mass.Super.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Westlaw.

1991 WL 83163                                                    Page 1
(Cite as: 1991 WL 83163 (N.D.Ill.))

C
Only the Westlaw citation is currently available.


United States District Court, N.D. Illinois, Eastern
Division.

MERRILL LYNCH, PIERCE, FENNER & SMITH,
INC., Plaintiff,
v.
Stuart PATINKIN, Defendant.

No. 91 C 2324.

May 9, 1991.


*MEMORANDUM OPINION AND ORDER*

ANN C. WILLIAMS, District Judge.

*1 This matter is before the court on plaintiff's
Motion to extend the Temporary Restraining Order
issued April 19, 1991, pending an award and final
decision of the arbitration panel of the New York
Stock Exchange, defendant's Motion to Vacate the
Temporary Restraining Order, and defendant's
motion to increase bond set under the temporary
restraining order.   Plaintiff's motion to extend the
Temporary Restraining Order is granted.   The
Temporary Restraining Order is extended until July
1, 1991.   At that time the court will review the status
of the arbitration proceedings, and may extend the
TRO if there is good cause to do so.   Defendant's
Motion to Increase Bond Set on the order to $50,000
is granted.   Defendant's motion to vacate the
temporary restraining order is denied.   Any further
proceedings in this case are stayed pending an award
and final decision of the arbitration panel in
accordance with the Constitution and Rules of the
New York Stock Exchange.


*Background*

Plaintiff's verified complaint alleges that Stuart
Patinkin entered Plaintiff's employ on March 15,
1982, pursuant to an Account Executive Trainee
Agreement ("the Agreement").   The Agreement
provides that Merrill Lynch retains exclusive
ownership of its client records and account
information, which are to be kept confidential.   The

Agreement also provides that the defendant will not
solicit any of Merrill Lynch's clients for a period of
one year after the termination of his employment
from Merrill Lynch. [FN1]

On April 12, 1991, defendant resigned from his job
at Merrill Lynch, without notice, to work at
Prudential Securities, a securities firm which is
competitive with Merrill Lynch.   Indeed, plaintiff
claims that the day after Patinkin left Merrill Lynch,
his former Merrill Lynch customers received letters
from Prudential Securities soliciting their business.
[FN2]

Plaintiff alleges that Patinkin took account records
out of the Merrill Lynch office, and that the
defendant used and transmitted information from
these records in order to solicit Merrill Lynch's
customers.   On April 19, 1991, plaintiff filed this
action for conversion, breach of fiduciary duty, and
unfair competition.   On that same day, plaintiff also
requested immediate injunctive relief, in the form of
a Temporary Restraining Order ("TRO"), prohibiting
the defendant from further breaching the terms of the
Agreement.   In response to plaintiff's motion, the
defendant presented a written motion to compel
arbitration, and oral argument on both the motion to
compel arbitration, and in opposition to the TRO.
Defendant Stuart Patinkin was given the opportunity
to testify at oral argument, but declined.   Hence, the
TRO was issued after notice was given to the
Defendant, and after the court heard and considered
the motions, oral evidence and other submissions by
both parties. [FN3]

In issuing the TRO the court found that the
Agreement "contain[ed] various restrictions on
Defendant's ability to use Plaintiff's records and
otherwise compete with Plaintiff upon a change in
the Defendant's employment."   (TRO, para. 2).
Further, the court also found that the plaintiff had no
adequate remedy at law for the alleged breach of the
Agreement (TRO, para. 5), and that the plaintiff
would suffer irreparable harm and loss if a TRO was
not granted (TRO. para. 4).   Finally, the court found
that greater injury would be inflicted upon the
plaintiff by the denial of the TRO than would be
inflicted upon the defendant by granting the TRO.
(TRO, para. 6).

*2 The TRO both enjoined and restrained the
defendant from soliciting or accepting business from

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

any client of plaintiff's whom defendant served, or whose name became known to the defendant while in plaintiff's employ. [FN4] Defendant was also enjoined and restrained from accepting any business from any clients whom Defendant solicited for purposes of doing business with Prudential Bache. Finally, defendant was enjoined and restrained from using, disclosing or transmitting information contained in plaintiff's records, including the names and addresses and financial information of plaintiff's clients. Patinkin was ordered to deliver any original records or copies to plaintiff, or it's attorney.

