11/01/2004

Neil H. Gendreau, CFP
139 Rocky Pond Road
Boylston, MA 01505

United States District Court
Donahue Federal Building
595 Main St.
Worcester, MA 01608

Re: Case Number 04-40221, American Express Financial Advisors Inc. v. Neil H. Gendreau, **Reply and Countercomplaint Filed by Defendant**

CC:
C. Alex Hahn, Esq.
Scibelli and Whiteley, LLP
Old City Hall
45 School St.
3rd Floor
Boston, MA 02108

Enclosures:

1. Reply and Countercomplaint
2. Excerpts from P2 Compliance Resource Guide, dated 02/11/2002, regarding:
    a. Approval of outside activities
    b. Selling Specific Types of Products and Services, specifically, Independent Brokering of Insurance Products
3. Historical E-mail communication with AEFA, regarding:
    a. 412(i) plan implementation
    b. Proposed marketing initiatives through AEFA:
        i. CPA Alliance
        ii. Stock Option Planning for employees at Astra Zeneca
    c. Difficulties with technology at AEFA
        i. Advisor Platforms
        ii. Client Platforms

**Reply and Countercomplaint**

1. **Nature of Reply** – Neil H. Gendreau, the defendant, and independent advisor, seeks to demonstrate the following as countercomplaint and reply:
   a. In order for a contract to be legally enforceable, valuable consideration must be exchanged between the parties. Neil H. Gendreau, as defendant, seeks to demonstrate that AEFA did not offer significant services to the Independent Advisor that are consistent with the plaintiff's alleged branding image.
   b. Neil H. Gendreau, CFP, the defendant, as Independent Advisor and accredited fiduciary, seeks to demonstrate that the plaintiff has no legal entitlement to privileged, confidential client information.
   c. Threatened injury to the defendant far outweighs threatened injury to the plaintiff.
   d. Consistent with 1a,1b, & 1c, Defendant motions to dismiss the Plaintiff's complaint and requests for Temporary and Full Injunctive Relief, based on insufficient standing, and the extent of harm imposed to the Independent Advisor, his practice, and his clients.
   e. If the United States District Court of said jurisdiction finds it necessary to send this case to arbitration by the NASD, then defendant files, with this countercomplaint, a civil action entered against the plaintiff for damages incurred to the extent that temporary injunctive relief impairs the Independent Advisor's ability to practice, calculated on a pro-rata basis from the date of specific injunction to the date which said case is resolved in favor of the Independent Advisor, based on YTD earnings at AEFA through 10/8/2004, the Independent Advisor's termination date.
   f. If the United States District Court of said jurisdiction finds it necessary to send this case to arbitration by the NASD, then defendant files, with this countercomplaint, a civil action entered against the plaintiff for all legal fees incurred, plus interest, for the defense of the Independent Advisor.

2. **Facts and Assessments of Independent Advisor:**
   a. **Termination Date** – Plaintiff alleges confusion and misrepresentation concerning official notice of termination in reference to procedures outlined by the Franchise Agreement, dated 12/15/1999:
      i. On or before 10/8/2004, my transitions co-ordinator with Fusion Financial Group filed a U-5 notice, an electronic notification of my intent to change broker-dealer affiliations, with the NASD. My U-4 status was updated the morning of October 8th, my first official day as newly appointed registered representative with National Financial Partners.
      ii. I was instructed by my transitions co-ordinator to send an E-mail of my termination notice (to him), then a faxed copy with my signature, dated 10/8/2004
      iii. Based on my interpretation of these instructions, I was under a false understanding, solely through my own misinterpretation, that such termination notice would be sent to the appropriate authorities at American Express.

      iv. Even had the written notice reached the proper personnel, which I now realize should have been John A. Henehan, my regional Vice President at the time, I still would still have been in violation of the Franchise Agreement by failure to provide two weeks advance notice.

      v. Independent Advisor attests that my departure was not conducted in a graceful manner, and for that, I hold no regrets. Quite clearly, the first priority in my transition was not for the concern of AEFA, but for concern of my clients and the continuity of my practice as Independent Advisor.

      vi. My next nearest notification to an AEFA representative was a phone call made to Keith Bixby, my then OSJ (Compliance Supervisor), on Tuesday October 12th, the next business day, at approximately 11 am EST. The purpose of the call was to request termination of an automated bank debit that was established to compensate Mr. Bixby for his services as OSJ.

      vii. On Monday October 18th, Martha Kondel, an AEFA home office employee representing the "risk mitigation" department, requests a faxed copy of my termination notice, dated October 8th, 2004. Independent Advisor honors Mrs./Ms. Kondel's request – a facsimile copy is sent.

