UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                          )
AMERICAN EXPRESS FINANCIAL                )
ADVISORS, INC.,                           )
                                          )
            Plaintiff,                    )        Civil Action No.
                                          )        04-40221-FDS
      v.                                  )
                                          )
NEIL H. GENDREAU,                         )
                                          )
            Defendant.                    )
                                          )
_____

MEMORANDUM & ORDER

SAYLOR, J.

      This is a civil action arising out of defendant Neil H. Gendreau's alleged violations of

agreements he signed with American Express Financial Advisors ("AEFA"). Gendreau is a

Certified Financial Planner who provides advice to clients concerning investments and other

financial matters. Prior to October 8, 2004, Gendreau was a franchisee of AEFA. That day, he

abruptly left AEFA for a competing organization, National Financial Partners ("NFP").[1]

Gendreau solicited a substantial number of AEFA clients to come with him to NFP, and

admittedly is in the process of soliciting others.

      While at AEFA, Gendreau executed two contracts setting forth his obligations and rights

upon termination from the company. AEFA contends that Gendreau materially breached the

terms of the contracts by (1) soliciting the clients of AEFA to leave and join him at his new firm,

_____

      [1] Gendreau is apparently now affiliated with Fusion Financial Partners, an affiliate of NFP. For the sake
of convenience, Fusion and NFP will be collectively referred to as "NFP."

(2) failing to immediately return client records and confidential and proprietary business records

to AEFA, and (3) failing to discontinue use of AEFA telephone and facsimile numbers and

computer software.[2]

Pending before the court is AEFA's motion for a preliminary injunction to "restor[e] the

status quo" and prevent what it characterizes as "Gendreau's ongoing breaches and violations" of

his contractual obligations.[3]  The court has reviewed the filings submitted by the parties and held a

hearing on the motion on November 9, 2004.  For the reasons set forth below, the motion for a

preliminary injunction is granted.

## **Factual Background**

Gendreau was hired as an employee of AEFA on January 5, 1994.  One year later, after

participating in extensive AEFA training, Gendreau became a AEFA financial advisor, affiliated

with the company as an independent contractor.

On December 15, 1999, Gendreau executed the American Express Financial Advisors Inc.

Independent Advisor Business Franchise Agreement ("Franchise Agreement") and an Addendum

3-R (Rollout) Restrictive Covenant Addendum ("Addendum").  The Franchise Agreement

---

[2] In the original AEFA preliminary injunction motion, filed on October 27, 2004, the company requested that Gendreau be enjoined from maintaining AEFA signage on the billboard outside of his commercial office building and from using AEFA stationery, insignia, and proprietary marks.  However, at the preliminary injunction hearing, held on November 9, 2004, AEFA stated that it no longer required injunctive relief with respect to AEFA signage, stationery, insignia, and proprietary marks.

[3] The parties in this matter are members of, or affiliated with, the National Association of Securities Dealers ("NASD").  Pursuant to the NASD Code of Arbitration Procedure, the substantive claims raised in the parties' pleadings, as well as AEFA's request for permanent injunctive relief, will be resolved by an arbitration panel of the NASD.  *See* Memorandum in Support of Preliminary Injunctive Relief, p. 3, n.1; Hahn Affidavit, Exhibit A.  If the court grants temporary injunctive relief, the NASD rules provide that arbitration will proceed on an expedited basis.  *See* Memorandum in Support of Preliminary Injunctive Relief, p. 3, n.1; Hahn Affidavit, Exhibit A.

provided that, upon AEFA's implementation of its new franchise program, Gendreau would

become affiliated with AEFA as a franchisee.  AEFA implemented its franchise program, and

Gendreau became a franchisee, on March 22, 2000.

**1.    The Franchise Agreement**

The Franchise Agreement authorized Gendreau to establish and operate an "Independent

Financial Advisor Business" for AEFA, and outlined the respective contractual obligations of

AEFA and Gendreau in his capacity as franchisee.

The Franchise Agreement begins with "recitals," which essentially describe the financial

services offered by AEFA through its financial advisors (which it calls the AEFA "System") and

the purposes of the contractual relationship between AEFA and its financial advisors.  In

describing the AEFA System, paragraph B of the recitals states:

> The distinguishing characteristics of the System include a well recognized brand;
> distinctive products & [sic] services; high level of securities and regulatory compliance;
> the highest standards of customer service and quality service, including financial planning;
> administrative procedures providing superior customer service, including consolidated
> statements; orientation programs; advertising and promotional programs; and direct
> marketing services, telemarketing, and on-line services directed to clients; all of which may
> be changed, improved and further developed by AEFA from time to time.

The recitals are followed by a description of the contractual duties of the parties.  Among

other things, section 3 of the contract obligates AEFA to "provide those Products & Services

distributed or offered by AEFA and/or its affiliates consistent with the standards set forth in the

[Confidential Operations] Manuals."  *Id.*   It further requires the company "to provide national

advertising as set forth below in section 12" and states that "AEFA may develop promotional

programs and sales campaigns for Products & Services, the nature, duration, and geographic

scope of which shall be determined by AEFA."  *Id.*  Section 12 of the contract further specifies

that

> AEFA has the right, but not obligation, to establish the System's advertising fund (the "Fund"). . . . AEFA agrees to direct all advertising programs conducted through the Fund, with sole discretion over the concepts, materials, and media used in such programs and the placement and allocation thereof. *Id.*

In addition, under section 12, "AEFA may designate any geographical area for purposes of establishing a regional or local advertising and promotional campaign ("Campaign"), and to determine whether a Campaign is applicable to the Independent Financial Advisor Business. . . . Each Campaign shall be coordinated by AEFA." *Id.* Moreover "[a]ll advertising and promotion by Independent Advisor shall be in such media and of such type and format as AEFA may approve . . . and shall conform to such standards and requirements as AEFA may specify . . . ." *Id.*