The court also granted the defendant's motion to compel arbitration, and ordered the parties to submit to arbitration in this matter, as provided for by the Constitution and Rules of the New York Stock Exchange. [FN5] Finally, the court noted that the TRO was entered to maintain the status quo and without prejudice to the merits of the claims of defenses which had been or may be asserted in this litigation. Under the court's order, the TRO was in effect until April 29, 1991.

On April 23, 1991, the defendant filed a motion for an increase in the amount of bond posted by the plaintiff, which was stayed by the court pending resolution of this motion. The defendant also filed a motion to compel expedited arbitration. On the same day, the court heard oral argument on these issues.

The court denied the motion for expedited arbitration, finding that the contractual provisions of the Agreement did not provide for expedited arbitration. [FN6] Because the terms of the Agreement merely required the parties to arbitrate in accordance with the Constitution and rules of the New York Stock Exchange, the court could not force the plaintiff to submit to expedited arbitration. See e.g., Merrill Lynch v. Cunningham, 736 F.Supp. 887 (N.D.Ill.1990); and Merrill Lynch v. Tobias, 90 C 20210, U.S. District Court, Western Division (July 17, 1990).

On April 29, 1991, the plaintiff brought this motion to extend the TRO pending an award and final decision of the arbitration panel in accordance with the Constitution and Rules of the NYSE. [FN7] A few minutes before motion call, the defendant submitted several documents and motions to the court, raising numerous arguments against the extension of the TRO. Defendant submitted a report on the status of the proceedings and accompanying affidavits, objections to plaintiff's motion to extend the TRO, and an answer to the plaintiff's complaint.

The court continued the hearing until 5:00 p.m.. The plaintiff, at that time, submitted its response to the defendant's objections. The court extended the TRO one day, and referred the matter to the emergency judge, as this judge was absent from court on April 30, 1991. The emergency judge did not hear the merits of the motions, and the parties agreed to extend the TRO for one day. This court held a hearing on May 1, 1991.

*Discussion*

*3 This court has already determined that the dispute in this case is arbitrable, and has ordered the parties to submit their dispute to arbitration. Since that time, Patinkin has complied with the TRO by returning all documents to plaintiff's attorney. [FN8] Although Patinkin, Prudential Bache Securities, and Merrill Lynch have initiated arbitration of their disputes before the New York Stock Exchange, the parties apparently have not agreed to find a mutually convenient date to proceed with arbitration proceedings in Chicago.

Now that arbitration proceedings have been initiated and the documents have been returned to the plaintiff, the defendant asserts that any harm or loss that Merrill Lynch has 'allegedly' suffered prior to the entry of the TRO has ceased due to Patinkin's compliance with the TRO. Defendant reasons that the balance of the equities has now tipped overwhelmingly in favor of Patinkin who will be unable to earn a living while this injunction in force. Defendant also argues that because the plaintiff refuses to go to expedited arbitration, equity and fairness require the court to vacate the temporary restraining order.

Under Federal Rule of Civil Procedure 65, unless there is agreement for extension between the parties, the court cannot extend a TRO without good cause. The Rule provides that a TRO:

... shall expire by its terms within such time after entry, not to exceed 10 days, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period or unless the party against whom the order is directed consents that it may be extended for a longer period. The reasons for extension shall be entered of record....

This court's reading of the rule is that under Federal Rule of Civil Procedure 65, a court cannot extend a TRO without a showing of good cause. Evidence of good cause is especially important when the TRO has been issued without notice to the other side. [FN9] In

the instant case, the defendant did of course, have notice and an opportunity to be heard before the TRO was issued. Therefore, the only question presented here is whether there is good cause to extend the TRO.