b. **Possession of Files and Alleged Violations of Client Privacy Acts:**
   i. It was not until late the afternoon on Friday, October 15th, when I received a call from Mr. Henehan, requesting to arrange a time for the return of client files and other data, allegedly confidential to AEFA. Mr. Henehan left his message on my voice system, which introduces me as a member of the Fusion Financial Group/National Financial Partners affiliation.
   ii. On Wednesday October 20th, Mr. Henehan makes an unannounced and uninvited visit to my office to make a final request for any files I may have available.
   iii. As duly noted, I refuse the return of any files, and suggest that AEFA should obtain a court order if they expect me to comply with their request. Mr. Henehan suggests that AEFA would be in the process to seek a restraining order to enforce compliance. Recognizing the implications of legal merit and remedies available to the parties, I nod and wish Mr. Henehan "good luck" with his new career as an advisor.
   iv. **AEFA contends that all Client Data is privileged information to AEFA and subject to protections offered by the Client Privacy Act:**
      1. **Client files and data contained wherein have been procured by Independent Advisor in pursuit of Independent Advisory practice.**
      2. **Procurement of client data is a necessary element of the Financial Planning Process, a fiduciary responsibility**

      duly recognized by the Certified Financial Planner Board of Standards.
3. **Within this context, it is the responsibility of the Independent Advisor to procure, maintain, and protect the confidentiality of such client data.**
4. **AEFA understands and recognizes that surrender of such data would place the Independent Advisor at a significant disadvantage in his ability to conduct his business and serve clients effectively.**

 v. <u>**Summary of Termination History as it relates to Client Privacy**</u>:
1. Status of U-4 is electronically updated on Friday October 8th, 2004.
2. <u>Tuesday October 12th</u> - Keith Bixby, former OSJ for Neil H. Gendreau, CFP, Independent Advisor, is notified by the defendant of the defendant's termination.
3. <u>Friday October 15th</u> – John A. Henehan, former Regional Vice President for the Southern New England Market Group, makes a call to the defendant's office requesting files.
4. <u>Monday October 18th</u> – Mrs./Ms. Martha Kondel, **"risk mitigator"** for AEFA, requests official written notification of my termination notice.
5. Meanwhile, I retain full access to all AEFA advisor related account data systems, including Advisor Jazz, OST, American Express Brokerage, and Lotus Notes, through Wednesday October 20th, the date of Mr. Henehan's unannounced visit.
6. **As Independent Financial Advisor, I retained electronic access to all AEFA account data and other "privileged" information for a full 12 days after my official termination date as an advisor affiliate. How many AEFA officers and employees does it take to de-activate a few simple passwords? <u>The confidentiality and privacy of my clients' data is at severe risk while they retain any portion of their current assets with AEFA.</u>**

c. **Representations to the Public:**
 i. The Plaintiff contends that I retain American Express labels, insignia, signs, and venues of communication in an attempt to misrepresent myself to the public as an AEFA Advisor:
  1. As previously noted, John A. Henehan, former regional Vice President for the Southern New England market group, had visited my office on Wednesday October 20th. Mr. Henehan has been to my office upon good relations many times in the past, and would have been in a position

to observe a number of changes with his last visit and most recent communication.
   a. All AEFA awards that have been presented to me, many personally by Mr. Henehan himself, have been removed from display on the conference table in my office.
   b. Four very large posters advertising certain segments of American Express Advisory services, normally on vivid display in my conference room, were conspicuously absent during Mr. Henehan's last visit, Wednesday October 20th.
   c. On Friday October 15th, while leaving a voice message for the request of client files, Mr. Henehan was in a position to hear my answering machine introduction, which announces my present affiliations with Fusion Financial Group and National Financial Partners.
2. Outside of 415 Boston Turnpike Rd., Shrewsbury, MA, where Independent Advisor conducts an independent advisory practice, a billboard is displayed to advertise all occupants at this commercial address. The AEFA Blue Box presented on this billboard is currently allocable to the advisory practice of Cheryl Crouse, who occupies this address as a representative of American Express Financial Advisors. Ms. Crouse had previously shared office space with me in Suite 213, but now has been forcibly been moved upstairs, as AEFA will not allow its "Independent Advisors" to share office space with other professionals not affiliated with AEFA.
3. The plaintiff and its legal council should be able to verify my present phone listing bears no reference to American Express Financial Advisors. Any party with access to a local phone directory would be able to verify my three listings, two in the yellow pages – one under <u>Financial Planning Consultants,</u> and one under <u>Investment Advisory Services</u> as **Gendreau, Neil,** and one in the White Pages as **Gendreau, Neil CFP.** The most recent local phone directory was published and distributed in February, 2004, several months in advance of my termination with AEFA.
4. **The plaintiff is fully aware that disconnecting phone lines and fax machines, paid for as business expenses by the Independent Advisor, would place the Independent Advisor at a significant disadvantage in his ability to communicate with clients at a critical point in the transition of his independent advisory practice.**