Section 5 of the Franchise Agreement addresses the duties of independent advisors. It mandates, among other things, that advisors

> . . . obtain all AEFA Products & Services solely from AEFA, or from suppliers approved by AEFA. If Independent Advisor desires to offer products or services, other than those already approved in the Manuals, Independent Advisor agrees to submit to AEFA a written request to approve the proposed products or services and its supplier . . . AEFA agrees to have the right to require that its representative be permitted to evaluate the proposed products or services. AEFA agrees to, within thirty (30) days after its receipt of such request, notify Independent Advisor in writing of its approval or disapproval of the proposed products or services and/or supplier. AEFA reserves the right to (i) deny approval of any proposed products or services and/or supplier, (ii) limit the number of approved products and services and approved suppliers and/or (iii) condition approval of unapproved products and services on AEFA being the supplier of such products and services. Independent Advisor agrees to not offer for sale or sell any products or services until written approval by AEFA of the proposed product or service or supplier is received. AEFA may from time to time revoke its approval of particular Products & Services or suppliers if AEFA determines, in its sole discretion, that the Products & Services or suppliers no longer meet the standards of the AEFA. *Id.*

Section 5 also requires franchisees to "purchase or lease a computer system that meets the

specifications of the AEFA" and to "acquire. . . a license to use software designated by AEFA for the computer system." *Id.* "At the request of AEFA," moreover, franchisees must "obtain such upgrades, or other modifications to the computer system and software to conform to the specifications of AEFA." *Id.*

The Franchise Agreement imposes specific obligations on the franchisee in connection with the termination of its independent contractor relationship with AEFA. Specifically, section 18 directs the franchisee, upon separation from AEFA, to

> immediately deliver to AEFA the Manuals and all other original records, including most recent financial plans and recommendations, computer databases and files, correspondence, and instructions containing confidential information relating to the System . . . the originals of all Client records, including records containing Client lists and/or information and transactions belonging to AEFA . . . *Id.*

The franchisee must also "immediately (i) discontinue use of any computer software developed for the System or AEFA, (ii) deliver to AEFA all such computer software . . . [and] (iii) erase or destroy any of such computer software . . . under the control of Independent Advisor . . . .", and cease using the telephone number assigned to it as an Independent Financial Advisor for AEFA. *Id.*

Section 18 obligates independent contractors who terminate their relationship with AEFA to

> immediately and permanently cease to use, in any manner whatsoever, any confidential methods, procedures, and techniques associated with the System; the Proprietary Marks; and distinctive forms, slogans, signs, symbols, and devices associated with the System. In particular, Independent Advisor agrees to cease to use, without limitation, all signs, advertising materials, displays, stationary, forms, products, and other articles which display the Proprietary Marks. *Id.*

Furthermore, section 19 of the Franchise Agreement contains a covenant that restricts the independent advisor, for one year following his or her severance from AEFA, from soliciting the

business of AEFA's clients.  The restrictive covenant provides, in part:

> Independent Advisor specifically acknowledges that, pursuant to this Agreement, Independent Advisor will receive additional substantive rights as a franchisee of AEFA. Independent Advisor also recognizes he or she will receive valuable information regarding the operational, sales, promotional, and marketing methods and techniques of AEFA and the System.  In recognition of and in consideration for these and other benefits, to protect the confidentiality of AEFA's client information and to protect AEFA's goodwill, Independent Advisor covenants that (a) during the term of this Agreement and (b) for one year after the expiration or termination of this Agreement in the geographic area within which Independent Advisor operates or operated, Independent Advisor agrees to not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person or entity:

> a.    (1) Encourage, assist, participate, induce, or attempt to induce any Client or prospective business or client to terminate an agreement with AEFA, AEFA's affiliates, Issuers, or any financial advisor business under the System;

> (2) Encourage, assist, participate, induce, or attempt to induce any Client or prospective business or client to terminate, surrender, redeem, or cancel any action related to Products & Services acquired or ordered from or through AEFA, AEFA's affiliates, Issuers, or any financial advisor business under the System, except as provided in the Manuals or with the AEFA's written approval and consent;

> (3) Solicit any Clients that Independent Advisor contacted, serviced or learned about while operating under this Agreement to open an account other than an AEFA account or to sell any investment, financial or insurance products or services other than through AEFA with AEFA's written approval and consent; . . .

*Id.*

Under section 19, the independent advisor agrees that "AEFA will be entitled to injunctive relief from a court or NASD arbitration should Independent Advisor violate any of the covenants in this Section 19 and in Sections 10 and 18 (the "Sections") of th[e] [Franchise] Agreement." The independent advisor also recognizes that, if the Sections are violated, "AEFA's remedies solely at law will be inadequate, that AEFA will be irreparably harmed by violations of the provisions in the Sections, and thus that AEFA will be entitled to injunctive relief to prevent

future violations of the provisions in the Sections until a full and final resolution of any dispute may be had on the merits." *Id.*

Finally, section 26 of the Franchise Agreement dictates that interpretation and construction of its terms be governed exclusively by Minnesota law.