The court recognizes that the defendant has returned the documents he removed from Merrill Lynch as required under the TRO. Because the documents have been returned, the only possible remaining harm to plaintiff is that the defendant may solicit its clients. The court finds that this possible harm justifies the extension of the TRO. As the Fourth Circuit Court of Appeals noted in *Merrill Lynch v. Bradley*, 756 F.2d 1048 (4th Cir.1985), a case that was factually similar to this one, the continuing possibility that the defendant will solicit plaintiff's clients justifies the TRO's extension. Without injunctive relief the defendant's conduct might irreversibly damage the status quo:

When an account executive breaches his employment contract by soliciting his former employer's customers, a non-solicitation clause requires immediate application to have any effect. An injunction even a few days after solicitation has begun is unsatisfactory because the damage is done. The parties cannot be 'unsolicited.' It may be impossible for the arbitral award to return the parties substantially to the status quo ante because the prevailing parties' damages may be too speculative.

*4 *Id.* at 1054.

The *Bradley* court therefore concluded that:

[W]here a dispute is subject to mandatory arbitration under the Federal Arbitration Act, a district court has the discretion to grant a preliminary injunction to preserve the status quo pending arbitration of the parties' dispute if the enjoined conduct would render that process a 'hallow formality.' The arbitration process would be a hallow formality where 'the arbitral award when rendered could not return the parties substantially to the status quo ante.' ... [this] decision will further, not frustrate, the policies underlying the Federal Arbitration Act.

*Id.* at 1053-1054.

Two other courts in this circuit have considered the issue of extending a temporary restraining order, in cases which were factually similar to this one. In *Merrill Lynch v. Cunningham*, 736 F.Supp. 887 (N.D.Ill.1990) and *Merrill Lynch v. Tobias*, 90 C 20210, U.S. District Court, Western Division (July

17, 1990), both courts found that the extension of the TRO was justified because of plaintiff's likely, and threatened loss of clients, and the irreparable harm that plaintiff would suffer if the TRO was not extended. *See also, Merrill Lynch v. Mathes*, No. CY-90-3060-AAM, U.S. District Court, Eastern District of Washington (August 2, 1990) (Injunctive relief extended pending arbitration of parties dispute).

The defendant has attacked the extension of the TRO on a number of grounds. First, the defendant argues that the Agreement is not valid. At the hearing on the motion to extend the TRO, the defendant testified that he was told by his supervisor that he was bound to the terms of the Agreement for only a two year period. Since the Agreement was signed in 1982, Patinkin argues that he is no longer bound to the its terms. The court finds that this argument is not credible, and is not supported by the clear terms of the parties' Agreement, which the defendant admitted he read, and understood before signing. [FN10] No language in the Agreement suggests that it is enforceable for only a limited period of time. The court rejects this position.

Defendant also argues that the TRO should be vacated because the Agreement, which defendant alleges is a restrictive covenant, is unenforceable. Defendant testified that some seventy to eighty percent of the clients he served at Merrill Lynch were long time friends, neighbors, and relatives, which he solicited without any real input from Merrill Lynch. Defendant asserts that under Illinois law, since he developed his client base, and provided the information about his clients to Merrill Lynch, the information is not confidential. Defendant reasons that since the information is not confidential, Merrill Lynch does not have a legitimate protectable interest in enforcing the restrictive covenant.

As the court told the parties several times at oral argument, these arguments have little bearing on the court's ruling on the motion for the extension of the TRO. In general, this court will not consider the merits of this case or the overall validity of the Agreement, as that is better left to the arbitration board. [FN11]

*5 Even if relevant to this motion, the court finds that the defendant's argument concerning his client base and the restrictive covenant has no weight. [FN12] Defendant's argument regarding the unenforceability of the Agreement as a restrictive covenant is based on Illinois law. Paragraph 4 of the Agreement explains, that the "Agreement shall be construed, and the validity, performance and

enforcement thereof shall be governed by the laws of New York." Therefore, Illinois law does not apply. [FN13] Also, the court believes that this argument is weak on its face, since the relevant language of the contract makes no distinction between clients Patinkin brought to the firm, and those supplied by Merrill Lynch. [FN14]

Finally, the defendant pointed out that at least one court in this circuit has declined to extend a TRO pending arbitration of the dispute. In *Merrill Lynch v. Rosenbaum* 90 C 5031 (N.D.Ill.1990), once the defendant returned plaintiff's account information, and plaintiff's claim had been submitted to the New York Stock Exchange, Judge Conlon vacated the TRO because she found that the balance of the equities favored the defendant. Here, this court issued the TRO out of concern for plaintiff's interest in its client base as well as its business records, and therefore declines to follow the *Rosenbaum* decision.