5. The use of all American Express stationary and insignia has been discontinued, effective October 8th, 2004. Although this statement may not be presently verified, it may be inferred by the context of other information that has been presented. **It is my willful intention and personal representation as an Independent Advisor to remove all identity and affiliation with AEFA.**
6. As the Independent Advisor, the defendant, composes this countercomplaint and reply, new stationary is being printed that will designate my new affiliation with Fusion Financial Group. An E-mail message from Barry Levy, my marketing consultant at Fusion Financial Group, confirms this activity. (See Attached)

## Neil H. Gendreau

**From:** "Barry Levy" <blevy@fusionfinancialgroup.com>
**To:** "Neil H. Gendreau" <ngendreau@fusionfinancialgroup.com>
**Sent:** Friday, October 29, 2004 8:02 AM
**Attach:** Generic Fusion .dat
**Subject:** Partnership copy

Here is a draft of the partnership piece we discussed last week. The partnership between you and Fusion and the advantages to your clients having this partnership. It has not been sent to compliance yet. I would like your feedback first.

Susan is working on other materials, and we will speak with you early next week to discuss the various items to help you move forward.

If you need to call me, please do not hesitate.

The stationary is with the printer. I will let you know the status when we speak.

10/31/2004

7. Clients are well aware of my transition strategy, my recent affiliation with Fusion Financial Group and National Financial Partners, and for those whom I have met, the personal and financial implications that are involved as they decide what level of continuing service they may prefer, and what costs may be involved for those assets that are considered for transfer. While I solicit my clients as an Independent Advisor to discuss the benefits of my new affiliation, they are especially aware of these changes as they sign new applications transferring their assets to NFP Securities Inc., their new broker/dealer of record.

3. **Legal Definitions of Work Relationships between two entities**
   a. Employer/Employee –
      i. Employer paid salary (Broker/Dealer)
      ii. Employer paid supplemental commissions or draws based on production or performance
      iii. Employer Paid Benefits (health, dental, life, disability, retirement plans) in whole or in part.
      iv. Employer Paid Licensing, Training and Continuing Education
      v. Employer Paid Vacation Time
      vi. Employee responsibility, scope of work, and responsibility set forth by employer and company policy
      vii. Employee performance monitored and supervised by employer
   b. Independent Contractor –
      i. Parties contract for services rendered based upon the nature and extent of work to be completed.
      ii. The nature and extent of work to be completed is defined by contract.
      iii. The nature of compensation is set forth by contract.
      iv. Specific performance by each party is set forth in the contract.
      v. Independent Contractor is responsible for assumption of expenses consistent with the completion of work that has been defined:
         1. Office Expenses
         2. Staff
         3. Equipment and Furniture
         4. Licensing, Training, and Continuing Education
         5. Personal and Employee Benefits
         6. Materials and Supplies
         7. Phone, Fax, and DSL services
      vi. Based on knowledge, expertise, and additional assumptions of professional responsibility, the Independent Contractor is given fuller discretion as to how the work should best be completed, but may consult with the contracted party to request additional input, resources, or to offer advice that is in the best interest to meet the objectives set forth by the contract.

4. **Status of Franchise Agreement**

a. The Franchise Agreement, as established by AEFA, clearly defines the independent contractor status of all "P2" advisors who participate in this venue. The defendant, as Independent Advisor, seeks to prove that AEFA failed it's responsibilities to provide specific performance as would be expected by its enhanced branding image, as defined by the contract. On page 1 of the Franchise Agreement, signed by the Independent Advisor on 12/15/1999, Recital B states the following objectives: "The distinguishing characteristics of "the System" include a well recognized brand: distinctive products and services…the highest standards of customer service and quality advice, including financial planning, administrative procedures providing superior customer service, including consolidated statements, orientation programs, advertising and promotional programs, and direct marketing services…and on-line services directed to all clients…"
b. Given these express goals, it will be demonstrated through the defendant's reply, that AEFA, as plaintiff, violated a number of these promises, and committed several breaches of contract in the following areas of operations:
    i. Distinctive Products and Services
    ii. Advertising and Promotional Programs (Marketing)
    iii. Administrative Procedures Providing Superior Customer Service, including Consolidated Statements…and On-Line Services Directed to all Clients
c. These breaches of responsibility have caused significant harm to the time, resources, and profitability of the Independent Advisor's practice on a historical basis. The extent of damages in the form of lost time, missed opportunities, and dissatisfied customers are immeasurable to the Independent Advisor's financial planning practice. It will be demonstrated that the defendant's relative success in the industry has <u>not</u> been attributable to the support and guidance of AEFA, nor has it been a result any affiliation of the Independent Advisor to AEFA's alleged branding image. On the contrary, the relative success of the Independent Advisor has been accomplished <u>in spite of</u> the defendant's contractual relationship with the plaintiff. <u>As such, the Franchise Agreement as defined by the plaintiff and signed by the Independent Advisor under false expectations of proper performance should be considered null and void, with no further obligations owed by the defendant, up to and including all legal claims and remedies requested by the plaintiff:</u>
    i. The return of all client files and confidential client data.
    ii. The disconnection of existing phone and facsimile lines.
    iii. Temporary Injunctive Relief
    iv. Specific Injunctive Relief to Enforce a One Year Covenant not to Compete.