### 2.    The Addendum

Under the terms of the Addendum, executed by Gendreau contemporaneously with the Franchise Agreement, Gendreau acknowledged that a violation of section 19 of the Franchise Agreement would cause irreparable harm to AEFA. The Addendum provides that Gendreau's "timely and complete compliance" with the conditions set forth therein "will have mitigated, to the extent deemed reasonable by the parties hereto, the irreparable harm AEFA would otherwise suffer through the Advisor's violation of the Restrictive Covenant [in section 19] without compliance with this Addendum or the Restrictive Covenant." *Id.*

The conditions under which AEFA agreed to forbear from enforcement of its rights under the restrictive covenant of section 19 were as follows: Gendreau must (1) have been affiliated with AEFA for at least six consecutive years as of the date of his termination notice; (2) have provided a written notice of his departure at least two weeks in advance of his termination of the Franchise Agreement; (3) not have not been subject to discipline under company rules while affiliated with AEFA; (4) have returned, within five days of his termination notice, all original client files and AEFA proprietary materials (as defined by the Franchise Agreement) to AEFA; and (5) have refrained from sending notification of his termination to clients, or soliciting or assisting AEFA clients to transfer assets to another broker/dealer prior to the effective date of his termination. *Id.*

Moreover, the Addendum provides that, in the event that AEFA has a reasonable basis for concluding that Gendreau failed to comply its requirements, the AEFA is entitled "to a forty-five (45) day injunction which enforces fully the terms of the Franchise Agreement including the Restrictive Covenant" and to a "[p]reliminary [i]njunction from a court of competent jurisdiction for fifteen (15) days, pending a decision on the merits by an NASD arbitration panel . . . ." *Id.*

### 3.    Gendreau's Termination

On October 8, 2004, Gendreau acted unilaterally to terminate his affiliation with AEFA. On that date, he registered with the NASD as an affiliate of NFP. Both parties stipulate that Gendreau did not inform AEFA of his termination decision and new affiliation. Gendreau also admits that he "violat[ed] the Franchise Agreement [and Addendum] by failure to provide two weeks advance notice" of his decision to leave AEFA. Gendreau Answer and Counterclaim, 2(a)(iv).[4]

On October 15, 2004, AEFA Field Vice President John Henehan learned of Gendreau's departure from AEFA the previous week. Henehan acquired this information from AEFA Field Risk Mitigation Director Erika D'Atri. Neither Henehan nor AEFA Group Vice President Patrick O'Connell received notice from Gendreau, either orally or in writing. On the same day, Henehan left a message on Gendreau's answering machine, requesting to arrange a time to collect AEFA client files and other AEFA confidential material in Gendreau's possession.

---

[4] Gendreau posits that AEFA may have become aware of his separation from the company on October 12, when he placed a call to Keith Bixby, his Compliance Supervisor at AEFA, requesting cancellation of "an automated bank debit" that was established to compensate Mr. Bixby for his services as Compliance Supervisor. However, he does not claim to have made the phone call to Bixby with the intention of communicating his resignation, nor does he aver that Bixby knew of his resignation during or after their phone conversation. *See* Gendreau Answer and Counterclaim, 2(a)(iv).

On October 18, Gendreau faxed AEFA a copy of a termination notice at the request of Martha Kondel, an employee in the AEFA risk mitigation department. Two days later, Henehan made an unannounced visit to Gendreau's office. Up to that point, Henehan had still not received a written copy of Gendreau's resignation, but understood that a copy had been delivered to AEFA's home office in Minneapolis, Minnesota. At their encounter in Gendreau's office, Henehan urged Gendreau to return AEFA's confidential client information and proprietary documents, such as company manuals, and requested that Gendreau cease using AEFA telephone and facsimile numbers.[5] He also asked that Gendreau remove the AEFA sign outside of his office.[6] Finally, Henehan asked to inspect Gendreau's computer to ensure that all AEFA software had been removed.

Gendreau refused all of Henehan's requests, and stated that he would not return any client files or confidential proprietary information to AEFA without a court order to do so.

AEFA contends that Gendreau had been in communication with certain clients in order to solicit them to leave AEFA before providing notice of his intent to terminate, and that he has continued to solicit business away from AEFA to the present day in violation of the Franchise Agreement. Gendreau admits that, since his termination decision, he has solicited clients to leave AEFA, and continues, to this day, in his efforts to convince AEFA's clients to transfer their assets

---

[5] Gendreau states that he has changed the message on his answering machine, but continues to use the phone and facsimile numbers assigned to him during his tenure with AEFA.

[6] As noted above, AEFA stipulated at the hearing that the present signage at the building comports with the contract to its satisfaction.

to NFP.[7]

## Analysis

In determining whether a preliminary injunction should issue, this court must consider (1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm to the plaintiff if the injunction is denied; (3) the balance of relevant impositions, that is, the hardship to the non-moving party if enjoined as contrasted with the hardship to the moving party if no injunction issues; and (4) the effect, if any, of the court's ruling on the public interest. *See Black Tea Society v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004). "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Services, Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002); *see Black Tea Society*, 378 F.3d at 15 (affirming the moving party's likelihood of success on the merits and addressing the remaining three prongs of the preliminary injunction test "[i]n the interest of completeness"). A district court's decision to grant a preliminary injunction is reviewed for abuse of discretion. *See Ross-Simons of Warwick, Inc. v. Baccarat*, 102 F.3d 12, 16 (1st Cir. 1996).

### 1.    Likelihood of Success on the Merits

#### a.    Choice of Law

---

[7] Gendreau states that his "[c]lients are well aware of my transition strategy, my recent affiliation with [NFP], and for those whom I have met, the personal and financial implications that are involved as they decide what level of continuing service they may prefer, and what costs may be involved for those assets that are considered for transfer. While I solicit my clients as an Independent Advisor to discuss the benefits of my new affiliation, they are especially aware of these changes as they sign new applications transferring their assets to NFP Securities Inc., their new broker/dealer of record." Gendreau Answer and Counterclaim, 2(c). Further, he states that he has discussed his thoughts on AEFA's shortcomings with his clients, and believes that some will remain loyal to AEFA, while others will transfer some, or all, of their account value from AEFA to NFP. Gendreau Answer and Counterclaim, 7(g)-(h).

In order to ascertain the likelihood of AEFA's success on the merits of its claim that Gendreau breached the contract, it is necessary first to establish which state's law governs the court's interpretation of the relevant contractual provisions. Because the court's jurisdiction over the current action is premised on diversity of citizenship, the court must apply the choice of law rules of Massachusetts, the forum state. *Dykes v. Deputy, Inc.*, 140 F.3d 31, 39 (1st Cir. 1998).