In addition, the court is not persuaded by defendant's argument that he will suffer undue hardship by the loss of Merrill Lynch clients if the TRO stays in effect until this matter is resolved by the arbitration board. The court finds that although this argument has some merit, the defendant has the ability to contact new clients, to solicit business from them, and to receive customers from Prudential. The court also notes that the TRO does not restrict solicitation of business from family members. Further, while defendant testified as to the hardship he would face if the TRO remained in effect, he also testified that he was given a bonus when he joined Prudential.

Furthermore, defendant's argument that the hardship suffered by his Merrill Lynch clients requires the dissolution of the TRO must be also rejected. Those customers are free to do business with other brokers at Merrill Lynch, or they can transfer their accounts to other brokerage firms. There is no great public harm from the clients' temporary loss of Mr. Patinkin's services. His clients, like those of many others before him, can find other brokers to manage their accounts until this matter is resolved by the arbitration board. The court finds that the balance of the equities does not favor vacating the TRO.

As was noted above, the intent of the court when it entered the TRO on April 19, 1991, was to maintain the status quo without prejudice to the merits of the parties claims or defenses that were or may be asserted in this litigation, until an arbitration panel could hear, and make findings on the issues presented in this lawsuit. It was the court's intention that the TRO would stay in effect until the case was presented

to the arbitration panel, which could use its expertise and knowledge in this field to resolve the dispute presented.

*6 After reading the submitted documents, the defendant's Answer to the verified complaint, and hearing testimony and oral argument on this motion, the court finds that there is still good cause for the issuance of the TRO. The court bases its finding on its belief that the plaintiff will suffer irreparable harm if the TRO is not extended. In doing so, this court joins several other courts which have found that Merrill Lynch suffers irreparable harm from the solicitation and loss of its clients, and that this is a harm for which there is no adequate legal remedy.

The court also finds that greater injury will be inflicted on the plaintiff by the denial of the extension of the TRO than will be inflicted upon the defendant by granting the extension. The court notes that the injuries which the parties face involve more than economic losses. If the economic status of the parties was the only factor to be considered here defendant might very well prevail on this motion. The court believes that the denial of the extension of the TRO under the circumstances presented in this case would leave Merrill Lynch vulnerable to the same conduct from other employees. Hence, the potential harm plaintiff faces, on several levels, is enormous. [FN15]

Therefore, the court extends the TRO until July 1, 1991, or until the arbitration panel is able to address whether the TRO should remain in effect. The parties are instructed to cooperate with each other in order proceed to arbitration, under the Rules and Constitution of the NYSE, as expeditiously as possible.

### Conclusion

The Plaintiff's motion to extend the temporary restraining order is granted. The TRO will remain in effect until July 1, 1991. The Defendant's motion to vacate the temporary restraining order is denied. Defendant's motion to increase bond to $50,000 is granted. Since the plaintiff refuses to agree to an expedited arbitration hearing, [FN16] and defendant will suffer some harm during the pendency of the TRO, an increase in the bond is warranted. A status hearing is set for 9:30 a.m. on Friday, June 28, 1991.

FN1. The agreement provides that:
1. All records of Merrill Lynch, including the names and addresses of its clients, are

and shall remain the property of Merrill Lynch at all times during my employment with Merrill Lynch and after termination of my employment for any reason with Merrill Lynch. None of said records nor any part of them is to be removed by me from the premises of Merrill Lynch either in original form or in duplicated or copied form, and the names and addresses and other facts in such records are not to be transmitted verbally or in writing by me except in the ordinary course of conducting business for Merrill Lynch. All of said records or any part of them are the sole proprietary information of Merrill Lynch and shall be treated by me as confidential information of Merrill Lynch.