- v. **All current and accruing legal fees incurred by the plaintiff, with interest.**
- d. **If it is agreed upon by this court of federal jurisdiction to dismiss the plaintiff's claims based on insufficient standing, then said case should not proceed to arbitration, and no fines or penalties should be assessed or continue to accrue, based on the subject matter of the plaintiff's complaint.**

5. **Plaintiff's breaches:**
   a. **Distinctive Products and Services** – AEFA claims access to "distinctive products and services" within Recital B on page 1 of its' Franchise Agreement. As Independent Advisor, upon a due diligence review of various broker-dealers within the industry, it can be demonstrated that AEFA is severely lacking in the ability to provide "distinctive products and services" that would attract a clientele that would be consistent with its' purported branding image. Here is a list of product categories that "the System" does not offer, nor does AEFA enable its' advisors to recommend these enhanced strategies through a third party broker for the benefit of their clients:
      i. **Exchange Funds that enable clients with high concentrations of low basis stock the opportunity to diversify these shares on a like-kind, tax free basis.**
      ii. **Private Equity Financing and Mezzanine Capital**
      iii. **Private Placement Limited Partnerships that offer more unique diversification opportunities.**
      iv. **Private Placement Variable Universal Life Insurance**
      v. **Private Placement Variable Annuities**
      vi. **Real Estate Investment Trusts (REITs) that offer tax free 1031 exchange capabilities for clients with applicable low basis real estate.**
      vii. **Section 412(i) Retirement Plans –**
         1. As part of due diligence, Independent Advisor is highly interested in marketing and soliciting qualified small business owners for the establishment of retirement plans that offer accelerated tax deductions based upon the actuarial calculation of guaranteed retirement benefits at normal retirement age. To guarantee the payment of such benefits, the IRS may allow employee deductions to exceed Section 415 limits, based on established revenue rulings that provide guidance for the establishment and maintenance of such plans.
         2. Enclosed, legal council and court of said jurisdiction will find extensive E-mail communication submitted by the Independent Advisor to proper venues along the chain of command, including compliance, brokered insurance, and regional management, requesting guidance for how such plans may be offered through AEFA.

3. The nature of 412(i) plans requires plan participants to fund retirement contributions with a product combination of flexible premium fixed annuities and guaranteed whole life insurance contracts. IDS Life, an insurer-subsidiary of AEFA who develops and underwrites risk management products marketed exclusively by AEFA advisors, does not offer flexible premium fixed annuities, nor does it offer guaranteed whole life insurance contracts with face values that would be required for the funding of 412(i) plans.
4. AEFA publishes a <u>Compliance Resource Guide</u> that establishes specific policies and procedures for AEFA advisors to conduct an advisory practice under the Franchise Agreement. (See Attached)
    a. Page 19 outlines those outside activities, including the sale of pre-approved outside insurance products, which require approval.
    b. Page 21 specifies "With **prior** written authorization from your registered principal, you may sell fixed life and health insurance products offered by other insurance companies **only** when a client cannot be insured with products available from IDS Life or from the companies with which AEFA maintains selling agreements.
    c. Flexible premium fixed annuities and guaranteed whole life insurance contracts issued at sufficient amounts for the funding of 412(i) plans are examples of fixed life insurance products not offered by IDS Life, and not available to agents of IDS Life (AEFA advisors) via companies with which AEFA maintains selling agreements.
    d. Page 60 of the <u>Compliance Resource Guide</u> indicates "AEFA policy specifies that you may sell only the products and services that the company distributes or authorizes you to sell. Authorized insurance products include those issued by IDS Life and IDS Life of New York and through companies with which AEFA has marketing or selling agreements....<u>Registered principals may authorize the placement of insurance outside AEFA as exceptions to this policy **only** when the risk cannot be insured by IDS Life or with nonproprietary insurance products available from the companies with which AEFA has marketing or selling agreements.</u> **Exceptions are limited to fixed life and health insurance products...**If authorization

        is granted to sell insurance outside the company, the registered principal is attesting to two things:
           i. Coverage for the client is not available within IDS Life or through the companies with which AEFA has marketing and sales agreements.
          ii. You are able to provide full and fair disclosure about the other company and its products.
        In addition, it has also been determined that the authorization makes sense from a business perspective."