Section 26 of the Franchise Agreement between Gendreau and AEFA provides that its terms shall be "interpreted and construed exclusively under the laws of the State of Minnesota." Massachusetts courts uphold the choice of law provisions of contracting parties "'as long as the result is not contrary to [Massachusetts] public policy and as long as the designated state has some substantial relationship to the contract.'" *Id.* (quoting *Steranko v. Inforex, Inc.*, 5 Mass. App. Ct. 253 (Mass. App. Ct. 1977). Thus, the court will apply Minnesota law to the present action, provided that (1) such application is consonant with Massachusetts public policy, and (2) Minnesota has a substantial relationship to the Franchise Agreement and Addendum.

As to the first requirement, Minnesota and Massachusetts courts enforce restrictive covenants, such as the non-solicitation and confidentiality covenants at issue here, under appropriate circumstances. *See American Express Financial Advisors Inc., v. Walker*, 1998 WL 754620, *5 (Mass. Super. 1998) (noting that "there are no substantive differences between Minnesota and Massachusetts law with respect to non-compete and confidentiality covenants," and therefore citing decisions from both jurisdictions in reaching a holding). Under Minnesota law, restrictive covenants concerning employment termination are "looked upon with disfavor, cautiously considered, and carefully scrutinized." *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 361 (Minn. 1988) (quoting *Bennet v. Storz Broadcasting Co.*, 270 Minn. 525, 533 (1965)).

11

Nonetheless, Minnesota courts, like their Massachusetts counterparts, enforce restrictive covenants if they are reasonably necessary to protect a legitimate business interest of the employer, are reasonable in scope and duration, and are not injurious to the public.  *See id.*; *Walker Employment Service, Inc. v. Parkhurst*, 300 Minn. 264, 270-271 (1974); *Boulanger v. Dunkin' Donuts Inc.*, 2004 Mass. Lexis 663, *8-*9 (2004)  ("A covenant not to compete is enforceable only if it is necessary to protect a legitimate business interest [of the employer], reasonably limited in time and space, and consonant with the public interest"); *see also, e.g., Novelty Bias Binding Co. v. Shevrin*, 342 Mass. 714, 716 (1961).

Minnesota and Massachusetts courts view retention of customer goodwill, protection of trade secrets, and protection of confidential business records and data as legitimate business interests of the employer.  *See Boulanger*, 2004 Mass. Lexis at *14 ("Legitimate business interests include protection of trade secrets, confidential information, and good will"); *Parkhurst*, 300 Minn. at 272 (upholding covenant which protected employer's confidential relationships with its customers); *Overholt Crop Insurance Service Co., Inc., v. Bredeson*, 437 N.W.2d 698, 703 (Minn. App. Ct. 1989) ("courts uphold [restrictive] covenants when they are designed to protect the employer against the deflection of trade or customers by the employee"); *Cherne Industrial, Inc. v. Grounds & Associates, Inc.* 278 N.W.2d 81, 89, 94 (Minn. 1979) (upholding an injunction to prevent use of employer's confidential data and trade secret data by former employee, because provisions of the restrictive covenant aimed to protect the employer's legitimate business interest).  Therefore, application of Minnesota legal doctrine on restrictive covenants to the present matter would not offend Massachusetts public policy.

As to the second requirement, AEFA has a principal place of business in Minneapolis,

12

Minnesota.  In addition, the evidence indicates that, throughout his ten-year affiliation with

AEFA, Gendreau received extensive training and support from the AEFA corporate headquarters

in Minnesota, and, on more than one occasion, attended intensive two-week training sessions in

Minnesota.  Henehan Affidavit, ¶ 5.  Gendreau also had numerous telephone and computer

contacts with the Minnesota office.  *Id.* at ¶ 8.

Based on these facts, the court concludes that Minnesota bears a substantial relationship

to the contracts at issue.  *See Dykes*, 140 F.3d at 39 (applying parties' contractual choice of law

and finding that the state selected by the parties bore a substantial relationship to the contract for

the sole reason that one party was headquartered in the state).  Accordingly, the court will honor

the parties' choice of Minnesota law.

### b.    The Breach of Contract Claim

Under Minnesota law, a restrictive covenant in connection with employment termination is

enforceable if (1) it was executed in exchange for consideration and (2) it is reasonably designed,

both in scope and duration, to protect a legitimate business interest.  *Webb Publishing Company*

*v. Fosshage*, 426 N.W.2d 445, 449-450 (Minn. App. Ct. 1988).

### (1)    Consideration for the Restriction

As to the first requirement, when a restrictive covenant is executed at the inception of the

employment relationship, no independent consideration is necessary to support the agreement.

*Overholt*, 437 N.W.2d at 702; *see Davies & Davies Agency, Inc. v. Davies*, 298 N.W.2d 127,

130-131 (Minn. 1980).  By contrast, restrictive contracts entered into subsequent to the initial

employment contract require independent consideration.  *Overholt*, 437 N.W.3d at 702.  Here,

the two contracts were entered into at the point where Gendreau was changing his status from an

independent contractor to a franchisee; he was not an employee who was forced to accept a contract of adhesion as a condition of continued employment.

In any event, there was more than sufficient independent consideration for the two contracts, in the form of the economic and professional benefits of becoming a franchisee. "Economic and professional benefits are sufficient consideration to support subsequent non-competition agreements." *Id.* at 703; *see Boulanger,* 2004 Mass. Lexis at *12-*13 (franchisee received consideration under the restrictive covenant in the form of the right to use the company's confidential information and trademarks and to receive profits from his franchise, long-term contracts of association with the franchise, and protection from competition from former franchisees).