2. In the event of termination of my services with Merrill Lynch for any reason, I will not solicit, for a period of one year from the date of termination of my employment in any community or city served by the office of Merrill Lynch, or any subsidiary thereof, at which I was employed at any time, any of the clients of Merrill Lynch whom I served or whose names became known to me while in the employ of Merrill Lynch. In the event that any of the provisions contained in this paragraph and/or paragraph (1) above are violated, I understand that I will be liable to Merrill Lynch for any damages caused thereby.

FN2. The court notes that on May 1, 1991, the defendant testified at the hearing on the extension of the TRO and did not deny any of these factual allegations.

FN3. Defendant now argues that the TRO was issued without notice. This argument is meritless. Shortly before motion call for the TRO the defendant filed a motion to compel which was in excess of twenty pages. At oral argument, defendant raised numerous arguments against the issuance of the TRO.

FN4. At the hearing on the motion to extend the TRO, both counsel agreed that defendant was not restrained from accepting business with those Merrill Lynch customers he did not solicit. Hence, Patinkin is free to accept business from any clients he did not solicit.

The TRO is accordingly modified to reflect this understanding.

FN5. The court specifically rejected defendant's argument that the Illinois Arbitration Act superseded the Federal Arbitration Act. Because the Federal Arbitration Act is applicable to this action, the court found that it is not bound by the Illinois Uniform Arbitration Act, which is superseded by the Federal Act. (See TRO, ¶ ¶ 8 and 9, *Conclusions of Law, and* 9 U.S.C. § 2. *See also, Zechman v. Merrill Lynch,* 742 F.Supp. 1359, notes 4 and 6 (N.D.Ill.1990).

The court further found that the Federal Arbitration Act did not preclude the issuance of a temporary restraining order in this case, pending arbitration. *See Merrill Lynch v. Tobias,* 90 C 20210, U.S. District Court N.D. Illinois, Western Division (July 17, 1990) (Roszkowski, J.) and *Merrill Lynch v. Cunningham,* 736 F.Supp. 887 (N.D.Ill.1990) (Hart, J., and *see also, Sauer-Getribe KG v. White Hydraulics, Inc.,* 715 F.2d 348 (7th Cir.1983) (finding that it was error for a district court not to grant injunctive relief pending arbitration of a matter where the plaintiff established the factors for obtaining a preliminary injunction), and *Merrill Lynch v. Bradley,* 756 F.2d 1048, 1052 (4th Cir.1985).

FN6. 9 U.S.C. § § 3-4 of the Federal Arbitration Act specifically states that arbitration can be compelled only "in accordance with the terms of the agreement to arbitrate.

FN7. Merrill Lynch has, in accordance with these rules, notified the Director of Arbitration of the NYSE to open a file in this matter, submitted a fully executed Uniform Submission Agreement, paid the filing fee, demanded the constitution of a panel of three members in accordance with the Rules of the NYSE, requested a cite for arbitration in Chicago, filed a formal claim with the Director of Arbitration of the NYSE, served a request for the production of documents from the defendant as provided for under Rule 619 of the NYSE, and notified opposing counsel of its

willingness to contact the NYSE to arrange a hearing date for arbitration.

FN8. The parties agree that Patinkin's attorney will be allowed to keep copies of the document, and to show and discuss the documents with his client for purposes of defending Mr. Patinkin in this litigation, and the pending arbitration.