5. The following criteria for offering fixed life insurance products conducive to the establishment of 412(i) plans appears to have been met:
   a. Clients could not be insured for 412(i) plans with fixed insurance products available from IDS Life or from the companies with which AEFA maintains selling agreements.
   b. Historical E-mail communication indicates that defendant as Independent Advisor expressly requested the ability to offer such products through the proper regulatory venues at AEFA (See attached).
   c. The authorization for the sale of such products makes sense from a business perspective.
6. Yet the defendant as Independent Advisor was denied the ability to market such products that are necessary for the establishment of 412(i) plans.

viii. **Conclusion – AEFA does not offer distinctive products and services that are consistent with its' purported brand image. As this and other examples will continue to demonstrate, the Franchise Agreement, as a legal contract, should be considered null and void by this Federal District Court of said jurisdiction.**

02/11/02 Platform 2

**P2 Compliance Resource Guide - Table of Contents**

| | |
|---|---|
| Changes to the Guide | 1 |
| Cover and Disclaimer | 2 |
| Introduction | 3 |
| Government and Industry Regulation | 4 |
|     Regulation of Financial Services Industry | 4 |
|     Contact with Regulatory Agencies | 6 |
|     Registration Requirements | 6 |
|     Office Registration and Location | 9 |
| | |
| Standards of Conduct | 11 |
|     Fiduciary Duty | 11 |
|     Conducting Business Ethically | 11 |
|     American Express Customer Privacy Principles | 13 |
|     A Duty to Report | 17 |
| | |
| Avoiding Improper Activities | 18 |
|     A Position of Trust | 18 |
|     Conflicts of Interest | 18 |
|     Activities Requiring Prior Approval | 19 |
|         Outside Activities | 19 |
|         Personal Trading | 23 |
|         Serving as a Witness | 23 |
|         Mediation and Arbitration | 25 |
|     Prohibited Practices (in alpha order) | 25 |
|         Arranging for Credit | 25 |
|         Borrowing From or Lending to Clients | 25 |
|         Business and Personal Checking Accounts | 25 |
|         Cash | 25 |
|         Client Securities Trading Passwords | 25 |
|         Commingling Funds | 25 |
|         Compensation Abuse | 25 |
|         Controlled Address | 25 |
|         Discretionary Power | 26 |
|         Fictitious Accounts | 26 |
|         Forgery | 26 |
|         Initial Public Offerings | 26 |
|         Legal Advice | 26 |
|         Notarizing Documents | 27 |
|         Private Securities Transactions | 27 |
|         Sales Charges | 27 |
|         Sharing Compensation | 27 |
|         Sharing Profits | 27 |
|         Signature Guarantees | 27 |

02/11/02 Platform 2

|   |   |
|---|---|
| Tax Advice | 28 |
| Timing Advice | 28 |
| Trading on Inside Information | 28 |
| **Books, Records and Documentation** | 29 |
| Complaints | 29 |
| Client File Content | 29 |
| Client Files and Client Lists | 32 |
| **Communicating with the Public** | 33 |
| Advertising | 33 |
| Types of Advertising | 34 |
| Resources | 36 |
| Telemarketing | 36 |
| Electronic Communications | 36 |
| Advertising on the Internet | 39 |
| Sales Literature | 42 |
| Materials Not Approved for Use w/Clients | 42 |
| Form Letters | 42 |
| Material Describing Products | 43 |
| Seminars and Seminar Materials | 43 |
| Business Cards and Stationery | 44 |
| Trademarks and Copyrights | 44 |
| Correspondence | 45 |
| Outgoing Correspondence | 45 |
| Advisor-created Client Account Summaries | 45 |
| Incoming Correspondence | 46 |
| Written Product Illustrations and Descriptions | 47 |
| **Making Suitable Recommendations** | 48 |
| FITS Factors | 48 |
| Client Suitability Data and Documentation | 48 |
| Special Suitability Considerations when Working w/the Mature Market | 50 |
| Money Movement | 50 |
| **Providing Full and Fair Disclosure** | 52 |
| Disclosure about Products, Services and Transactions | 52 |
| Disclosure about Yourself | 53 |
| Disclosure about the Company | 54 |
| **Selling Specific Types of Products and Services** | 55 |
| Financial Planning | 55 |
| Life Insurance | 57 |
| Independent Brokering of Insurance Products | 60 |

02/11/02 Platform 2

**Referrals From Other Professionals.** Advisors may accept referrals from other professionals, but may not share compensation without corporate office approval. In order to share compensation, the other party must be appropriately licensed and registered.

**Investment Clubs.** Guidelines governing investment clubs differ depending upon whether the club is simply a client or whether you are also a member of the club. If you are not a member, the club should be treated in the same manner as other institutional or group clients. However, if you are a member or wish to become one, you may not solicit clients to become members. If you or a member of your family is a member, you need to follow the Personal Trading Rules for Investment Clubs. Contact the Personal Trade Team at 612-671-5196, or refer to the Personal Trade rules in the Compliance Information Center of Advisor Connect.

## Activities Requiring Prior Approval

### Outside Activities
NASD Rule 3030 requires all registered persons to provide written notice to the member (AEFA) of any business activity, other than a passive investment, outside the scope of their relationship with the member firm.