Here, Gendreau claims that the agreements were not supported by consideration, because the AEFA failed to offer "significant services to [its] Independent Advisors," and therefore failed to live up to the "branding image" it conveyed in recital B of the Franchise Agreement. Gendreau may sincerely believe that the services provided by AEFA to its Independent Advisors and customers did not match the company's representations in recital B. Nonetheless, the contracts were plainly supported by consideration in the form of the benefits attendant to establishing and operating an AEFA franchise. Gendreau's subsequent displeasure with aspects of his relationship with AEFA does not negate the presence of consideration at the time he executed the Franchise Agreement and Addendum.

     **(2)    Reasonable Design and Legitimate Business Interest**

As to the second requirement, the court must balance the employer's interest in protection from unfair competition with the employee's right to earn a livelihood. *Kallok*, 573 N.W.2d at

361.  If the employer's interest predominates, the agreement is valid and enforceable.  *Id.*  The

need to protect trade secrets and other confidential business information and to retain goodwill

are legitimate business interests for purposes of restrictive covenants.  *Parkhurst*, 300 Minn. at

272; *Overholt,* 437 N.W.2d at 703; *Cherne*, 278 N.W.2d at 89, 94.  *Alside, Inc. v. Larson*

involved a restrictive covenant preventing a departing employee from using his employer's trade

secrets, customer lists, and other confidential information pertaining to its business in future

employment.[8]  300 Minn. 285, 288-289 (1974). The court granted the employer an injunction to

prevent the former employee from imparting this information to a competitor, and concluded that

the covenant reasonably balanced the employer's legitimate interests and the right of the employee

to earn a livelihood.  *Id.* at 296.; *see also American Express*, 1998 WL at *11-*12 (ordering

AEFA's former financial advisors to return to all AEFA materials in their possession, except

materials concerning their existing clients, to AEFA within ten days, and enjoining the financial

advisors from using AEFA confidential information in connection with any business in

competition with AEFA for one year).

　　　In contrast to confidential business information, a readily definable concept, "[g]oodwill

encompasses a variety of intangible business attributes that tend to enable a business to retain its

customers."  *See American Express*, 1998 WL 754620 at *5.  As one court has put it, "[s]tripped

to its core, when American Express states that it wishes to preserve its goodwill, it means that it

wants to prevent its clients (and their investments) from leaving American Express with their

---

[8] The confidential information which the employee had access to included customer reference lists, prospects lists, monthly customer purchase records, sales commission reports, sales analysis reports, promotional contest sales reports, speciality sales contest commission reports, accounts receivable listings, sales and inventory reports, trade inquiry reports, and information on sales methods and promotional programs.  *Id.* at 289-290.

financial advisors . . . ."  *See id.*  Goodwill is viewed as belonging to the employer, rather than to employees or affiliates, because the employer facilitates the introduction of clients to its affiliates and enables its affiliates to cultivate direct relationships with clients.  *See Alside*, 300 Minn. at 296; *Ikon Office Solutions v. Belanger*, 59 F. Supp. 2d 125, 128 (D. Mass. 1999) (A legitimate business interest for purposes of a restrictive covenant is "goodwill belonging to the employer, if the employer introduced the client to the salesman or the salesman cultivated his relationship with the client while employed by the employer").  The closer an employee's contacts are with customers and the greater access he has to business secrets and confidential information, the greater the risk that he will harm the employer's goodwill and reputation upon his separation from the company.  *See Alside*, 300 Minn. at 296 (If a non-solicitation covenant is "ever enforceable," it is where the employee was "not only trained in the business operations of the [company] but had a unique and intimate relationship with its customers throughout a number of years," and now admits to "tr[ying] to transfer the goodwill that he had built up while working for" the company); *Oxford Global Resources, Inc. v. Guerriero*, 2003 U.S. Dist. Lexis 23503, *33 (D. Mass. 2003) ("damage measures would not fully capture goodwill, which is not just lost sales, but lost reputation"); *Belanger*, 59 F. Supp. at 128.

In *American Express*, AEFA brought a motion for a preliminary injunction to enforce provisions of a restrictive covenant against former employees.  1998 WL at *1.  The provisions at issue in the case were substantially similar to those AEFA seeks to enforce in the case at bar, including the Minnesota choice of law provision.  *See id.* at *2-*3.  As in the instant action, AEFA sought to bar the former employees from soliciting the business of American Express clients for a period of one year.  However, unlike in the present action, AEFA also sought to

16

enforce a one year blanket prohibition on all business dealings between its former financial advisors and AEFA clients, regardless of whether the client or the financial advisor initiated those dealings. *Id.*[9]

The court deemed it "reasonable for American Express to attempt to protect its goodwill and confidential information regarding . . . clients" through a restrictive covenant. *Id.* at *8. It explained that AEFA had a reasonable business interest in convincing their customers to associate goodwill with AEFA products and services, rather than with the former employee. *Id.* Accordingly, some period of time of non-competition was necessary to permit AEFA to replace the departing financial advisor, and allow the replacement to establish rapport with clients. *Id.* The court determined that a one-year prohibition on solicitation was reasonable, and enjoined the former employees from enticing business away from AEFA for one year. *Id.*; *see also Alside*, 300 Minn. at 296; *Overholt*, 437 N.W.2d at 703 (subject matter of non-competition agreement was reasonable where the provisions prevented contact by former employees with the company's existing policyholders).

However, the *American Express* court also considered the countervailing interests of clients, who wished to continue doing business with AEFA's former financial advisors, and of the departing financial advisors, who needed to earn a livelihood. 1998 WL at *10. In light of these competing interests, the court shortened the one-year ban on all business dealings with AEFA's clients to four months, and refused to force the financial advisors to relinquish existing clients who had followed them from AEFA. *Id.*

---

[9] AEFA states that it "not requesting that the Court prevent its clients from voluntarily leaving AEFA, or that [Gendreau] be prevented from servicing those clients who have already left AEFA as those issues will be addressed by the NASD arbitration." Preliminary Injunction Memorandum, p. 13, n.6.