FN9. See also, *Merrill Lynch v. Tobias,* a case which was extremely similar to this one factually, Judge Roszkowski found that "Rule 65 presumably contemplates TROs issued without notice to the adverse party. The rule is silent as to whether a TRO issued with notice to the adverse party expires after 10 days." (*Tobias,* at p. 5). Judge Roszkowski found that Illinois law was instructive on this procedural point, and that it suggests that when a TRO is issued with notice to the adverse party, it will not necessarily expire after ten days:

In this regard, Illinois case law indicates that TROs with notice to the adverse party do not necessarily expire after 10 days. In *City of Chicago v. Westphalen,* 93 Ill.App.3d 1110 (1st Dist.1981), the court held that when notice is provided in conjunction with a TRO, the TRO can be issued for a period of greater than 10 days. *See also, Lawter International, Inc. v. Carroll,* 107 Ill.App.3d 938 (1st Dist.1982); *Kable Printing Co. v. Mount Morris Bookbinders Union Local 65-B,* 349 N.E.2d 36 (1976). This holding makes sense. The trade-off for an *ex parte* issuance of a TRO is that the TRO has a limited life. *Levas and Levas v. Village of Antioch, Ill.,* 684 F.2d 446, 448 (7th Cir.1982). This type of protection is not required when a TRO is issued with notice and both parties have an opportunity to present evidence before the court. *Id.* at 6.

FN10. Although the court believes that this is an issue which should go before the arbitration board, for purposes of the motion to extend the TRO, this argument is rejected. The court makes this tentative finding, which is not binding on the arbitration board for the limited purpose of deciding the motion to extend the TRO.

FN11. Indeed, the court specifically declined to turn the motion for an extension of the TRO into a hearing on a preliminary injunction, because issuing a preliminary injunction would require inquiry into plaintiff's likelihood of success on the merits to a greater extent than that required for the issuance of a TRO. The court agrees that "such a judicial inquiry would inject into the merits of issues more appropriately left to the arbitration panel." *Tobias,* at p. 7.

Similarly, the court also believes that defendant's general argument that the employment agreement is too broad to be enforceable, is also better left to the arbitration board, which is already responsible for finally determining whether the Agreement is enforceable.

FN12. Again, the court notes that these are tentative rulings for purposes of deciding the motion to extend the TRO.

FN13. Similarly, defendant's testimony regarding confidentiality at Merrill Lynch, and how easily he and others gained access to customer names and files is not an issue that this court will deal with at this time. In the initial motion for a TRO, the plaintiff submitted an affidavit explaining how client files are only available to those Merrill Lynch employees who have access to the firm's computer password. Based on this evidence, the court found that the customer lists were intended to be confidential, meaning that they are only intended to be used by Merrill Lynch employees. In light of this reasoning, defendant's arguments regarding his own access to names of Merrill Lynch customers before they became clients of Merrill Lynch is unpersuasive. The point here is that once an individual becomes a client of Merrill Lynch, the firm makes an effort to keep information about that client confidential.

FN14. Paragraphs 2 states in pertinent part that:

In the event of termination of my services with Merrill Lynch for any reason, will not solicit, for a period of one year from the date

of termination ... any of the clients of Merrill Lynch whom I served or whose names became known to me while in the employ of Merrill Lynch.

FN15. Although the defendant testified that other former brokers at Merrill Lynch kept, retained and ultimately used client information for their own personal benefit, the court cannot rely on these conclusory, hearsay allegations, which lacked sufficient foundation for reliability.

FN16. The defendant determined that the Arbitration Board could hear this matter on an expedited basis on May 8, 1991. The court is now unsure as to when an arbitration hearing will be held.

1991 WL 83163, 1991 WL 83163 (N.D.Ill.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in N.E.2d
(Cite as: 2002 WL 31862713 (Mass.Super.))

Only the Westlaw citation is currently available.

Superior Court of Massachusetts.

PRUDENTIAL INSURANCE COMPANY OF
AMERICA et al.,
v.
Douglas F. TRACIA et al.

No. 20024369C.

Nov. 12, 2002.

*MEMORANDUM OF DECISION AND ORDER ON
PLAINTIFFS' MOTION FOR A PRELIMINARY
INJUNCTION*

PETER M. LAURIAT, Justice.

**\*1** Prudential Insurance Company of America and Pruco Securities Corporation (collectively "Prudential") brought this action against Prudential's former agent, Douglas F. Tracia ("Tracia"), for injunctive relief and damages arising from his alleged violation of one or more employment agreements. After securing an ex-parte temporary restraining order from the court on October 17, 2002, Prudential has now moved for issuance of a preliminary injunction to preclude Tracia from violating certain terms and conditions of a Prudential Statutory Agent Agreement ("SAA") dated November 9, 2000, pending the determination of the merits of Prudential's claims against Tracia by arbitration.