You are prohibited from engaging in employment or outside activities that: (a) compete with or do business with AEFA or its parent company; (b) create the potential for a conflict of interest with AEFA or its parent company; or (c) interfere with your ability to provide effective service to clients and the company.

**Disclosure procedures.** You must provide prompt disclosure (i.e., within **seven** business days) to your registered principal if you participate or intend to participate in an outside business activity, regardless of whether compensation is received. For this purpose, you must complete an Outside Business Activities Disclosure Form (Form 507), available in the Forms Cabinet on Advisor Connect. You must complete this form at least annually and at other times specified below. To ensure that conflicts of interest do not develop that would put AEFA or its clients at a disadvantage, your registered principal will determine whether an activity is appropriate when he or she is notified. If the activity is deemed to be inappropriate, you will be required to immediately cease the activity.

All NASD-registered people associated with AEFA, including all advisors, registered principals, paraplanners and staff, must complete an Outside Business Activities Disclosure Form regardless of whether or not you are involved in an outside business activity.

**When to disclose outside business activities.** You are required to complete an Outside Business Activities Disclosure Form and submit it promptly (i.e., within seven business days) to your registered principal under the following circumstances:
- Annually, even if there is no activity or no new activity to report.
- When you obtain your first NASD registration (this includes pre-client ready advisors).
- When you first become associated with AEFA, if already NASD registered.
- When you begin, terminate or change the scope of your involvement in an outside business activity.
- When you sell a pre-approved outside insurance product.

### Procedure for completing the form
1. Obtain a copy of the **Outside Business Activities Disclosure Form (Form 507)** from the Forms Cabinet on Advisor Connect, or you may order the form from Supply.
2. Complete Sections 1, 2, and 3 (Registered Person Information, Disclosure of Outside Business Activities and Registered Person Authorization and Signature). You must disclose all requested information, even if the information was disclosed previously ("same as last year" is unacceptable). If you need additional space, attach a separate piece of paper. The attachment must be signed and dated.
3. Promptly submit the completed and signed form to your registered principal.

02/11/02 Platform 2

Your registered principal will complete Section 4 (Registered Principal Review and Authorization). **Note: If you are a registered principal, you may not review and sign your own form; your field compliance director (FCD) or GVP will do the review.**

**Activities to disclose.** You must be aware that participation in some outside business activities is prohibited to registered persons under all circumstances. Other business activities are permissible only under limited circumstances and with prior written approval by your registered principal, GVP and/or SVP. Consult with your registered principal if you currently engage in or plan to engage in an outside business activity to get their approval.

Following are the types of business activities you must disclose, along with requirements for disclosure:

> **Business ownership.** You must disclose any business ownership or co-ownership, regardless of whether you receive compensation from that activity. (Business ownership includes the ownership of investment real estate and/or rental property.)
>
> You must disclose all real estate you own, other than your primary residence or a vacation home used solely by you and members of your immediate family.
>
> If the business activity is performed in the same office as your AEFA financial planning practice, you must obtain **prior approval.** In addition, the outside business must be identified as clearly separate and distinct from your financial planning practice. In some cases, you will be required to use signs and/or walls to separate the space. You must clearly note on your form that the activity takes place in your AEFA office.
>
> If you own real estate that is leased to an AEFA client, a Letter of Release must be signed by the client(s). You may not co-own a business, including real estate, with a client. There are two possible exceptions:
>   1. If the co-ownership pre-existed the advisor/client relationship.
>   2. If the client is an immediate family member.
>
> If the co-ownership pre-existed the client/advisor relationship, you may continue the relationship, provided the business does not compete with the products and services of American Express, AEFA or an affiliate. In addition, you must submit:
>   - A written letter of agreement to refrain from purchasing additional business investments or expanding your existing business relationship with the client.
>   - Signed and notarized disclaimers (Letters of Release) from both yourself and the client stating the business relationship is unrelated to AEFA.
>
> **Note: American Express will not lease office space in a building that is owned or managed by any field member.**
>
> **Real estate activities.** You are prohibited from selling real estate for a fee or commission, representing yourself as a real estate broker or agent, or displaying real estate licenses or other real estate certification to clients, prospects or the public, in general.
>
> There is one exception, with written approval from your registered principal, you may maintain an existing real estate license for the purpose of specific licensed real estate activity, such as the sale of your own or an immediate family member's home, provided there is no potential conflict of interest. If you are approved to maintain a real estate license, each sale requires **prior** written approval from your registered principal and GVP. In addition, each sale must be disclosed on the Outside Business Activities Disclosure Form.
>
> Note: Failure to comply with this policy may result in the termination of your real estate license.
>
> See "Business ownership," above, regarding co-ownership of a business with a client.