In addition to advancing a legitimate business purpose, restrictive covenants must be reasonably tailored, in terms of length and scope, to achieve that purpose. *See, e.g., Overholt*, 437 N.W.2d at 703. Geographic limitations, which cover the areas in which the employee actually worked for the employer, are enforceable. *See id.*, 437 N.W.2d at 703; *Alside,* 300 Minn. at 288-289, 296. Minnesota courts uphold geographic restrictions where they are limited to the territory necessary to protect the employer's business interest. *See id.*; *Compare Davies*, 298 N.W.2d at 131 (covenant reasonably prohibited competition with employer in employer's principal business area) *with Klick v. Crosstown State Bank of Ham Lake, Inc.*, 372 N.W.2d 85, 88 (Minn. App. Ct. 1988) (non-competition covenant was unreasonable because it barred former employees from doing business outside of employer's reasonable trade area).

The test employed by Minnesota courts to evaluate the reasonableness of a temporal restriction takes into account the nature of the former employee's work, the time necessary for the employer to train a new employee, and the time necessary for the customers to become familiar with the new employee. *See id.*; *American Express*, 1998 WL at *8. In *Overholt*, the court noted that the former employee had received extensive training at the company seeking to enforce a restrictive covenant. 437 N.W.2d at 703. Moreover, the former employee had developed strong relationships with the company's customers during his five-year tenure with the company. *Id.* at 704. Based on this evidence the court found a two-year ban on direct competition reasonable. *Id.* Time constraints of one to two years have been routinely upheld under Minnesota law. *See id.*; *Fosshage*, 426 N.W.2d at 450 (eighteen- month prohibition on solicitation of company's clients found reasonable); *Cherne*, 278 N.W.2d at 85 (two-year prohibition on rendering services to company's former or prospective customers found

18

reasonable); *Parkhurst*, 300 Minn. at 272 (one-year prohibition on employment with competitors found reasonable).

The restrictions on solicitation in section 19 of the Franchise Agreement are reasonably designed under the circumstances.[10]  AEFA trained and supported Gendreau during his ten-year affiliation with the company, and Gendreau developed strong ties to AEFA clients in his capacity as a financial advisor.  Henehan Affidavit, ¶¶ 12-13.  The prohibition on solicitation affords AEFA time to hire a replacement for Gendreau and allows that replacement to cultivate a relationship with clients formerly serviced by Gendreau.  It gives the company an opportunity to reinforce the association between its services and goodwill in the minds of its customers.

Moreover, the non-solicitation covenant in section 19 did not unduly interfere with Gendreau's ability to earn a livelihood upon separation from AEFA or with customers' ability to receive financial planning from a financial advisor of their choice.  Significantly, the Addendum gave Gendreau the option to avoid the constraints of section 19 in exchange for compliance with the Addendum's conditions, which consisted of little more than providing AEFA notice and assisting in an orderly transition.  In the event that Gendreau chose not to comply with those conditions, he was still permitted, under the Franchise Agreement, to deal with AEFA clients at

---

[10] Gendreau attempts to rebut the legitimacy of the non-solicitation covenant by arguing that client goodwill belongs to him, rather than to AEFA.  He states that "[i]t has been the sole accountability of the Independent Advisor, who has assumed all the responsibilities, due diligence, and expenses for managing a successful business, and who has attracted meaningful relationships with clients that bear little relation to the presence of AEFA other than as a place where their investments are held in custody."  Gendreau Answer and Counterclaim, 7(g).  This argument, although somewhat compelling, is contrary to case law.  Minnesota and Massachusetts courts have held that goodwill is the property of the employer and that the employer may attempt to preserve it through restrictive covenants.  Employers may also attempt to prove to clients that goodwill originates with the company, rather than the former employee or affiliate, through enforcement of restrictive covenants.  *See Alside*, 300 Minn. at 296; *Ikon Office Solutions v. Belanger*, 59 F. Supp. 2d 125, 128 (D. Mass. 1999) (A legitimate business interest for purposes of a restrictive covenant is "good will belonging to the employer, if the employer introduced the client to the salesman or the salesman cultivated his relationship with the client while employed by the employer").

the clients' initiative and to solicit any client other than those serviced by AEFA.  Thus, the non-solicitation covenant strikes an fair balance between AEFA's legitimate business need to preserve goodwill, the right of Gendreau to earn a livelihood, and the right of customers to freely select financial planning services.

The non-solicitation covenant is also reasonably designed, in terms of scope and duration, to protect AEFA's goodwill.  It covers only the territory in which Gendreau worked while affiliated with AEFA and expires after one year.  One year affords AEFA a reasonable amount of time to replace Gendreau and allow his replacement to cultivate a rapport with its clients.

Likewise, the restrictive covenants contained in the Franchise Agreement and Addendum advance the legitimate business goals of preserving AEFA's confidential business information and goodwill following the departure of a company affiliate.  AEFA seeks to protect its confidential information by mandating the immediate return of confidential client records and proprietary business information.  The purpose of the solicitation prohibition in section 19 is preservation of goodwill, which encompasses client retention and protection of AEFA's reputation.  Similarly, provisions of section 18, barring former employees from using AEFA signage, phone numbers, and other paraphernalia, foster client retention, because they prevent former financial advisors from creating a false impression that they are still affiliated with AEFA.  Accordingly, the business objectives advanced by the restrictive covenants are entirely legitimate.