Tracia has opposed Prudential's request for injunctive relief on the ground that he did not sign the SAA that Prudential had proffered to the court in support of its initial request for an injunction, and that the SAA that he did execute on December 4, 2000 did not contain the restrictive provisions upon which Prudential relied.

I.

Since the parties' focus is directed to the validity of the disputed SAA, the court agreed to hold an evidentiary hearing on Prudential's request for injunctive relief. While the parties then presented 23 exhibits and the testimony of six witnesses and over a period of three days, as well as lengthy affidavits and memoranda of law, the court is no closer to a determination of whether Tracia signed the SAA

dated November 9, 2000, or the SAA dated December 4, 2000, or both. Indeed, the only conclusion that the court has drawn with respect to the disputed SAA is that upon the record now before the court, the parties' evidence on that subject is equally credible--or incredible.

The ultimate determination of the validity of any or all of Tracia's signatures on the SAA must await a hearing on the merits, at which witnesses who have relevant testimony, as well as expert handwriting examiners, may be called to testify. However, on the record now before it, the court concludes that Prudential has failed to show that it has a likelihood of success on the merits of its claim that Tracia has violated the terms of the SAA dated November 9, 2000, and its request for an injunction to enforce the provisions of that agreement must be denied. See *Packaging Industries Group, Inc. v. Cheney,* 380 Mass. 609, 617 (1980).

II.

In order for an injunction to issue, Prudential must demonstrate a likelihood of success on the merits of its claims and a need for injunctive relief that rises to the level of a substantial risk of irreparable harm. The Court must then balance that risk, assuming it exists, against any similar risk of irreparable harm which granting the injunction would create for the opposing party. *Packaging Industries Group, Inc. v. Cheney,* 380 Mass. 609, 617 (1980).

The documentary and testimonial evidence presented by the parties is not in dispute with respect to a Prudential Representative's Agreement ("PRA") that was executed by Tracia and Prudential on September 22, 1997, when Tracia began his employment with Prudential. (Exhibit 1.) In the absence of any subsequent binding agreement between the parties (the validity of the later SAA being uncertain), the court will look to and rely on the terms and Conditions of the PRA to determine Prudential's request for injunctive relief.

**\*2** Section 6 of the PRA provides:

...

(B) That all books, records, documents and supplies, and all contract holder or product information of any kind whether furnished by [Prudential] or obtained or prepared by me while employed by [Prudential] shall be deemed exclusively [Prudential] property; and upon termination of this Agreement by either party, [Tracia] will promptly deliver all such property, including all copies thereof to a proper

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

representative of [Prudential].

(c) That all information which either identifies or concerns contract holders of [Prudential] or its subsidiaries, including, but not limited to, contract values and beneficiary information is confidential and of special value to [Prudential]; and therefore, I shall not provide to any person not in [Prudential's] employ any information which may be used to solicit for sales on behalf of some other company or organization.

Section 14 of the PRA provides:

That for a period of two years from the termination date of this Agreement, [Tracia] shall not directly or indirectly:

(a) Solicit, cause or induce any contractholder of the Company or its subsidiaries who became known to [Tracia] during my employment with [Prudential] to purchase services or products which compete, directly or indirectly, with those sold by [Prudential] or its subsidiaries.

(b) Do anything to cause, persuade or encourage anyone to reduce, discontinue, or terminate any [Prudential] or subsidiary policy, contract, service or product of any kind.