02/11/02 Platform 2

**Outside employment.** You must disclose any employment you engage in outside of AEFA, including self-employment. Some examples of self-employment include representing cosmetics, clothing or product distribution companies; part-time teaching; owning a franchise retail store, etc.

You must disclose the amount of time you devote to outside employment and the compensation you receive.

You are prohibited from being employed by a business that competes with American Express or AEFA (e.g., travel agent, other broker-dealer or credit card company) or does business with either.

You should not accept employment outside the company if the work would adversely affect your ability to conduct your AEFA financial planning practice or to give sufficient attention to clients or your direct reports/advisors if you are a leader.

You are prohibited from giving legal advice. You are also prohibited from providing tax advice or bookkeeping services for clients or the general public, unless you have been authorized to maintain a certified public accountant (CPA) practice as an outside activity. See "Tax activities" below.

**Managing real estate.** You may manage rental property for an owner as long as the activity does not present a conflict of interest, such as could arise from managing property that is leased to an AEFA client or leased to an AEFA sales office. You must disclose your management responsibilities and the names of all AEFA clients or entities that are parties to leases you manage on the Outside Business Activities Disclosure Form.

**Independent brokering of outside insurance products.** With **prior** written authorization from your registered principal, you may sell fixed life and health insurance products offered by other insurance companies only when a client cannot be insured with products available from IDS Life or from the companies with which AEFA maintains selling agreements. In such cases, you must follow the procedures for independent brokering in **Compliance Bulletin 2470 A, dated 6/11/2001** and/or in the Independent Brokering of Outside Insurance Products section of this Guide.

Once the business has been placed, you must complete an Outside Business Activities Disclosure Form (Form 507). You must continue to disclose your affiliation with the outside insurance company as long as you are appointed with it, regardless of whether compensation is being received.

Nonproprietary insurance products that **are** available and authorized for sale through AEFA are found on Advisor Connect under Products & Services, External Products, **Brokered Insurance**. For these sales, Single Case Authorizations and disclosure are not required.

The sale of any other nonapproved, nonproprietary product, including mutual funds, variable life insurance, annuities, certificates and limited partnerships, is prohibited. (This list is not all-inclusive.)

**Past appointments for sales of non-company products.** You must disclose appointments you hold with outside companies, regardless of whether compensation is being received. You do not need to disclose appointments with nonproprietary insurance companies with which we have selling agreements (e.g., First Colony and DBS).

**Memberships on boards of directors and similar governing bodies.** You must disclose the names of the corporations and organizations, whether for-profit or nonprofit, on whose boards of directors you serve. Serving on for-profit boards requires **prior written approval.**

Regardless of whether you are the servicing advisor or not, you may not participate in any financial decisions or financial activities while serving as a board member.

- 21 -

02/11/02 Platform 2

take the form of registered/certified mail. The receipt must be kept in the client file, where it will be maintained as documentation of delivery. You must never hold policies in your files, even if the client asks you to do so.

State regulations generally give clients 10 days after delivery to cancel a policy for a refund of all premiums paid. (Some states, such as California, provide longer "free look" periods for older clients.) This period begins to run on the date you deliver the policy to the client. If you hold a policy rather than delivering it, the start of this 10-day period is delayed. These delays, especially when involving variable policies, may be detrimental to the interest of the client, yourself and the company. The same policy delivery applies to LTC and disability insurance.

Note: All **Not-In-Force** policies must be personally delivered to the client by you. You are required to witness the client's signature(s).

**Rebating.** Splitting the commission from a life insurance product with a client or prospect is known as "rebating." AEFA and nearly every state prohibit this practice.

## Independent Brokering of Insurance Products

AEFA policy specifies that you may sell only the products and services that the company distributes or authorizes you to sell. Authorized insurance products include those issued by IDS Life and IDS Life of New York and through companies with which AEFA has marketing or selling agreements (e.g., First Colony, Unum Provident, BISYS, DBS, etc.). Information about insurance products available for sale is found on Advisor Connect:
- For IDS Life products, select Products & Services, **Insurance**.
- For nonproprietary insurance products available through AEFA, go to Advisor Connect and select Products & Services, External Products, **Brokered Insurance**.

Registered principals may authorize the placement of insurance outside AEFA as exceptions to this policy **only** when the risk cannot be insured by IDS Life or with nonproprietary insurance products available from the companies with which AEFA has marketing or sales agreements. Exceptions are limited to fixed life and health insurance products. Exceptions for the sale of annuity and variable life products and of any other products or service are prohibited.

You may not sell products or services that conflict or compete with products and services that the company offers.

If authorization is granted to sell insurance outside the company, the registered principal is attesting to two things:
- Coverage for the client is not available within IDS Life or through the companies with which AEFA has marketing and sales agreements.
- You are able to provide full and fair disclosure about the other company and its products.

In addition, it has also been determined that the authorization makes sense from a business perspective.

Note: You will not be granted exceptions to obtain appointments for the purpose of becoming the registered representative or agent of record for insurance policies or annuity contracts that were not sold through AEFA.