### (3)    Evidence of Breach of Contract by Gendreau

The evidence overwhelmingly indicates that Gendreau has breached the provisions of the Franchise Agreement pertaining to AEFA's confidential information, and that he shows no inclination to comply with these provisions.  He admits to possessing client files and data, and

does not deny AEFA's charges that he retains other confidential business information as well as access to AEFA computer software. Thus, he is in breach of his obligation under section 18 of the Franchise Agreement to "deliver to AEFA the Manuals and all other original records, including most recent financial plans and recommendations, computer databases and files, correspondence, and instructions containing confidential information relating to the System . . . the originals of all Client records, including records containing Client lists and/or information and transactions belonging to AEFA . . ." In addition, Gendreau's continued use of telephone and facsimile numbers assigned to him during his tenure with AEFA violates section 18 of the Franchise Agreement.

Gendreau is also bound by the non-solicitation provision in section 19 of the Franchise Agreement. He does not qualify for exemption from this provision because he failed to comply with several conditions for exemption set forth in the Addendum; among other things, he freely admits that he did not provide notice two weeks in advance of his resignation or return all original client files within five days of his termination notice.

Gendreau has clearly breached his duties under section 19 of the Franchise Agreement. He openly acknowledges that he has solicited the clients he serviced while affiliated with AEFA since he joined NFP, and indicates that he intends to continue to discuss the benefits of transferring assets from AEFA to NFP with AEFA's clients.

The restrictive covenants contained in the Franchise Agreement are reasonably tailored to protect AEFA's legitimate business interests in its confidential information and goodwill. The evidence indicates that Gendreau breached these covenants, and intends to continue to flout their dictates. Thus, there is a strong likelihood that AEFA will succeed on the merits of its breach of

contract claim.

### (4)    Claimed Evidence of Breach of Contract by AEFA

Gendreau attempts to escape the consequences of his breach by arguing that AEFA "nullified" the restrictive covenants in the Franchise Agreement and Addendum by materially breaching duties it owed to him under those agreements.  Specifically, he contends that the company contravened recital B of the Franchise Agreement by failing to provide (1) distinctive products and services, (2) advertising and promotional programs, (3) local marketing initiatives, and (4) the technology necessary for superior customer service.  As evidence, he submits documentation showing that the company consistently denied his requests to sell products not offered by AEFA and rejected his suggestions for advertising initiatives.  Further, he introduces evidence of his complaints to AEFA over its technology and computer systems.

If AEFA did, in fact, materially breach the Franchise Agreement, such a breach would serve as a basis for releasing Gendreau from the restrictive covenants and denying the company's motion for preliminary injunctive relief.  *See, e.g., National Overall Dry Cleaning Company v. Yavner*, 321 Mass. 434, 440 (1947) ("an employer seeking the aid of a court of equity to enforce a provision of an agreement which restricts the employee's freedom of employment must show performance himself of the contract"); *New England Canteen Service, Inc. v. Ashley*, 372 Mass. 671, 676 (1977) ("even if we were to assume a business interest subject to protection [under the restrictive covenant], a finding of material breach, if warranted, would serve as a basis to deny injunctive relief" to the employer); *Overholt*, 437 N.W.2d at 704 (considering, and ultimately rejecting, the employee's argument that he was released from a restrictive covenant due to his

employer's breach of contract).  However, Gendreau's argument that AEFA failed to perform under the Franchise Agreement is unavailing.

The recitals, which he cites to support this claim, precede, and are clearly segregated from, the provisions of the contract that impose binding obligations on the parties.  They appear in the introductory portion of the Franchise Agreement, and describe the AEFA "System" and the purpose of the relationship between AEFA and its independent financial advisors.  Because the recitals are "precatory rather than mandatory in character," they do not impose duties or create rights under the contract.  *See Milliken v. Town of Littleton*, 361 Mass. 576, 580 (1972); *see also, e.g., Youngers v. Schafer*, 196 Minn. 147, 153 (1936); *W.H. Barber Co. v. McNamara-Vivant Contracting Co., Inc.*, 293 N.W.2d 351, 356 (1979).

Moreover, even assuming *arguendo* that the recitals are binding, Gendreau's complaint is not that AEFA failed, altogether, to provide products and services, advertising, or computer systems and software.  Rather, his grievance arises from the fact that the company did not accommodate his requests and suggestions concerning the sale of certain products and services and certain marketing opportunities, and employed inferior information systems and technology. However, the Franchise Agreement unmistakably endows AEFA with sole discretion over which products and services franchisees may offer, what advertising and marketing campaigns the company will launch, and what technology will be made available to its financial advisors.  Indeed, it is the franchisee, and not AEFA, who has obligations with respect to advertising, products and services, and computer technology.  The Franchise Agreement imposes duties on franchisees to sell products offered by AEFA or its affiliates, unless they receive AEFA authorization to sell another product, to receive AEFA permission before engaging in advertising, and to acquire the

computer system and software designated by AEFA.  Language which binds the employee, rather than the employer, and affords discretionary power to the latter, cannot form the basis for the employee's claim that the employer failed to perform under the contract.  *See Overholt*, 439 N.W.2d at 704.

Although Gendreau may have expressed legitimate grievances about AEFA products and services, advertising, and technology, nothing in the Franchise Agreement or Addendum required AEFA to accede to his every demand concerning these matters.  Because AEFA did not breach its own contractual obligations, Gendreau is not excused from abiding by the restrictive covenants. Thus, there is a strong likelihood that AEFA will succeed on the merits of its breach of contract claim.[11]

## 2.    <u>Immediate Irreparable Harm</u>

In order for the court to issue a preliminary injunction, AEFA must also demonstrate that it will suffer immediate irreparable harm if preliminary injunctive relief is not issued.  This requires a showing that monetary remedies available at law will not adequately compensate AEFA, and that equitable injunctive relief is necessary to forestall irreparable harm to the company.  *North Central Public Service Company v. Village of Circle Pines*, 302 Minn. 53, 60 (1974).