"Non-competition and non-disclosure agreements are enforceable as long as they are necessary to protect a legitimate interest of the employer and are not designed to protect an employer from ordinary competition. Both an employer's good will and confidential and proprietary information are considered legitimate business interests entitled to protection." *Salomon Smith Barney, Inc. v. Wetzel and Carlson,* No. 01-J-44 (Mass.App.Ct. January 29, 2001) (Porada, J.) at 3, citing *Marine Contractors Co., Inc. v. Hurley,* 365 Mass. 280, 287 (1974). "[A] stockbroker relationship is more akin to a sales person than a lawyer or doctor and ... an employer is entitled to have protected as his or her goodwill a customer base which an employee has developed or acquired through the training and resources provided by the employer ... Similarly, ... the list of plaintiff's clients and the financial data and personal information relating to them is confidential information entitled to be protected under the criteria established in *Jet Spray Cooler, Inc. v. Crampton,* 361 Mass. 835, 840 (1972)." *Id.* at 4. On the present record, Prudential has demonstrated a likelihood of success on the merits of its claims against Tracia based upon the PRA.

The court also concludes that Prudential has shown that it will suffer a substantial risk of irreparable harm if an injunction is not granted to enforce the Sections 6 and 14 of the PRA. "[Once] the plaintiff's confidential information is disclosed the harm is complete and irreparable." *Id.* The losses related to

any actions by Tracia in derogation of Sections 6 and 14 of the PRA may be very difficult to quantify. On the other hand, the PRA does not preclude Tracia from gainful employment at another company, even one which is Prudential's competitor. Nor does the PRA preclude Tracia from servicing clients who seek him out, although he may not "cause, persuade or encourage" those clients from reducing, discontinuing or terminating any of Prudential's contracts, services or products. Finally, Prudential acknowledges and agrees that if an injunction should issue, Tracia is entitled to a very prompt hearing and determination of Prudential's claims against him before an arbitration panel appointed by the NASD on an expedited basis. Under these circumstances, the court concludes that the potential harm to Prudential if an injunction should not issue outweighs the potential harm to Tracia if an injunction issues pending a determination of the merits of this action.

### ORDER

*3 For the forgoing reasons, it is hereby *ORDERED* that a Preliminary Injunction shall issue, restraining and enjoining Douglas F. Tracia, until further order of the court, from:

1. Soliciting, causing or inducing any contractholder of Prudential Insurance Company, Inc. and/or Pruco Securities, Inc. who became known to Tracia during his employment with Prudential Insurance Company, Inc. and/or Pruco Securities, Inc., except individuals who are related to Douglas F. Tracia by blood or marriage, to purchase services or products which compete, directly or indirectly, with those sold by Prudential Insurance Company, Inc. and/or Pruco Securities, Inc.;

2. Doing anything to cause, persuade or encourage anyone, except those individuals who are related to Douglas F. Tracia by blood or marriage, to reduce, discontinue, or terminate any policy, contract, service or product of any kind issued by Prudential Insurance Company, Inc. and/or Pruco Securities, Inc.; and

3. providing to any person or entity not employed by Prudential Insurance Company, Inc. and/or Pruco Securities, Inc., any information which either identifies or concerns contract holders of Prudential Insurance Company, Inc. and Pruco Securities, Inc., except those individuals who are related to Douglas F. Tracia by blood or marriage, including, but not limited to, contract values and beneficiary information, and from providing to any person not employed by Prudential Insurance Company, Inc. and/or Pruco Securities, Inc. any such information, except information related to

Not Reported in N.E.2d
**(Cite as: 2002 WL 31862713 (Mass.Super.))**

individuals who are related to Douglas F. Tracia by
blood or marriage, which may be used to solicit for
sales on behalf of some other company or
organization.
It is further *ORDERED:*

4. That within ten days of the date of this Order,
Tracia shall deliver to a proper representative of
Prudential Insurance Company, Inc. and/or Pruco
Securities, Inc. all books, records, documents and
supplies, and all contract holder or product
information of any kind, including all copies thereof,
whether furnished by Prudential Insurance Company,
Inc. and/or Pruco Securities, Inc., or obtained or
prepared by Tracia while employed by Prudential
Insurance Company, Inc. and/or Pruco Securities,
Inc., except with respect to those individuals who are
related to Douglas F. Tracia by blood or marriage.

SO ORDERED.

2002 WL 31862713 (Mass.Super.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works