AEFA extends Errors and Omission protection to you for outside insurance sales that are authorized in writing by your registered principal. The company wants to limit its exposure by restricting these sales to those that are important for your continuing success with AEFA.

If it is necessary for you to seek life or health insurance for clients outside IDS Life and the nonproprietary products available through AEFA, you must do the following:
1. Complete Part I of the **Single Case Authorization to Place Insurance Outside American Express Financial Advisors Inc. (Form 33274)**, available in the Forms Cabinet on Advisor Connect. You must indicate the insurer and the product.


**Neil H Gendreau**
02/27/2004 02:41 PM

To:      Erika C D'Atri/Field/WH/AEFA@AMEX
cc:
Subject: Re: Urgent Information Regarding 412 (i)

The bull sees red. Proceed at your own risk.

_____
Neil H. Gendreau
Certified Financial Planner
American Express Financial Advisors
IDS Life Insurance Company
Suite 213
415 Boston Turnpike Road
Shrewsbury, MA 01545
Phone: (508) 845-8880
Fax: (508) 508-842-0330
From: Erika C D'Atri on 02/27/2004 02:40 PM

From:    Erika C D'Atri on 02/27/2004 02:40 PM
To:      Neil H Gendreau/Field/WH/AEFA@AMEX
cc:      Keith T Bixby/Field/WH/AEFA@AMEX
Subject: Re: Urgent Information Regarding 412 (i)

Hi Neil:

I hope that you are well.

I appreciate your concern, urgency, and frustration regarding this issue.

I also sincerely appreciate your efforts to do the "right thing."

However, I must caution you that after reading your e-mail, I developed the impression that, if necessary, you were going to "sell away."

You may not have intended that interpretation. However, if I develop that impression, CO compliance will most certainly note it as a red flag.

Selling away is one of the worst violations of company policy.

I strongly caution you to consider the ramifications of such a statement and the actions that you are implying.

If you have any questions, please contact me.

Best wishes.

Erika

From: Neil H Gendreau on 02/27/2004 02:33 PM

From:     Neil H Gendreau on 02/27/2004 02:33 PM
To:       Bill Baker@AMEX
cc:       Donald K Davenport@AMEX, Erika C D'Atri/Field/WH/AEFA@AMEX, Keith T Bixby/Field/WH/AEFA@AMEX
Subject:  Urgent Information Regarding 412 (i)

To those concerned:

I have accessed the three revenue rulings recently issued by the IRS concerning potential abuses constructed within certain 412(i) plans. For those who have consulted these resources, one would discover IRS support for the concept of providing non-discriminatory, guaranteed death benefits, even when required plan contributions exceed the 415 limit.

More precisely, these revenue rulings provide additional guidance for the use of life insurance contracts within section 412(i) plans, by further defining those plan specifications that require adherence to the code, and by admonshing certain abuses that IRS has viewed as violations against the nature and intent of section 412(i).

The content of these revenue rulings may be summarized by the following:

1. Excess life insurance cannot be bought to generate tax deductions in excess of what would be calculated for level funding requirements.

2. Excess tax deductions may not be taken for any plan excess benefits paid to employees which revert as repayments to the plan.

3. Distributions of life insurance contracts may be taxed at an amount in excess of cash surrender values, which remain repressed during the accumulation phase of a policy, by using a "safe harbor approach" that may more accurately define the economic value of the life insurance policy.

4. Differences in death benefit cannot discriminate in favor of highly compensated employees.

The risks to marketing this plan under a regulated provider are no worse than they were before these revenue rulings, and no worse than if AEFA were to provide an appropriate venue. None of these clarifications would imply jeapordy to the status or functionality of 412(i) plans that are properly designed. In the meantime, to disqualify advisors from offering this retirement planning strategy while AEFA develops an approved methodology is a violation of higher financial planning standards and appropriate business ethics. The use of vague references to IRS guidance designed as a means to discourage advisors from pursuing a strategy from which AEFA may not currently profit is not a good way to build credibility at any level. Fear and ignorance are not appropriate means for establishing adequate controls and protocal. This behavior at the corporate level is a detriment to progress as a whole, especially for AEFA. Meanwhile, clients and advisors should not be held responsible to suffer for AEFA's lack of insight and failure to execute.

There has been at least one other AEFA who has taken exception to your policy with blessings from the company. I speak of this with confidentiality and without resentment or malice. I am motivated that this individual was able to implement progress despite unfavorable odds.

Unless those responsible for imposing said impediments are willing to suggest interim alternatives for the solicitation of this market, I will have no choice other than to pursue external resources for this endeavor until AEFA is able to come up with its own process. I think I have made myself quite clear, and I have openly solicited the proper channels at best effort to perform this activity within the graces of American Express Financial Advisors. However, if AEFA is not willing to reciprocate the appropriate allowances,