An "inherent threat of irreparable injury may be inferred from the breach of an otherwise valid and enforceable restrictive covenant [not to compete or not to disclose trade secrets], sufficient to invoke at least temporary equitable relief."  *Cherne*, 278 N.W.2d at 92 (quoting *Eutectic Welding Alloys Corp. v. West*, 281 Minn. 13, 16 n.4 (1968)); *see Thermorama Inc. v.*

---

[11] Because the court finds that there is a substantial likelihood of success on the breach of contract claim, and because that claim is broad enough to encompass all of the alleged immediate irreparable harm, the court does not reach the merits of the remaining counts of the complaint.

*Buckwold,* 267 Minn. 551, 552-553 (1964); *Creative Communications Consultants v. Gaylord,* 403 N.W.2d 654, 657 (Minn. App. Ct. 1987) (irreparable harm found based on disclosure of confidential information); *American Express,* 1998 WL at \*10 ("The loss of goodwill by its nature is difficult to measure, as are the money damages resulting from the loss of clients").

Here, as set forth above, the restrictive covenants contained in the Franchise Agreement are valid and enforceable.  In addition, there is more than a mere allegation that Gendreau has breached the covenants: Gendreau admits to retaining client records, soliciting AEFA clients, and using AEFA phone and facsimile numbers identical to those he used while affiliated with AEFA. Irreparable harm to the employer can be inferred from a former employee's admission that has breached provisions of a restrictive covenant.  *See Cherne*, 278 N.W.2d at 92.

Further, there is uncontroverted evidence in the record indicating that Gendreau continues to possess AEFA's confidential business information, such as company manuals containing company methods, procedures, and techniques, and retains access to AEFA computer programs and software.  Henehan Affidavit, ¶ 24.  Injuries sustained by AEFA, stemming from Gendreau's appropriation of its confidential business information and client records and from the loss of clients due to Gendreau's solicitation and use of AEFA phone and facsimile numbers, are, by their nature, difficult to measure in monetary terms.  *See American Express*, 1998 WL at \*10; *Gaylord*, 403 N.W.2d at 657.

Finally, Gendreau specifically acknowledged in section 19 of the Franchise Agreement, and in the Addendum, that his failure to comply with the non-solicitation covenant would cause irreparable harm to AEFA and entitle the company to preliminary injunctive relief.  Henehan Affidavit, Exhibits A, B.  Gendreau openly admits that he has solicited clients of AEFA, and has

failed to comply with other material terms of the contract. Thus, AEFA has demonstrated that it is at risk of irreparable harm, absent a preliminary injunction to enforce the restrictive covenants and maintain the status quo.

**3.      Balance of the Equities**

The third prerequisite for preliminary injunctive relief is a showing by AEFA that the hardship it will endure without injunctive relief outweighs the hardship Gendreau will incur if an injunction issues. As set forth above, AEFA will suffer substantial harm if Gendreau is permitted to retain the company's confidential client records and business information and to continue to solicit AEFA clients. As for the harm to Gendreau, the requested injunction will not subject him to any obligations beyond those he expressly agreed to undertake in exchange for the benefits of operating an AEFA franchise. Moreover, the injunction would not bar him from working at his chosen profession, or indeed from servicing his existing clients or from taking on AEFA clients who independently seek out his business. Finally, Gendreau will not have to wait for a protracted period of time before this matter is resolved on the merits. Upon entry of injunctive relief, the NASD Code of Arbitration Procedure requires the NASD to commence a hearing, within fifteen days, to address AEFA's contractual claims and to determine the need for ongoing injunctive relief. Thus, because the balance of harms tilts in its direction, AEFA has met the third requirement for the issuance of preliminary injunctive relief.

**4.      Public Interest**

The principal public interest at stake in this matter is the protection of the rights of the financial planning clients of Gendreau and AEFA. Gendreau represented, and AEFA does not presently dispute, that Gendreau was responsible for approximately 180 client groups at AEFA,

and that about one-third of those clients (measured in terms of assets) have already followed him to NFP and transferred their assets to from AEFA.[12]  Gendreau also represented that he has appointments scheduled with other clients to try to convince them to leave AEFA and come with him.   Presumably, some substantial percentage of the clients are individuals, and their investments represent some substantial percentage of their net wealth.

All of these clients, whether they have left AEFA or stayed behind, are entitled to receive financial planning services from financial advisors of their choosing and to freely transfer investments and assets between financial advisors as their preferences may dictate.  This court is reluctant to impose any order, notwithstanding the terms of the contract, that may interfere with the legitimate desires of the clients to receive financial planning services from persons or organizations of their choosing, or that might interfere with their investment decisions.

Accordingly, based on the record before it, the court will not force Gendreau to relinquish his existing clients or obstruct AEFA clients from transferring their business to Gendreau on their own initiative.  Issuance of a preliminary injunction under these circumstances comports with the overriding public interest in permitting individuals to select their own financial planning advisors.  The court will therefore attempt to preserve the status quo, while simultaneously preventing Gendreau from further solicitations of AEFA clients pending a decision on the merits (or the passage of one year, whichever comes first).

That outcome is at least somewhat troubling, however, for it permits Gendreau to reap much of the benefit of his breach of contract.  It should be noted, therefore, that AEFA may

---

[12] AEFA represented at the hearing that regulatory and privacy requirements dictated that clients dictate in writing their intentions to transfer from AEFA to a different financial planner. The preliminary injunction order will take into account that necessity to have written confirmation of a transfer.

ultimately be entitled to money damages arising out of the solicitation of such clients, and that other equitable relief in favor of AEFA may well be appropriate after development of a full factual record.

### Conclusion

For the reasons set forth in this Memorandum, the court finds that preliminary injunctive relief in favor of AEFA is warranted.  The Preliminary Injunction Order shall be set forth in an Appendix to this Memorandum.

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: November 10, 2004